**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| PHILIPPE Y. LOIZON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) |
| vs. | ) |
| | ) |
| HONORABLE TIMOTHY C. EVANS, CHIEF | ) |
| JUDGE OF THE CIRCUIT COURT OF COOK | ) |
| COUNTY, ILLINOIS, in his Official capacity | ) |
| directing the COOK COUNTY ADULT | ) |
| PROBATION DEPARTMENT, and | ) |
| THE OFFICE OF THE CHIEF JUDGE OF | ) |
| THE CIRCUIT COURT OF COOK COUNTY | ) |
| ILLINOIS, | ) |
| | ) |
| Defendants. | ) |

## TABLE OF CONTENTS TO COMPLAINT

PRELIMINARY STATEMENT ................................................................1

JURISDICTION AND VENUE ...............................................................5

PARTIES ................................................................6

FACTS IN SUPPORT OF CLAIMS ................................................................6

Loizon's Employment History with the APD................................................................6

P.O.s Express their Concerns about Problems within the APD...................................................18

APD's Relationships with Law Enforcement Agencies .................................................19

Loizon's Efforts to Improve APD Policies are Ignored by Evans.................................................25

Loizon's Effort to Institute Practices to Better Monitor P.O.'s Performance is Quashed ............26

Evans Conducts a Clandestine Meeting with African American P.O.s, only................................28

The APD Becomes the Subject of Media Attention with the Publication of Articles

Containing False Allegations about Loizon................................................................29

Evans Issues a Press Release Announcing an Investigation into Allegations Contained

in the *Tribune* Article and Places Loizon on "Desk Duty"...............................................36

Loizon Complains about Unfair Treatment and Unlawful Employment Practices ......................38

APD Belatedly Issues Contradictory Policies on the Subject of Informants................................39

Despite his Continuing Satisfactory Job Performance, Evans Terminates Loizon's Employment..................................................................................................................................40

Evans Wrongfully Terminates Loizon's Employment for Pretextual Reasons ............................45

Disparate Treatment of Loizon in Comparison to African American APD Officers ....................50

COUNT I - VIOLATION OF TITLE VII – DISCRIMINATION .................................................56

COUNT II -VIOLATION OF TITLE VII - RETALIATION ........................................................58

COUNT III - VIOLATION OF FAIR LABOR STANDARDS ACT............................................60

COUNT IV - VIOLATION OF ILLINOIS WAGE PAYMENT AND COLLECTION ACT .....62

COUNT V - VIOLATION OF ILLINOIS MINIMUM WAGE LAW ..........................................62

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| PHILIPPE Y. LOIZON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) |
| vs. | ) |
| | ) |
| HONORABLE TIMOTHY C. EVANS, CHIEF | ) |
| JUDGE OF THE CIRCUIT COURT OF COOK | ) |
| COUNTY, ILLINOIS, in his Official capacity | ) |
| directing the COOK COUNTY ADULT | ) |
| PROBATION DEPARTMENT, and | ) |
| THE OFFICE OF THE CHIEF JUDGE OF | ) |
| THE CIRCUIT COURT OF COOK COUNTY | ) |
| ILLINOIS, | ) |
| | ) |
| Defendants. | ) |

<u>**COMPLAINT**</u>

NOW COMES the Plaintiff, PHILIPPE Y. LOIZON ("Loizon"), by and through his attorneys, Friedman Maguire & Carey, P.C., and for his Complaint against Defendants, HONORABLE TIMOTHY C. EVANS, in his OFFICIAL CAPACITY OF THE CHIEF JUDGE OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS ("Evans"), and THE OFFICE OF THE CHIEF JUDGE OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS ("OCJ") states as follows:

<u>**PRELIMINARY STATEMENT**</u>

The Illinois Supreme Court through its administrative arm, the Administrative Office of Illinois Courts ("AOIC"), has ultimate responsibility for the Office of the Chief Judge of the Circuit Court of Cook County's management and supervision of the Cook County Adult Probation Department ("APD"). The Cook County Board, via the statutory framework created for funding

the operation of the APD, is responsible for advancing the operation of funds required for the OCJ's and APD's operations. For many years, the Justices of the Illinois Supreme Court, executive members of the AOIC staff and the President and Commissioners of the Cook County Board have known of the OCJ's failure to address the many management and operational deficiencies and dysfunctionalities of the APD that are described in this complaint. Despite such knowledge, they nevertheless have allowed the mismanagement of the APD to continue unabated. The reasons for the Illinois Supreme Court's inaction and failure to exercise its authority to take the necessary steps to establish effective and accountable leadership and control of the APD by the OCJ are not clear. What is obvious, however, is that decades of the Supreme Court's and AOIC's inaction and neglect have undermined the APD's ability to carry out its stated mission and, in the process, the interest of public safety. Philippe Loizon dedicated nearly 30 years of his life to effectively serve the mission of the APD; supporting probationers to become law abiding and contributing members of society, while effectively monitoring probationers' behavior in an effort to reduce, if not avoid, repeated criminal conduct. As this complaint alleges, Evans and the OCJ wrongfully terminated Loizon's employment with the APD. Unless and until the Illinois Supreme Court, AOIC and Cook County Board take the actions necessary to address the OCJ's mismanagement and neglect, the deficiencies and dysfunctionalities of the APD described in this complaint will continue and the public's interest in effective rehabilitation and the reduction in violent crime will not be realized.

Loizon joined the APD in November 1988 as a Probation Officer ("P.O.") in the Caseload Unit. Thereafter, he earned a reputation as a tireless, able and effective P.O., receiving a number of commendations for his work from persons within and outside of the OCJ and APD. Loizon was promoted to the position of Supervisor of the Caseload division located at the criminal court house at 26th and California, effective March, 1997. He was promoted again in 2003, to the position of

Deputy Chief of the Caseload, Home Confinement, Gang Intervention ("GIU") and Intensive Drug Probation ("IDP") Units of the APD. By 2009, Loizon's proven management skills resulted in the added assignment of the Sex Offender Unit. Loizon supervised all of these APD Units, in addition to continuing to supervise APD staff located in the 6 court districts: 2650 S. California, Skokie, Rolling Meadows, Bridgeview, Maywood, and Markham.

Loizon's experience in supervising these units provided him with a unique insight into a number of serious deficiencies in the management and operation of the APD. In the period of 2009 - 2010, Loizon participated in meetings with other Deputy Chiefs and supervisors to develop policy proposals intended to address a variety of dysfunctionalities within the APD. Those dysfunctionalities included, but were not limited to, rampant nepotism in hiring and the reluctance of white Deputies and Supervisors to recommend and impose appropriate discipline or, in many instances, any discipline at all against African American employees for failure to competently perform their duties, violations of APD policies and procedures, insubordinate conduct, false claims about other employees and superiors, and a variety of other patently improper actions.

Loizon and other supervisors also developed policy proposals intended to address the absence of clear APD policies on such key issues as permissible searches, taking probationers into custody, working with probationers who become informants of law enforcement agencies such as the Chicago Police Department ("CPD") and Federal Bureau of Investigation ("FBI"), and the coordination and participation of APD P.O.s with other law enforcement agencies. They prepared and submitted a written proposal of proposed policy changes to the then Acting Probation Chief, Jesus Reyes ("Reyes"), and the OCJ in or about 2010. However, neither Evans nor Reyes ever responded to those proposals nor did they respond to policy proposals that Loizon personally submitted to them thereafter.

3

Despite a clean personnel record and consistent outstanding performance evaluations through 2016, Evans directed that Loizon be taken off the streets and ordered to "desk duty" in May, 2014, following the publication of a *Chicago Tribune* ("*Tribune*") article critical of the APD and the conduct of officers in the weapons units that Loizon supervised. The article contained false claims of misconduct by Loizon and other APD P.O.s, based primarily on information provided to the reporters by convicted felons. On the same day as the publication of the *Tribune* article, Evans issued a press release. The release announced that Evans had hired the law firm of Laner Muchin to investigate the alleged misconduct described in the *Tribune* article. Evans' press release stated that the law firm would be issuing a report on its findings to Evans within 60 days and that Loizon had been placed on desk duty pending issuance of the report.

Evans subsequently received the Laner Muchin report, but did not disclose its findings to Loizon, to the Chief P.O., Lavone Haywood ("Haywood"), or to anyone else in the APD. Despite the fact that Loizon had presented the Laner Muchin investigators with a list of witnesses who could exonerate him of the false allegations made in the *Tribune* article, most, if not all of those witnesses were never interviewed in the course of the investigation. Loizon remained on desk duty for more than two years. He filed repeated grievances about his treatment with the APD and OCJ that were ignored. Loizon remained on desk duty until June, 2016, when he took extended leave, using some of the 3,674 hours of comp time he had accrued from 2003 into 2015.

On May 19, 2017, Evans directed Haywood to execute a letter prepared by the OCJ at Evans' direction, notifying Loizon that his employment with the APD was being terminated, effective immediately. The termination letter was written not long after the publication of a *Tribune* article that was critical of the high number of Loizons' accrued compensatory ("comp") hours – all of which had been approved as legitimately earned by the APD's Chief P.O. and

4

confirmed by the Human Resources Director. Evans' termination letter contained vague, general allegations of misconduct, unsupported by any facts. Haywood knew that the allegations of Loizon's misconduct were not true and purely pretextual, but he signed the letter because he had been so instructed by Evans.

Contrary to the treatment afforded to minority supervisors and employees within the APD, Loizon was terminated without prior notice, without any witnesses, facts or other evidence being presented to support the vague assertions of misconduct contained in Evans' termination letter. Loizon was denied the opportunity to present witnesses and documents in defense of Evans' bogus charges. And, unlike other APD employees whose accrued, unpaid comp time was paid, Loizon's demands for payment of his comp time, both before and after the termination of his employment, were ignored.

On April 1, 2016, shortly before taking extended leave, Loizon attended a meeting with Haywood, Assistant Chief Matthew Sobieski ("Sobieski"), and members of Evan's staff. At that meeting, Loizon was assured by the attendees from the APD and OCJ that there would be no attempt to impose any discipline against him before interviewing a specific list of witnesses that Loizon identified and who had direct, personal knowledge of matters that would confirm that any claims of Loizon's misconduct were baseless. Notwithstanding this assurance, Evans and the OCJ proceeded to terminate Loizon's employment on May 19, 2017, without interviewing any of the witnesses that Loizon had identified at the April 1, 2016 meeting.

## JURISDICTION AND VENUE

1.      Plaintiff alleges violations of his civil rights pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"), and pursuant to 42 U.S.C. §§ 1981 and 1983.

5

2.      This Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1343, 42 U.S.C. §2000e-5(f), 42 U.S.C. §§ 1981 and 1983 and 29 U.S.C. 201, et seq.

3.      Venue is proper under 28 U.S.C. § 1391(b) because the events giving rise to this claim occurred in this judicial district and plaintiff and defendant reside in this District.

4.      Pursuant to 28 U.S.C. § 1367, this Honorable Court has supplemental jurisdiction over Loizon's state law wage claims.

## PARTIES

5.      Loizon is at all relevant times hereinafter mentioned a resident of the City of Channahon in the County of Grundy, and a citizen of the State of Illinois and of the United States of America.

6.      Defendant Evans, at all times since his election in 2001, has been the Chief Judge of the Circuit Court of Cook County whose duties include overall responsibility for the management and operation of the APD and the OCJ.

7.      Defendant OCJ, which is headed by Evans, is the administrative arm of the Circuit Court of Cook County, Illinois. The OCJ contains various internal departments and offices, including the APD.  At all relevant times the OCJ was Loizon's employer, with ultimate control over his hiring and firing, conditions of his employment, and oversight of the management and operation of the APD.

## FACTS IN SUPPORT OF CLAIMS

**Loizon's Employment History with the APD**

8.      On November 14, 1988, Loizon signed an acknowledgement confirming his employment with the APD as a P.O.

6

9.      On December 29, 1988, Loizon received his first assignment to the APD's Caseload Unit, Division 6, and was later assigned to Division 5. The term "division" within the APD refers to a group of employees to which a supervisor is assigned to manage.

10.     Probation supervision is a sentencing option in which probationers are required to comply with specific court-ordered conditions of supervision while residing in the community. Through guidance, surveillance, and referrals to service providers, P.O.s assist probationers to comply with their sentences. When probationers fail to comply, they are either subject to administrative sanctions imposed by the P.O. or they are brought back to court for a violation of probation hearing. Standard probation involves different levels of supervision and utilizes numerous conditions and intermediate sanctions to hold probationers accountable and to provide them with opportunities to make positive changes in their lives. Approximately 88 percent of probationers in the APD are sentenced to standard probation as opposed to specialized or intensive probation.

11.     Basic conditions of standard probation include the following:

- reporting to a P.O.;
- allowing a P.O. to make home visits;
- refraining from further criminal activity;
- not possessing a weapon;
- not leaving the state without permission from the court; and
- refraining from the use, possession and sale of illegal drugs.

12.     In addition to these basic conditions, most probationers are subject to a combination of special conditions tailored to their unique circumstances. Commonly used special conditions include the following:

- victim restitution;
- community service;
- costs;
- fines;
- fees;

7

- drug testing;
- drug treatment;
- home confinement/curfews;
- mental health counseling; and
- educational programs.

13. In 1990 Loizon was transferred to Markham Courthouse as a Caseload Officer.

14. On or about February 24, 1991, Loizon received a medal of distinction for his dedication and services to the APD.

15. On or about August 13, 1991, Loizon was transferred from Division 5 to Division 4 where he was assigned to Judge Wasilewski's courtroom in Markham under the supervision of O. Holton.

16. On December 30, 1996, Loizon was notified by Martin that he had been selected for a promotion to the position of Supervisor and on April 21, 1997, Loizon was sworn in as Supervisor for the APD.

17. On or about November 15, 1999, Loizon was assigned to the Home Confinement Unit, with his office located at 1644 West Walnut Street, Chicago, Illinois 60612 (the "Walnut Facility").

18. The Home Confinement Unit monitors probationers and pretrial defendants who have been ordered by the court to serve a period of home detention and/or abide by a curfew or who have been ordered to GPS monitoring under Public Act 95-0773 (also known as the Cindy Bischoff Law) and Public Act 98-1012. Radio frequency (RF) electronic monitoring equipment is used to assist in monitoring home detention/curfew cases, and GPS technology is used to monitor those monitored under Public Acts 95-0773 and 98-1012.

19. Allowing individuals to serve their pretrial time or sentences at home, instead of in jail or prison, has several advantages:

- the social and economic costs of incarceration are avoided;
- individuals are held accountable; and
- individuals receive more opportunities to obtain or continue employment and to attend treatment/education programs that support rehabilitation.

20.     Those being monitored with RF electronic monitoring equipment include individuals who have been convicted of, or who are awaiting trial for, a variety of felony charges including, but not limited to, drug-related charges, sex offenses, DUI, battery, weapons charges, and theft. Those being monitored with GPS are individuals charged with an offense against an intimate partner (e.g., violation of an order of protection, domestic battery, aggravated domestic battery, stalking). These individuals are ordered to wear a GPS tracking device to help monitor compliance with orders to stay away from the complaining witness, the complaining witness' home/workplace, or any other protected address specified on the order of protection.

21.     On September 11, 2000, Loizon received an evaluation from Supervisor Bob Grogan for his work in the Home Confinement Unit during the rating period of January 1, 2000 through August 31, 2000, with a rating of "highly meets expectations."  Further stated is the following:

> Phil Loizon is paid the same salary as a Monday through Friday Field supervisor. However, he works the mid-night shift.  He had been responsible for the maintenance and security of the Walnut facility during his watch.  The major area of this supervisor's responsibility is night surveillance.  This supervisor also must own a weapon and attend training for same, as well as be tested yearly for proficiency and once a year for re-qualification.  This supervisor also submitted to random urine testing.  He has to schedule field activities, radios, phones, and vehicle usage.  This supervisor's hours vary from day-to-day, in the office or in the field.  He works nights, midnights, weekends, early morning, and has 24 hours on call responsibilities.   In emergencies he has to back-up other field service supervisors/Deputy Chiefs.  On days when we have no security after 10:00 p.m., Phil has provided security for the Walnut facility.  He is always on alert to the possibility of theft of both personal and department property, as well as physical harm to employees and clients.  **My action plan for Phil is to continue the excellent work that he has been doing.**

(Emphasis Added).

9

22.     On or about January 11, 2003, Loizon received an evaluation from Supervisor Gruca for the rating period of January 1, 2002 through December 31, 2002 with a rating of "exceeds expectations."

23.     On or about June 16, 2003, Loizon was promoted to the position of Deputy Chief.

24.     As Deputy Chief P.O., Loizon was responsible for the following:

   a.   Schedule and monitor three levels of staff.

   b.   Oversee operations of the division.

   c.   Maintain a working knowledge of and enforcing Department policy and procedure, as well as the terms of four collective-bargaining agreements.

   d.   Review and evaluate staff performance. Identifying stats training needs providing training, guidance, counseling, and, if needed, identifying, recommending and delivering correction action to staff for deficient or delinquent performance and/or policy and procedure in fractions.

   e.   Work to maintain employee relations.

   f.   Undertake activities to achieve employee and program development.

   g.   Complete fieldwork.

   h.   Organize, conduct and or participate in staff, divisional, Department Managers and department meetings.

   i.   Audit department records, assisting in ensuring that ACA accreditation standards are maintained.

   j.   Create, interpret in maintain various divisional statistics.

   k.   Develop, review, and enforce policy and procedures, preparing reports and conducting internal investigations.

   l.   Interface with the judiciary, other outside personnel/citizens, and offenders as needed.

   m.  Make staffing recommendations and placement.

n.   Undertake activities to ensure that the division and or assigned location(s) receive required supplies and identifying areas that require maintenance.

o.   Serve on committees in interface with other agencies and the judiciary.

p.   Be actively involved with policymaking.

q.   Work closely with all the directors in the department to address department issues.

r.   Conduct investigations and recommend the issuance of employee discipline as needed.

s.   Conduct grievance meetings and prepare written responses.

t.   Monitor vendor/service contracts.

u.   Perform all other miscellaneous duties as assigned.

25.    As Deputy Chief Loizon was assigned responsibility for overseeing several of the department's armed officers unit, including the GIU, Sex Offenders Unit, IDP Unit, and Home Confinement Unit.  All of these units are subject to weekly reporting requirements that vary from one contact each week for IDP probationers to five contacts each week for IPS probationers.

26.    The GIU provides intensive supervision as well as educational and treatment services for probationers who are gang members. P.O.s in the unit receive intensive gang awareness training and perform extensive fieldwork and surveillance. Much of their supervision strategy involves working with family members and strengthening the probationers' ties to prosocial relationships and activities. Officers also work closely with the CPD. An interagency agreement with CPD, which calls for the sharing of information on probationers supervised in the unit, enables police officers to assist in the monitoring of probation conditions, including curfews, and increases both departments' awareness of gang activity. In addition to the standard conditions of probation, the following special conditions are mandatory for all probationers sentenced to the program:

11

- Increased reporting
- Frequent field visits
- Random drug testing
- 130 hours of community service (unless the probationer is a full-time student in an academic or vocational program)
- Curfews
- Enrollment in a high school or GED program (if the probationer does not have a high school degree)

27.     The Sex Offender Unit works to hold probationers accountable, reduce reoffending, and improve the lives of victims. The program targets individuals who have committed felony sexual offenses against adolescents or children who are family members. Long-term treatment, close collaboration with carefully selected service agencies, and rigorous court-imposed conditions are key components of the program. This combination of elements is necessary in order to change the attitudes and behaviors of this high-risk and highly manipulative group of probationers. Sex offending is a complex and serious social problem. Its impact on victims can be devastating and can last a lifetime. Offenders who victimize children present numerous challenges to P.O.s. Perpetrators can be extremely deceptive about the risk they actually pose because they are skilled at manipulating others and at denying and minimizing their behavior. Moreover, they tend to be more outwardly cooperative than other probationers, further masking the risk they present. To meet these challenges, P.O.s in the unit are extensively trained in sex offender issues, and work closely with treatment providers to monitor probationers' compliance with the program's numerous conditions. Individuals in the program receive quality treatment that includes assessment, polygraph analysis, and group/individual therapy that utilizes cognitive behavioral therapy and relapse prevention techniques. Funds from the department's Probation Services Fees Budget are used to defray the costs of treatment, making treatment accessible to those who could not otherwise afford it.

28.     In addition to the standard conditions of probation, probationers in the Sex Offender program are subject to the following special conditions:

- increased office reporting;
- field visits;
- curfews;
- searches of home and computer;
- drug testing;
- restrictions against residing/loitering near day care centers, schools, playgrounds, or any place used primarily by minors;
- restrictions against possessing any pornographic or sexual materials; and
- compliance with the Illinois Sex Offender Registration Act.

29.     The Intensive Probation Supervision Program (IPS) was established in 1984 as a program for high-risk probationers convicted of serious felony offenses. The program balances strict surveillance with intervention strategies aimed at the unique risks and needs of each case. Probationers sentenced to IPS are required to comply with rigorous conditions that include frequent reporting, curfews, drug testing, community service, and any other special conditions deemed appropriate by the court. P.O.s work in pairs with reduced caseloads. Guidelines for IPS have been established by the AOIC. These guidelines require the department to conduct eligibility screenings on cases recommended for IPS. This process includes conducting a social history investigation, reviewing the conditions of IPS with the defendant, obtaining a full criminal history and making a field visit to the defendant's residence to discuss the program with family members and/or other individuals living with the defendant. Defendants are generally deemed appropriate for IPS if they indicate they are aware of and willing to comply with the conditions, are being sentenced for a probationable offense, and are residing within the county. Once a case is accepted, an IPS officer meets again with the probationer to develop a supervision strategy that addresses court mandates and other issues identified through a risks and needs assessment. After successfully completing 12 months of IPS, probationers serve the remainder of their sentences on standard

probation.

30.     IDP uses intensive supervision, drug testing, and referrals to drug treatment to change long-term habits of high-risk drug addicted probationers. The unit recognizes that to change someone's behavior, addiction to drugs and alcohol must be addressed first. It is not uncommon for some individuals who are supervised in the unit to have gone their entire adult lives under the influence of drugs and/or alcohol. To be eligible for the program, individuals must have substance use disorders. P.O.s in the unit have experience and specialized training enabling them to work effectively with addicted individuals, who in addition to substance use disorders usually have a number of associated problems. In addition to standard conditions of probation those in IDP must attend substance use disorder treatment, report more frequently, and submit to random drug testing. Upon successful completion of 12 months of IDP, probationers are transferred to standard caseload for the duration of their sentences.

31.     At one point, Loizon personally supervised approximately three times more employees than any other Deputy Chief in the APD.

32.     At any given time Loizon was responsible for the oversight of approximately 125 P.O.s, including eight or nine supervisors, covering 7,000 probationers participating in the APD's supervision program throughout Cook County.

33.     Loizon was given the "Chief's Award" for the best run unit on two occasions, the only time such an award was made by the APD.

34.     On or about February 10, 2005, Loizon received an evaluation from his Supervisor, Quinn, for the rating period of January 1, 2004 through December 31, 2004 with a rating of "Exceeds Expectations."  This evaluation was signed by Loizon's supervisor Quinn and then Chief P.O., Veronica Ballard.  Further comments stated are as follows:

14

Deputy Chief Loizon has worked hard to establish the Gang Intervention Unit as a credible and viable sentencing option for the court. **He meets regularly with judges and assisted with the implementation of a working agreement with the U.S. Marshal's Office**. He also worked with the Home Confinement staff to create shifts that allow for maximum coverage. The Home Confinement unit remains shorthanded and Deputy Chief Loizon has worked various shifts to address the unit's needs without cancelling shifts. He works evenings, weekends and night shifts so staff can attend training and use accrued time. The caseload totals for the Gang Intervention unit increased substantially thus three additional officers were added. **Deputy Chief Loizon has established strong rapport with the judiciary, states attorney's office and helped establish a memorandum of understanding with the U.S. Marshal's office**.

(Emphasis added).

35.     In 2005, Loizon assumed all caseloads at the Walnut facility as a result of Deputy Chief Lisle's transfer to another assignment. In addition to the Walnut Street Facility caseloads, Loizon was assigned the Harrison and Kedzie Probation Department, Grand and Central Probation Department, Belmont and Western Probation Department and Northwest Settlement Probation Department. These facilities are typically maintained by no less than three Deputy Chiefs. Loizon managed the above mentioned facilities alone.

36.     In 2006, in addition to the assignments contained in the paragraph next above, Loizon was assigned the additional responsibilities of the IPS Unit, IDP Unit and the GIU when then Deputy Chief Haywood was transferred to Maywood. Loizon was the only Deputy Chief assigned to these additional Units.

37.     In 2006, Loizon received an evaluation from his Supervisor, Quinn, for the period of January 1, 2005 through December 31, 2005 with a rating of "Exceeds Expectations." This evaluation was signed by Loizon's supervisor and Reyes. The evaluation stated, in part:

Deputy Chief Loizon's previous experience in Home Confinement enables him to provide solutions to issues that arise. He is also very knowledgeable in the responsibilities of Gang Intervention unit staff and works in the field with both units. **Deputy Chief Loizon meets regularly with the judiciary, attorneys, police agencies and service providers**. He also conducted training for IPCSA

15

**and provided an overview of the Gang Intervention unit to suburban police agencies**. Deputy Chief Loizon has been instrumental to the success of the Gang Intervention unit. **He continues to meet with staff and outside agencies regarding the program.** He has also maintained the unit telephone and receives calls from police agencies through the night regarding clients in violation. He works in the field and has often left his home at night to provide assistance to staff. He has also conducted field work with Home Confinement staff and completed follow up reports to address issues that arose. He worked well with staff in Rolling Meadows and although he was not on site at all times he talked with staff on a daily basis. He also took time to work in Saturday bond court with a pretrial officer at this facility. Mr. Loizon also addressed all concerns and violations of policy and procedure in a thorough timely manner.

(Emphasis added).

38.     On October 16, 2006, Loizon complained in writing to then Acting Chief Reyes concerning a severe supervisor shortage in the field service units. Among other things, Loizon was concerned that the shortage of supervisors was resulting in a failure to do the mandated home confinement checks of probationers. Loizon had only two supervisors when nine supervisors were needed. Loizon advised Reyes that the lack of supervisory coverage was preventing the APD from adhering to court mandates and posed a threat to community safety. Neither Reyes nor any other APD or OCJ representative responded to Loizon's complaint.

39.     On numerous occasions, Loizon provided written requests to his superiors, including Reyes and Evans, regarding Loizon's concerns about deficiencies within the APD including, but not limited to, the need for additional manpower, the need for new policies and procedures and clarification of existing policies and procedures, as well as the need for holding officers accountable. These request were repeatedly disregarded.

40.     Ultimately, Reyes instructed then Assistant Chief of Probation, Haywood, to instruct Loizon to cease putting into writing any further communications to Reyes and the OCJ regarding Loizon's concerns about deficiencies in the APD's management and operation.

41.     On February 14, 2007, Loizon received an evaluation from his Supervisor, Quinn,

for the rating period of January 1, 2006 through December 31, 2006 with a rating of "Exceeds

Expectations."  This evaluation was signed by Quinn and Reyes and stated, in part:

> Deputy Chief Loizon has worked diligently to make sure coverage is provided for
> field service staff.  He constantly adjusts his schedule address the needs of the unit.
> **He continues to maintain a strong relationship with members of the States
> Attorney's office and Chicago Police Department** along with monitoring and
> responding to telephone calls for the Gang Intervention unit clients.  He has
> addressed issues within the unit in a timely manner and staff are fully aware of
> expectations.

(Emphasis added).

42.     On October 14, 2008, Catharine O'Daniel, an attorney representing a probationer,

sent a letter to Evans commending Loizon for his professionalism, dedication and true sense of

service in his supervision of her client.

43.     In 2009 Loizon was assigned to oversee the Sex Offender Unit in addition to the

other assignments referred to in paragraphs 35 and 36 above.

44.     On February 23, 2009, Loizon received an evaluation from his Supervisor, Quinn,

for the rating period of January 1, 2008 through December 9, 2008 with a rating of "Exceeds

Expectations."   This evaluation was signed by Quinn and Reyes.   Among other things, it

commended Loizon for his work in maintaining a strong relationship between the APD and CPD.

The evaluation stated, in part:

> Deputy Chief Loizon has worked to make sure coverage is provided in the field
> service units.  He has adjusted his schedule to address the needs of the unit.  In July
> of 2008, an additional deputy chief was assigned to the field service unit.  Deputy
> Chief Loizon works closely with the new deputy chief to ensure field coverage was
> provided and reviewed the operations of the units.  He has conducted curfew checks
> with members of the IPS, Home Confinement and Gang Units along with the
> recently promoted supervisor assigned to the unit.  **He continues to maintain a
> strong relationship with members of the States Attorney's office and the
> Chicago Police Department** along with monitoring and responding to telephone
> calls for the gang intervention unit clients.  He has addressed issues within the unit

17

and staff are fully aware of expectations. He responded to field incidents in a timely manner in particular the Dickerson incident involving an officer assigned to the gang intervention unit.

(Emphasis added).

**P.O.s Express their Concerns about Problems within the APD**

45.     On December 10, 2010, an article written by Lee Williams was published by the Illinois Policy Institute entitled "A Public Menace" that discussed a variety of problems within the APD. The article referenced a convicted sex offender on probation, who had raped a 13-year old child in her bedroom after he was not present at his residence for 41 curfew checks made by the assigned P.O.s responsible to confirm his compliance with the curfew terms of his probation order. Although missing 41 curfew checks was a clear probation violation, the P.O. took no official action to violate the probationer back to jail. Reyes, then Acting Chief of the APD, admitted that the APD "dropped the ball" with its monitoring of this probationer.

46.     On December 31, 2010, after meeting with a number of APD P.O.s concerned about various problems within the APD, Lee Williams published another article with the Illinois Policy Institute. The article, entitled "Cook County Probation Officers Propose Policy Solutions," referenced the following problems identified by APD P.O.s:

> The department should test new job applicants, conduct oral interviews, create an eligibility list and hire according to merit, the officers say a process already in place for decades at most law enforcement agencies. Currently, there is no such practice within the probation department. Prospective employees are usually evaluated according to their clout, after completing only a written application and submitting letters of recommendation. As a result, the officers say **the department has become an employment agency, and a dumping ground for political hires.**

> Supervisors say they can't supervise. They receive little or no support from management, **especially if recommending discipline to an employee of another race**. **The employee's ability to equate discipline with harassment, supervisors say, so often impedes management that some have given up. This practice would end if management would support their disciplinary decisions, they say**. Similarly, although all of the officers that met with the Institute were union members, they say their unions are out of control. They

blame their own unions for the departments [sic] inability to rid itself of staff who are not qualified or capable of doing their job. The supervisors said current collective bargaining agreements have rendered them unable to remove an officer for cause, regardless of the seriousness of the offense.

When an offender who is not in custody violates his probation, a warrant is issued for his arrest. There are thousands of them. Who, the officers asked, is responsible for serving these warrants and taking probationers back into custody? No one. A poorly written policy states it is the responsibility of the Cook County Sheriff to serve probation warrants. However, the Cook County Sheriff's Department has thousands of active warrants of its own. Probation warrants, the officers say, often go unnoticed. The offenders are free to roam the streets. They're arrested only if they happen to be contacted by a law enforcement agency, which runs their name through a computer and sees the active warrant. The Cook County Probation Department should create its own warrant unit and clean up the backlog decade-old warrants. Many of these wanted offenders, the officers say, are only caught after the reoffend and victimize someone else.

There is little accountability within the Cook County Adult Probation department, unless word of a problem weeks out. The officers who met with the Institute came armed with horror stories: a caseload officer who interviews a client who reeks of marijuana but takes no action, and officer who documents that they have conducted curfew checks throughout the city even though they never left the building, a sex offender who is only checked once or twice a month even though the court has ordered daily checks, or a specialized unit that is armed and assigned to conduct field work, even though it's officers were early leave the building. Members of this unit, the officer say, which hasn't made an arrest in more than a decade, all receive five-percent more pay. The officer say a total shift in culture is needed a new way of thinking. To shift to this culture to accountability, the department must institute new policies and new standard and meet out discipline if their violated.

In the mid-1990s, the department hired a probation consultant and gave him complete access to its facilities and staff, and free reign to investigate its practices. The consultant had decades of experience with the Pennsylvania Department of Corrections. His report, which cost thousands of taxpayer dollars, was chock-full of valid suggestions, time-prove remedies and sound policies. None were adopted. Instead, the report was shelved. The officers hope another consultant could be retained, and that this time any valid suggestions become adopted.

(Emphasis added).

## APD's Relationships with Law Enforcement Agencies

47.     On December 29, 2010, Robert D. Grant, Special Agent in Charge, and Matthew

R. Alcoke, Acting Supervisory Special Agent of the Chicago field office of the FBI sent a letter to

then Assistant Chief P.O. Haywood. In the letter, the FBI agents referenced a recent conversation

19

between Alcoke and Haywood related to a relationship between the FBI's gang/violent crime intelligence unit and the APD "in combating gang violence" in the larger Chicago-area law enforcement community. The letter referenced such relationships between the FBI and local probation departments in San Diego, Albuquerque, Delaware, New Hampshire, Buffalo, Los Angeles, Louisiana, Harrisburg, PA., Modesto, CA, and Utah. In the letter, Alcoke also described the approach taken in those other communities that he and Haywood had discussed for application in Chicago, i.e., "that probationers, particularly those with known and/or admitted gang ties, are in a unique position to see a benefit from cooperating with law enforcement and providing valuable intelligence about gang and/or about specific violent crimes which would otherwise be difficult for law enforcement to obtain. The FBI's executive management in Chicago wholly supports the idea of establishing this invaluable liaison here."

48. On July 21, 2011, the FBI sent a letter to then Deputy Chief Sobieski thanking him for the assistance provided by the APD in connection with the FBI's arrest of an individual at the APD's Walnut Facility.

49. In September, 2011, Robert S. Mueller, III, then Director of the FBI, sent a letter that recognized Loizon "for [his] outstanding cooperation and assistance in connection with an investigation of great importance. The FBI's ability to carry out its investigative responsibilities to the American People has been greatly enhanced through your help, and you can be very proud of your valuable contributions to the success achieved." The referenced investigation related to a sex trafficking ring involving young girls for which the APD provided information leading to a key arrest.

50. In January, 2013 the FBI issued a commendation concerning Loizon and the APD's interagency cooperation that stated, in part, "In recognition of your outstanding assistance to the

20

FBI in connection with its investigative efforts. **Your Cooperation was of immeasurable help to our representatives. I share their gratitude for your support, which assisted them in carrying out their responsibilities. You can take pride in the role you played in the success achieved, and my associates and I congratulate you on a job well done."** (Emphasis added).

51.     On March 11, 2013 six-month old Jonylah Watkins was fatally shot while sitting on her father's lap as they sat parked in a minivan, an incident occurring in Chicago that garnered national press.

52.     On March 20, 2013 Evans and Reyes received a memo from Christopher Kennedy, Commander of the Gang Investigation Division with the CPD that stated the following:

> I would like to take this opportunity to express my deepest gratitude and appreciation to some of the exceptional Officers working in your administration. I am referring specifically to Probation Officers Robert Sepulveda #177, Probation Officer Mark Dovin #872, and Deputy Chief Probation Officer Philippe Loizon. I would also like to call your attention to a case where there assistance proved to be invaluable.
>
> Recently, Chicago Police Department Detectives, and Officers from the Gang Investigation Division were conducting a homicide investigation into the fatal shooting of a six month old baby. The innocent child, Jonylah Watkins was playing in her Father's arms as they were seated in the parked vehicle. Suddenly, a gunman emerged alongside the car, opened fire with a handgun, striking both Jonylah and her Father. Jonylah later succumbed to her injuries. Chicago Police launched an exhaustive search for her killer and soon developed the identity of a suspect. The case garnered national attention in the press.
>
> During the course of the investigation, Officers located a subject believed to have information regarding the homicide. This individual was also named as an offender in an unrelated domestic battery, and currently on probation. Upon interviewing the subject, it soon became apparent that he was unwilling to cooperate the investigation. Based on his arrest, and the apparent violation of his probation status, the Officers contacted the Adult Probation for assistance. P.O. Dovin, P.O. Sepulveda, and Deputy Chief Loizon immediately proceeded to the Area Central Detective Division, and began their investigating into the violation. As part of their duties, the Officers conducted a probation compliance check of the subject's residence. It was at this time that P.O. Dovin observed a key piece of evidence in the man's bedroom linking him to the vehicle used to flee the crime scene. Facing the possibility of serious charges, the individual went on to disclose his full

knowledge of the incident, and implicate the suspect in question. As a result, the offender was subsequently taken into custody, and charged with First Degree Murder, and Attempt First Degree Murder.

The dedication to duty, and professionalism displayed by Deputy Chief Probation Officer Phileppe [sic] Loizon, Probation Officer Robert Sepulveda, and Probation Officer Mark Dovin brought about the successful resolution to a difficult case. Their actions brought credit to your agency, and are to be commended for their exemplary work

It is my hope that we continue to enjoy an excellent working relationship with your agency, and that the citizens of Cook County continue to enjoy the safety, the freedom secured by the efforts of Officers such as these.

53.     On April, 2013, FBI agent Christopher G. Weismantle sent an email to then Acting

Chief P.O. Reyes, referring to the FBI Director's Award Presentation that was to be made that day

in the Chambers of Judge Evans at the Daley Center. The email confirmed that FBI Supervisory

Special Agent, Matthew Alcoke and Assistant Special Agent in Charge Thomas Trautmann, and

Chicago Division, Special Agent in Charge Cory B. Nelson would be in attendance for the

presentation of the Director's Award directly to Evans and others with letters of commendation to

be provided to other APD employees "who have been integral to our liaison efforts." The email

further stated,

> **As you know, the FBI/Chicago Police Department's (CPD) Task Forces and the Cook County Adult Probation (CCAP) Department have worked in concert since approximately 2007 in collaboration on various crime reduction efforts.** Since SSA Alcoke and Mr. Haywood formed a more integrated relationship between our entities in 2010, the value and volume of intelligence obtained through this relationship increased substantially. The tracking of concrete, statistical acomplishments [sic] made evident the importance of our collaboration. We value this partnership and wanted to recognize your organization as an integral member of the law enforcement community in striving for safer neighborhoods. I know that SSA Alcoke and myself have had several meetings and emails with Mr. Haywood over the years regarding our relationship, and this award specifically, so Mr. Haywood can certainly discuss with you more specific accomplishment/investigative activity associated with this award. We hope that today will be an opportunity for both

our entities to come together to discuss cementing this relationship for the future.

(Emphasis added).

54. The FBI Director's Award presentation took place in the Chambers of Judge Evans and was attended by Evans, Reyes, Haywood, Loizon and a number of other APD Deputy Chiefs and P.O.s. One of the FBI representatives read aloud a "recognition statement" that included in addition to the statements made in the email from Alcoke to Reyes referenced in the paragraph next above, the following comments:

> Since 2007, Chicago's Violent Crime and Criminal Enterprise Squads have worked closely with [APD] Senior Management, Supervisors, and Probation Officers, especially within both their Intensive Probation Supervision Program (IPS) and Gang Intervention Probation Program (GIPP). Among the benefits yielded from this relationship are the following:
>
> - [APD] personnel routinely contact Chicago [FBI office] with intelligence obtained from Probationers regarding crimes such as murder, aggravated battery (shooting), armed robbery, and weapon or illegal narcotic possession and trafficking. These violations are beneficial to active CE investigations targeting RICO predicates by gang members;
>
> - [APD] provides direct access to Probationers who freely speak to Chicago regarding gang hierarchies, wanted persons, victims and/or subjects of violent crime investigations, and locations of contraband or evidence of a crime (e.g.: location of murder weapon) and;
>
> - [APD] Probationers, especially those assigned to IPS or GIPP, regularly provide information to Chicago which is utilized to obtain court authorized search warrants targeting contraband held by Violent Crime/Criminal Enterprise subjects with significant criminal histories. Chicago's liaison with [APD] and CPD affords an opportunity for Chicago to also debrief subjects of these warrants and further VC/CE investigations."

55.     The recognition statement referenced several cases of "notable achievements" resulting directly from the liaison with the APD and referred to the relationship that was established between the FBI, CPD and APD in 2010, as follows:

> In late 2010, Chicago created FBI/CPD Violent Crime Squad 2 (VC-2) and began formalizing the working relationship between [APD] and Chicago. In return, [APD] found a willing intelligence partner in the FBI who provided an outlet for the volume of significant intelligence gleaned from field interviews with IPS/GIPP Probationers. Chicago became [APD's] "go-to" agency for actionable intelligence received from Probationers which greatly enhanced VC-2's mission in not only broadening the Humint [human intelligence] resources supporting existing CE cases, but it also resulted in statistical accomplishments credited to Chicago Task Forces and specialized CPD Enforcement Teams.

56.     The recognition statement concluded as follows:

> Chicago [FBI office] requests that [APD] be recognized for their significant efforts in partnering with the FBI to further our investigative efforts. As [APD] is overseen by Mr. Lavone Haywood, Mr. Jesus E. Reyes, and the Honorable Timothy C. Evans, Chicago requests that these individuals be duly recognized.

57.     On April 29, 2013, FBI special agents, Cory B. Nelson and Matthew R. Alcoke, sent a letter to Reyes stating, "I would like to recognize Loizon for his dedication and outstanding achievement in collaborative efforts to reduce crime in Cook County. I commend DC Loizon for his commitment to safeguarding the citizens of Cook County and working with the FBI and their law enforcement partners in their collective efforts."

58.     On June 11, 2013, Evans sent a letter to Loizon stating, "I was pleased to join you for the special presentation by the Federal Bureau of Investigation honoring Adult Probation Department staff recently held in the Daley Center. The Bureau's recognition of the critical and valuable contributions of probation officers in helping to keep communities in Cook County safe

is more than gratifying, and I salute and thank you for bringing distinction to our department. I enclose our group photograph taken that day as a personal memento of the occasion."

59. On or about July 12, 2013, Reyes recognized Loizon's dedication to his job and contributions to the department and stated, "I certainly count him among the most reliable and hard-working members of the department's management team."

**Loizon's Efforts to Improve APD Policies are Ignored by Evans**

60. On March 25, 2013, Loizon received an evaluation from Haywood for the rating period of January 1, 2012 through December 31, 2012, with a rating of "Exceeds Expectations." This evaluation, signed by Haywood and Acting Chief Reyes stated, in part:

> **D.C. Loizon consistently conducted case audits during the year on assigned supervisors and officers. As a result, caseload no contact dropped dramatically. Phil held staff accountable.** D.C. Loizon's attendance records were consistently reviewed and well maintained. **D.C. Loizon held weekly meetings with his supervisory staff and their assigned staff. Division productivity increased as a direct result of achieving established goals. D.C. Loizon is very conscious of staff shortages.** Throughout the year, he made his concerns known, both verbally and submitted written requests for additional staff. He did an excellent job of working with the staff he had. D.C. Loizon's division completed 100% of the required 2012 training. **He consistently worked with the training unit to provide additional training to staff needing skill enhancement.** D.C. Loizon consistently works well with the two collective bargaining units. He accomplishes results without creating friction. D.C. Loizon regularly meets with Judges, keeping them informed of department programs and urging them to utilize these programs. D.C. Loizon, on a monthly basis, inspects his divisional cubicles to ensure files, paperwork, and other confidential documents are sorted properly. **D.C. Loizon consistently takes the initiative in solving problems. He continuously looks for better ways to perform his job. D.C. Loizon's work throughout the year exceeded expectations. He consistently assists other managers and works with other agencies to improve the Adult Probation Department. D.C. Loizon consistently makes a substantial contribution to the department's operations. He willingly steps up when others will not**. D.C. Loizon has raised his skill level in dealing with difficult staff. He handles confrontation constructively. He continues to improve on conflicts with difficult staff.

(Emphasis added).

25

61.     On April 10, 2013, Loizon met with Evans at which time Loizon expressed concerns about deficiencies and dysfunctionalities within the APD, including ways in which the APD had "dropped the ball" and offered proposed solutions to Evans, who took notes throughout the meeting.

62.     Evans did not respond to the concerns and recommendations that Loizon brought to his attention at the April 10, 2013 meeting.

**Loizons' Effort to Institute Practices to Better Monitor P.O.s' Performance is Quashed**

63.     In July, 2013, Loizon attended an executive staff meeting of the APD that was attended by Acting Chief Reyes, Assistant Chiefs Haywood and Nicole Raymond, all Deputy Chiefs, the Director of APD Human Resources, Noreen Larson, and others.

64.     Prior to the July 2013 meeting, Loizon asked that a presentation he prepared, concerning use of the "60-day no contact list" in caseload management strategies, be added to the meeting agenda.  Loizon spoke to both Reyes and Assistant Chief Sobieski about what he intended to present at the meeting.  Both men were supportive of the idea.

65.     The 60-day no contact list allows supervisors to determine whether the P.O.s they supervise are meeting APD standards relative to the officers' contact with probationers.  The list contains information that shows a variety of information, such as the last time the P.O. entered information related to the probationer, whether it was a court hearing, phone call, or collateral contact (e.g., information provided by an employee of a treatment center about the probationer), and the last visit with the probationer.

66.     The caseload strategies that Loizon prepared to discuss at the executive staff meeting included how the supervisors could and should be using the 60-day no contact list as a

tool in the management of the P.O.s they supervised and the need to use the list regularly in supervising their P.O.s and monitoring the performance of their duties.

67.     At the executive staff meeting, Loizon passed out examples of the 60-day no contact list, associated record sheets and other information to show the attendees how the list could and should be used to manage and monitor P.O.s in the conduct of their job responsibilities.  Loizon provided the materials for demonstration purposes only, to show various examples of how the list could be used to identify P.O.s who were failing to perform their duties in conformity with APD policies and procedures. Some of the supervisors and probationers referenced in the handout materials who were falling short in the performance of their duties were under Raymond's supervision.

68.     After Loizon began his discussion of the handout materials at the executive staff meeting, Raymond asked Reyes to step outside the conference room where the meeting was taking place.  When they returned to the conference room, Reyes told Loizon to stop his presentation, immediately.  Reyes chastised Loizon about the presentation and instructed him to make sure all of the presentation materials were gathered and shredded.

69.     It is standard for minutes of every executive staff meeting to be prepared and circulated among all attendees and approved at the next executive staff meeting.  Following the executive staff at which Loizon attempted to make his presentation, however, no meeting minutes were circulated.

70.     Loizon made repeated attempts to obtain a copy of the meeting minutes from the meeting at which he attempted to make his presentation on use of the 60-day no contact list, but no minutes were ever provided to him.

71. On July 26, 2013, Loizon sent a memo to Reyes that summarized the events related to Loizon's aborted effort to make a presentation at the executive staff meeting on the 60-day no contact list and its use to improve supervisors' management of P.O.s assigned to them. Loizon noted in the memo that Reyes had chastised him for using documents to demonstrate problems within the APD and then insisted that Loizon shred the documents following the meeting.

72. On October 14, 2013, Loizon sent an email to the OCJ's Human Resources Administrator, Bruce Wisniewski, asserting that Loizon had been the subject of discriminatory and harassing conduct and had been retaliated against by then Assistant Chief Raymond, an African American, and Reyes.

73. Loizon did not receive a response to his October 14, 2013 email.

74. On December 11, 2013, Loizon sent an email to Wisniewski complaining about Reyes' abusive management practices, including disparaging and inflammatory remarks made by Reyes about Loizon and other managers in the APD.

75. Loizon did not receive a response to his December 11, 2013 email.

**Evans Conducts a Clandestine Meeting with African American P.O.s, only**

76. On or about November 17, 2013, Evans held a clandestine meeting with the African American APD P.O.s and staff, only, at a residence on the south side of Chicago. Caucasian officers of the APD were not invited to attend the meeting.

77. Among those present at the clandestine meeting with Evans were Connie Williams, Angela Falls, Darryl Gray, Valerie Sterling, Luther Rivers and April Mohn. Shortly after this secret meeting, Williams, Gray and Sterling were promoted to a Deputy Chief position and Mohn was promoted to Supervisor.

78.     Evans never conducted a meeting at which only Caucasian staff of the APD were invited to attend.

**The APD Becomes the Subject of Media Attention with the Publication of Articles Containing False Allegations about Loizon**

79.     On December 15, 2013, the *Tribune* published an article entitled "How Cook County lost track of hundreds of convicts." The article was highly critical of Reyes in his role as Acting Chief P.O. for the APD and described the APD as a dysfunctional department that falls short of its mission of holding offenders accountable and creating safer neighborhoods. The article noted that as of November 5, 2013, there were 1,361 probationers on the APD's 60- day list – a list of all those on probation who had not been seen by their P.O. for at least two months.

80.     On March 17, 2014, following the *Tribune* article that was critical of Reyes and the APD, Reyes was transferred to another department and received the title of Policy Consultant, with an annual salary in the range of $150,000.

81.     On information and belief, sometime in 2014, Reyes provided a letter written by P.O. Robert Sepulveda in 2004 or 2005, to *Tribune* reporter, Todd Lighty. The letter was based on false information provided to Sepulveda by convicted felon, Alajanadro Santoyo, concerning a 2003 curfew check of his residence at which Sepulveda was not present. Santoyo had been convicted of a gun charge. The terms of his probation prohibited him from possession of a fire arm, using drugs and associating with gang members. Loizon found cocaine at Santoyo's residence during the curfew check and when Santoyo's mother started to speak Spanish to her son, Loizon told her to stop and speak only in English. Despite Sepulveda's knowledge that it was standard practice not to allow conversations in a foreign language between persons during home curfew check, Sepulveda's letter accused Loizon of acting improperly by telling Santoyo's mother to shut up, stop speaking Spanish and only speak English.

29

82.     On May 21, 2014, the *Tribune* published an article titled "Warrantless Searches Draw Criticism," written by Cynthia Dizikes and Lighty.  The May 21, 2014 article contained numerous false and misleading statements in reference to Loizon and other APD officers, primarily based upon the assertions of convicted felons.

83.     The May 21, 2014 article falsely accused Loizon of engaging the following alleged misconduct:

i.      That Loizon built alliances with the police and FBI at time over his bosses objection;

ii.     That Acting Probation Chief Officer Reyes ordered Loizon to limit working with police and the FBI for fear those agencies were getting unfettered access to homes without obtaining court-ordered warrants;

iii.    That officers were not adequately trained and were running around with guns without having taken any courses in being a law enforcement officer;

iv.     That Loizon engaged in a "home invasion" of non-probationer, Kenny Ray, where probationer and Ray's nephew, Michael McGowan resided and a search was conducted by the CPD;

v.      That in September, 2003, the CPD's Special Operations Section "tagged along" while Loizon and other officers were conducting the curfew check of Santoyo, a gang member sentenced to probation for carrying a loaded gun.  Referring to the Sepulveda letter, the article referred to Loizon's conduct relative to telling Santoyo's mother to speak English instead of Spanish;

vi.     That Loizon had struck a probationer that was investigated by Chief Probation Officer Veronica Ballard in 2005 was stymied by "those in the chain of command;" and

vii.    That Loizon had an improper personal relationship with probationers Stanley Oden and Robert Jones; allegedly improperly allowing Oden to live with Loizon and his family, and taking Jones to White Sox games and failing to help Jones obtain employment.

84.     The allegations of misconduct by Loizon contained in the article of May 21, 2014 were not true.

85.     Any and all alliances between the APD and other law enforcement agencies that Loizon had any involvement with were known and approved by his superiors including Evans, Acting Chief P.O. Reyes, Assistant Chief and then Chief P.O. Haywood, Chief Veronica Ballard, as reflected by the facts alleged at paragraphs 44, 47-59 above and paragraph 89 below.

86.     In addition, the APD's policy on establishment of the GIU, effective November 14, 2005 states, in part," The GIU shall work in collaboration with community agencies and law enforcement to reduce gang related violence."

87.     The APD's website that describes the GIU's activities also confirms the close working relationship with the CPD:

> The Gang Intervention Unit provides intensive supervision as well as educational and treatment services for probationers who are gang members. Probation officers in the unit receive intensive gang awareness training and perform extensive fieldwork and surveillance. Much of their supervision strategy involves working with family members and strengthening the probationers' ties to prosocial relationships and activities. **Officers also work closely with the Chicago Police Department. An interagency agreement with CPD, which calls for the sharing of information on probationers supervised in the unit, enables police officers to assist in the monitoring of probation conditions, including curfews, and increases both departments' awareness of gang activity.**
>
> In addition to the standard conditions of probation, the following special conditions are mandatory for all probationers sentenced to the program:
> • Increased reporting
> • Frequent field visits
> • Random drug testing
> • 130 hours of community service (unless the probationer is a full-time student in an academic or vocational program)
> • Curfews
> • Enrollment in a high school or GED program (if the probationer does not have a high school degree)

(Emphasis added).

31

88.     At no time did Reyes order Loizon to limit working with the police and/or the FBI for fear those agencies were getting unfettered access to homes without obtaining court-ordered warrants.

89.     In fact, Reyes accompanied Loizon and other officers on a curfew check that involved the search of the probationer's residence and Reyes was fully aware of and approved joint operations with other law enforcement agencies, including the CPD, FBI, Cook County Sheriff, U.S. Marshals and the APD.

90.     Contrary to Judge Hooks' assertions cited in the *Tribune* article, all weapons units P.O.s received 40 hour gun training and had to requalify every year; and P.O.s assigned to the GIU attended and completed training at the Chicago Police Academy.

91.     Loizon did not conduct illegal searches of probationer's homes.  In fact, on various occasions, including in February, 2014, Loizon specifically prohibited P.O.s from conducting a search of a probationer's home because it would have been illegal.

92.     There was no "home invasion" of Kenny Ray.  Loizon was present at the curfew check of probationer, McGowan, in a supervisory capacity.  McGowan resided in the home that was owned by Ray's sister and where Ray also lived and had gun possession and a drug conviction for marijuana on his record.

93.     The curfew check at the home where McGowan resided was conducted by two P.O.s, Melvin Dixon ("Dixon") and Angela Thompson, and the officers' supervisor, Candace Haskins.  The smell of cannabis was evident to the officers upon entry and when Dixon walked to the bedroom upstairs he observed Ray smoking cannabis.

94.     Having found cannabis in the residence, the APD officers called in the CPD, per standard operating procedure of the APD.  After arriving at the home, the CPD officers made the

arrest of Ray and the probationer, who was not in the home at the time the P.O.s had arrived and, therefore, was in violation of his curfew restriction.

95. The home was a single family residence, not an apartment building, and the terms of McGowan's probation, like that of most probationers on intensive or gang intervention probation expressly allowed P.O.s to search the entire residence at which the probationer resides.

96. The CPD did not "tag along" with Loizon and James Brannigan at the time they conducted the curfew check of the Santoyo residence. Rather, the CPD was contacted after the P.O.s had arrived and found cocaine at the premises.

97. Furthermore, under Illinois law a defendant's agreement in a guilty plea to the conditions of probation, including allowing searches of his or her residence, constitutes a prospective waiver of his or her Fourth Amendment right to challenge such a search.

98. Specifically, in the case of *People v. Absher*, 242 Ill.2d 77 (2011), the Illinois Supreme Court affirmed the trial court's conviction of Absher for possession of crack cocaine and marijuana discovered during a search of his residence by his P.O., who was accompanied by officers from the Belleville Police Department during the search.

99. For the safety of the P.O.s making home visits, it is standard practice not to allow communication in a foreign language, which is why Loizon told Santoyo's mother she was to stop speaking Spanish and only speak English.

100. Sepulveda was not present at the time of the curfew check on Santoyo and simply related what Santoyo had told him in his letter to Reyes that Reyes decided to pass on to Lighty and the *Tribune* more than 10 years after the search and eight (8) years after Sepulveda wrote his letter to Reyes.

101.     The allegation that Loizon hit a probationer was made by P.O. Michael Dickerson. Loizon denied hitting the probationer and an investigation was conducted exonerating Loizon. The investigation was not "stymied" by anyone and resulted in no finding of misconduct by Loizon.

102.     Dickerson, on the other hand, later fired over a dozen shots from his gun out of the passenger window of his car at an innocent Hispanic teenage boy. He hit the boy once in the chest and shortly thereafter, Dickerson was caught on video punching another teenage boy who had been arrested in the area by the CPD and presented to Dickerson for a possible identification. Dickerson received no discipline for either incident.

103.     Five years later, Dickerson was convicted of attempting to hire a man to kill his wife and sentenced to 20 plus years in prison.

104.     Stanley Oden was a probationer who had completed his probation at the time he was befriended by Loizon and his family. Oden was responsible for providing information to law enforcement agencies that led to the arrest of persons who had committed a rape of a UIC student and the kidnapping of a seven year old child and her mother.

105.     The information provided by Oden, former leader of the New Breed gang, led to the saving the mother and child, who had been locked in a car trunk by the kidnapper.

106.     After Oden completed his probation, Loizon arranged with the Baptist Church in Channahon, where Loizon and his family lived, for Oden to move into an apartment in a building owned by the church.

107.     The day that Loizon went to the church with Oden to help him move into the apartment, the church backed out of the agreement after being introduced to Oden, an African American, for the first time.

108.    Loizon's wife felt badly about what she considered to be discriminatory treatment by the church.  She told Loizon that Oden could stay at their home until he could find an apartment. However, as it turned out, Oden soon became a part of the Loizon's family.  He became a big brother to the Loizon's two sons and daughter. He ended up living with the Loizons for almost two years, before he was murdered in Rockford while the Loizons were on vacation.

109.    Robert Jones was a probationer of Lorenzo Burton ("Burton"), an African American P.O. with whom Loizon had issues related to Burtons' dealings with probationers as informants.  Loizon made a number of attempts to find employment for Jones, including at a pizza restaurant and with the Chicago White Sox. On more than one occasion, Jones had falsely reported to his P.O. that he had employment when he did not.

110.    Loizon never took Jones to White Sox games.  Jones was never an informant coerced or "developed" by Loizon to act as an informant for any law enforcement agency.

111.    Loizon first met Jones when he came to Loizon's office to complain about P.O. Burton.  Jones told Loizon that Burton had forced him to be in informant with Landon Wade, a CPD Sargent.  Jones also told Loizon that Burton allowed him to smoke cannabis and avoid curfew.  Loizon told Jones that failing to comply with the terms of his probation was totally unacceptable, regardless of whether he was acting as an informant with the CPD.

112.    Loizon confronted Burton about what he had been told by Jones.  Burton denied everything that Jones had accused him of, but Loizon was skeptical of Burton and nevertheless made it clear that if what Jones said was happening was true, Burton had to "knock it off."

113.    In addition to warning Burton about not coercing probationers to become informants, Loizon advised Assistant Chief Haywood about what Jones told Loizon and about

Burton's denial. Loizon said that it was his intention to go to Wade's superior just to make sure that Wade knew that Jones could not be allowed to violate the terms of his probation.

114.     After speaking with Haywood, Loizon and APD Supervisors Thomas Dibiase and Vernon Winstead met with Wade's superior officer at the Holman Square police station. In the presence of Dibiase and Winstead, Loizon told Wade's superior what Jones had told him about Wade's and Burton's allowing Jones to smoke dope and ignore his curfew. Loizon told Wade's superior officer to instruct Wade that if that was happening, Wade needed to understand that such conduct could not be tolerated and was a violation of APD protocols and the terms of Jones' probation, which prohibited any use of drugs and full compliance with curfew hours, 7:00 p.m. to 7:00 a.m.

115.     Loizon reported conduct by Burton that violated APD various policies to Haywood, members of the OCJ, and the law firm of Laner Muchin, during its investigation of matters alleged in the May 21, 2014 *Tribune* article. Despite his reporting of Burton's conduct, no investigations of Burton were conducted.

116.     Loizon did take Jones to a dentist who was a friend of Loizon's and who voluntarily treated Jones, because Jones had an abscessed tooth that was causing him severe pain and Jones had no dentist or insurance of his own. Jones' tooth was so severely infected that the dentist feared that Jones might die if he was left untreated. Occasionally, while involved in transporting a probationer and when he stopped for food, like pizza, Loizon might share it with a probationer, such as Jones.

**Evans Issues a Press Release Announcing an Investigation into Allegations Contained in the *Tribune* Article and Places Loizon on "Desk Duty"**

117.     On May 21, 2014, the same day the Dizikes and Lighty article was published in the *Tribune*, Evans issued a Press Release from the OCJ. In the Press Release, Evans announced,

among other things, that he had retained the law firm of Laner, Muchin, Ltd. "to look into allegations that high ranking officials in the Adult Probation Department of the Circuit Court of Cook County improperly cooperated in searches of probationers' homes with local and federal law enforcement agencies;" that he had asked the law firm to investigate "whether the heads of the department's specialized weapons units encouraged and participated in improper searches and seizures, as well as engaged in other questionable practices;" that Loizon had been "placed on desk duty as of Friday, May 16, 2014;" and that the law firm's "investigation is expected to be completed within 60 days."

118.    Although the Press Release stated that Laner Muchin was retained to investigate high ranking *officials* and the *heads* of the department's specialized weapons units, Loizon was the only employee demoted to desk duty at Evans' direction without being afforded any opportunity to respond to the allegations of misconduct asserted in the *Tribune* article.

119.    While on desk duty, Loizon was prohibited from going into the field as part of his normal duties as the Deputy Chief. However, he continued to supervise P.O.s' field work and schedules and he approved arrests, among other duties.  Loizon also continued handling all calls made to the APD's gang intervention hotline 24 hours a day, seven days a week, through June, 2015.

120.    As a result of his May 21, 2014 demotion, Loizon's pay was reduced by $1.00 per hour.

121.    Although the Press Release stated that the Laner Muchin investigation was expected to be completed within 60 days and the firm's investigation report was received by Evans in or about August, 2014, Evans never disclosed the results of the report to the public, to the Chief P.O. of the APD or to Loizon.

37

122.    On information and belief, Evans did not release a copy of the Laner Muchin report to the Illinois Supreme Court or its administrative arm, the AOIC.

123.    On information and belief, neither the Illinois Supreme Court and AOIC nor the Cook County Board that directly funds the operations of the OCJ and APD's operations, asked Evans or the OCJ to see a copy of the Laner Muchin report.

124.    On information and belief, the Laner Muchin investigation report made to Evans and the OCJ did not conclude that Loizon had engaged in the misconduct alleged in the *Tribune* article of May 21, 2014.

**Loizon Complains about Unfair Treatment and Unlawful Employment Practices**

125.    On May 27, 2014, Loizon sent an email to Evans, Haywood, Wisniewski and Larson requesting that he be provided with counsel to assist him in refuting the slanderous and untrue allegations contained in the *Tribune* article. His request was denied.

126.    After the OCJ denied Loizon's request, he retained his own counsel in an effort to defend his reputation and prove the lack of merit to the false allegations contained in the *Tribune* article.

127.    On June 19, 2014, Loizon filed a charge with the EEOC based on race discrimination and retaliation and specifically alleged unfair treatment, being subjected to different terms and conditions of employment, including but not limited to, being investigated and being assigned to desk duty, indefinitely and without just cause.

128.    On April 29, 2015, Loizon filed a grievance regarding the APD's unlawful failure to pay him for thousands of hours of compensatory time accrued by Loizon over many years.

129.    On May 8, 2015, Loizon sent a memo to Assistant Chief Sobieski with reference to the subject, "violation of due process." The memo summarized their meeting on May 5, 2015,

wherein Loizon and Sobieski discussed Loizon's previously filed grievances that had not been acted upon. In his May 8, 2015 memo, Loizon requested the immediate resolution of his grievances, the payment of all compensatory time that was owed to him and to be immediately restored to full duty.

130. On May 14, 2015, Sobieski sent a memo to Loizon stating that an investigation was pending with regard to Loizon's compensatory time. However, no one contacted Loizon as part of the investigation and Loizon never received any further communications from anyone at the APD or OCJ regarding the results of the purported investigation or any decision made with respect to his accrued comp time.

131. On October 29, 2015, Loizon sent an email to Laura Kelly of the OCJ with copies to Haywood, Sobieski and Larson, expressing concern and disagreement about still being on desk duty despite initially being told he would only be on desk duty for 60 days.

132. Loizon received no response to his October 29, 2015 email.

**APD Belatedly Issues Contradictory Policies on the Subject of Informants**

133. On November 18, 2015, Haywood distributed a number of Memoranda to all APD Staff, including one on the subject of "Informants" and another regarding "Coercion."

134. The November 18, 2015 "Informants" Memorandum stated:

All staff is prohibited from the cultivation or solicitation of informants for any reason. At no time shall staff gather information (cultivate) for the sole purpose of providing said information to another law enforcement agency. Outside agencies requesting permission to have a probationer work as an informant will be directed to the State's Attorney's office for further direction. A violation of any of the above listed policies shall be considered a major cause infraction that may result in disciplinary action up to and including termination.

135. The November 18, 2015 "Coercion" Memorandum stated:

At no time shall probation staff coerce a probationer to provide information by offering immunity or benefit or excuse any violations in exchange for said

39

information. If a probationer voluntarily offers information concerning criminal activity this information shall be forwarded through the chain of command. The Assistant/Deputy Chief will direct the information to the appropriate authorities. A violation of any of the above listed policies shall be considered a major cause infraction that may result in disciplinary action up to and including termination.

136.    Prior to the two November 18, 2015 memoranda on the topic of informants, the APD had no written policies or procedures on the subject.

137.    However, the APD did invite Loizon, other Deputy Chiefs and Supervisors to attend nearly annual training sessions/conferences during which the topics of the "utilization and management of informants in gang investigations" and "confidential informant management" were addressed.

138.    Pursuant to APD policies on attendance at conferences, seminars, meetings and training, the criteria for selecting appropriate staff to attend such outside training included the appropriateness of the subject matter related to the staff member's job duties and the relevance to the APD's goals and objectives.

139.    Loizon was specifically invited to, and attended, at least one such training session while on desk duty in 2014.

140.    Notwithstanding the absence of a formal written policy on dealing with informants until November, 2015, at all times in the performance of his duties Loizon conducted himself in a manner consistent with that policy; not actively soliciting or cultivating informants, but relaying information that they might voluntarily divulge to him and/or to other P.O.s to the appropriate authorities.

**Despite his Continuing Satisfactory Job Performance, Evans Terminates Loizon's Employment**

141.    On February 15, 2016, Loizon received an overall job performance rating of "Meets Expectations" from his immediate Supervisor, Sobieski, for the rating period of January 1, 2015

through December 31, 2015, including the rating of "Exceeds Expectations" in 5 out of 9 categories. The evaluation, the last he received before being terminated, was signed by both Sobieski and Chief P.O. Haywood and stated in pertinent part:

> Deputy Chief Loizon has provided consistent direction and set deadlines for staff on the completion of the required quarterly audits. When staff failed to comply with these directives corrective action was taken. D.C. Loizon took steps in 2015 to ensure adequate field coverage throughout the week and to ensure all staff adhere to the approved schedule. Deputy Chief Loizon actively participates in monthly executive team meetings. **He not only identifies problems but consistently proposes solutions that will improve department operations.** D.C. Loizon regularly meets with staff but needs to document these meetings with formal minutes to be submitted monthly. D.C. Loizon is well prepared for all grievance and discipline meetings. **All action/responses are based on applicable policy and articles of the collective bargaining agreement**. D.C. Loizon mentors supervisors in this process to improve their aptitude as well. D.C. Loizon has the ability to organize operations to ensure properly delivery of services. His extensive knowledge in probation operations allows him to quickly identify deficiencies and then develop an action plan to restore compliance. D.C. Loizon was the catalyst behind the increased monitoring of the 60 days case update list. He took the initiative to modify the report to a shorter timeframe thereby virtually eliminating probationers from appearing on the 60 day list. **This was the model for other divisions in the Department.** While reviewing work on a daily basis D.C. Loizon is able to identify both deficient and exemplary performance. He provides guidance to all levels of staff under his supervision in an effort to improve their skills and put them in a position to succeed. **Many of his subordinates have been promoted to supervisor/deputy chief. D.C. Loizon has intimate knowledge of both policy and procedure and the collective bargaining agreements.** This knowledge is displayed in his response to grievance's [sic] and during disciplinary proceedings. It is also apparent in how he oversees the day to day activities in the multiple units in his division. All of these qualities have been described in detail in the above sections. **D.C. Loizon is able to organize his team to accomplish the mission of the Department.** The work product produced by staff is a reflection of DC Loizon's ability to lead.

(Emphasis added).

142. On March 28, 2016, the *Tribune* published another article written by Dizikes and Lighty entitled, "Chief Judge mum on completed inquiry to Cook County probation agency." The article contained a photograph of Evans with the caption, "Chief Judge Timothy Evans has refused to offer details of an investigation into the county's probation department that came after allegations surfaced about rogue officers."

143.     The March 28th article noted that it had been nearly two years since Evans promised the public a swift and thorough investigation into the APD, yet Evans was refusing to say what, if anything, was found.

144.     The March 28th article stated, "Evans' silence stands in stark contrast to the outrage he expressed in May 2014 following a Tribune investigation into how the probation department had for years quietly worked with the FBI and Chicago police to conduct questionable searches."

145.     In the March 28th article, Dizikes and Lighty also noted that Devlin Schoop, a former Laner Muchin lawyer who played a leading role in the investigation requested by Evans, had been appointed a Cook County judge under Evans.

146.     On March 30, 2016, two days after publication of the article that was highly critical of Evans' silence following the Laner Muchin investigation, then Chief P.O. Haywood sent a letter to Loizon stating the following:

> You are hereby directed to meet with Assistant Chief Sobieski, representatives of the chief judge, and me on Friday April 1, 2016 at 1:00 p.m., at the Richard J. Daley Center, Room 2600.  The purpose of the meeting is to discuss allegations that you may have engaged in the following types of conduct during your employment with the APD:
>
> > -Directed or conducted illegal searches of the residences of probationers or non-probationers.
> >
> > -Failed to comply with APD directives circumscribing the APD's cooperation with law enforcement [sic] agencies
> >
> > -Cultivated improper relationships with probationers, including pressuring them to act as confidential informants for law enforcement agencies
>
> Following the meeting, a decision will be made about whether further information or meetings are necessary to make a conclusion regarding the allegations.  A report and recommendations as to appropriate actions to be taken, if any, will be made based on the information provided during the meeting.  Recommendations may include discipline up to and including termination of your employment by the Department.

Effective immediately and pending a decision based on a report and recommendations following the meeting, you are hereby reassigned to administrative duties. While performing your new duties, you are not to perform field work of any kind or to engage in any work on behalf of the Department that involves direct, personal contact with probationers or members of the public.

Your authorization to possess and use a firearm while on duty is hereby suspended until further notice, and you are to return your APD weapons authorization card to me immediately upon receipt of this letter. Due to your new assignment, your compensation will no longer include "shift differential" paid in connection with your previous assignment.

147. On April 1, 2016, Loizon attended a meeting at the Daley Center that was also attended by Haywood, Sobieski, Sevcik, Laura Kelly, who is an attorney and Director of Human Resources for OCJ, Steven Brandt, who is an OCJ attorney, and a stenographer.

148. At the April 1, 2016 meeting, no facts were cited or evidence presented at the meeting in support of any of the allegations of possible misconduct by Loizon referenced in the March 30, 2016 letter. Instead, Loizon was asked a number of questions related some of the matters contained in the March 30, 2016 letter and his conduct relative to various APD policies and procedures.

149. At the April 1, 2016 meeting, Loizon answered all of the questions he was asked, confirming that his conduct was in all respects consistent with APD policies and procedures including, but not limited to, those related to searches of the residences of probationers or non-probationers, working with informants, conducting "sweeps" of probationer's residences and working with other law enforcement agencies.

150. During the April 1, 2016 meeting, Loizon reminded Haywood, Sobieski and certain others in attendance at the meeting of their personal knowledge of and/or participation in matters related to working with informants as well as their personal knowledge of and participation in

sweeps and joint actions involving the coordination and cooperation with law enforcement agencies – matters that were the subjects of the questions asked of Loizon during the meeting.

151.     At the conclusion of the April 1, 2016 meeting, Loizon specifically asked if the meeting was considered to be an investigatory or pre-disciplinary meeting, in which case he would be entitled to bring a representative with him and be able to present evidence and witnesses to refute any evidence of wrongdoing presented. Loizon indicated that there was ample documentary evidence to support his position that he had not engaged in any misconduct as well as a number of witnesses with direct personal knowledge of matters that would confirm he had not engaged in any misconduct.

152.     Haywood, Sobieski and the OCJ staff members in attendance at the meeting acknowledged that Loizon was correct as to his rights if the meeting was considered an investigatory meeting or pre-disciplinary hearing but they decided not to answer his direct question.  Instead, they assured Loizon that any witnesses he identified to them would be contacted and interviewed as part of their investigation into the matters referenced in the March 30, 2016 letter.

153.     In response to the assurance provided him at the April 1, 2016 meeting, Loizon provided Haywood, Sobieski, and members of the OCJ staff in attendance the names of the following witnesses: Lorenzo Burton, Landon Wade, Landon Wade's Commanding Officer, Vernon Winstead, Tom Dibiase, Russell Bergun, Cynthia Bauman, Valerie Sterling, John Rowski, Julie Tomalis, Matt Sobieski, Candice Thomas, Melvin Dixon and Angela Gooding.

154.     No one from the APD or the OCJ interviewed the witnesses that Loizon identified and that he was assured would be interviewed, after the April 1, 2016 meeting.

44

155.     Although the March 30, 2016 letter from Haywood stated that following the April 1, 2016 meeting a decision would be made about whether further information would be necessary to make conclusions regarding the allegations contained in the letter and that a report and recommendations would be made regarding appropriate actions to be taken, if any, based on the information obtained during the April 1, 2016 meeting, Loizon was not informed of a need for any further information or meetings; nor was he informed of any report that was prepared or any conclusions that had been reached or recommendations made regarding the allegations contained in the March 30 letter at any time.

**<u>Evans Wrongfully Terminates Loizon's Employment for Pretextual Reasons</u>**

156.     Loizon was required to remain on desk duty at all times from May 21, 2014 until June, 2016, when Loizon took what turned out to be an extended leave to care for his mother and for himself and family resulting from injuries sustained when his family van was rear ended outside of Indianapolis on the way to a softball tournament in Columbus, Ohio.

157.     On March 8, 2017, the *Tribune* published another article written by Lighty entitled, "After Tribune reveals probation official's $200K in comp time, Cook County Courts vow action." The article was critical of the high number of Loizons' accrued comp hours.

158.     The March 8, 2017 article stated, in pertinent part, "Philippe Loizon, a deputy Chief in the Cook County APD, accrued at least 3,674 hours of comp time from 2003 into 2015" and referred to Loizon as "a controversial figure in the probation department."

159.     Chief P.O. Haywood was Loizon's supervisor and was responsible for reviewing and signing off on Loizon's time sheets.  Haywood has acknowledged that Loizon legitimately and legally earned all of the accrued compensatory time referenced in the article, much of it due

to Loizon's assignment to handle the "gang telephone" 24 hours a day, seven days a week, including vacations, sick days and holidays, between 2003 and June, 2015.

160. On May 19, 2017, after 28½ years of dedicated service to the APD, the continuing outstanding performance reviews he received and the absence of any evidence of misconduct to support the claims in the *Tribune* articles, Evans directed Haywood to sign a letter prepared at Evans' direction informing Loizon that his employment with the APD had been terminated, effective immediately.

161. The May 19 letter lacked any specificity for the general accusations of misconduct it contained, which included the following:

> i. You have demonstrated that your vision of probation diverges from the mission of the APD as stated in the letter;
> ii. Your questionable judgment in interactions with both probationers and non-probationers;
> iii. Your defiance of departmental policy and orders with regard to the appropriate relationship between law enforcement agencies and the Adult Probation Department; and
> iv. Your actions vis a vis a former probationer which could reasonably be perceived as attempted interference with an ongoing investigation.

162. At no time prior to or after the letter of May 19, 2017 did the OCJ or APD inform Loizon what specific conduct he had engaged in that allegedly "demonstrated [his] vision of probation diverges from the mission" of the APD.

163. At no time prior to or after the letter of May 19, 2017 did the OCJ or APD present Loizon with the specific facts regarding the alleged "questionable judgment in interactions with both probationers and non-probationers."

164. At no time prior to or after the letter of May 19, 2017 did the OCJ or APD inform Loizon what specific conduct allegedly constituted a "defiance of departmental policy and orders with regard to appropriate relationship between law enforcement agencies" and the APD.

46

165.    At no time prior to or after the letter of May 19, 2017 did the OCJ or APD inform Loizon of the specific departmental policy and orders regarding the appropriate relationship between law enforcement agencies and the APD that Loizon had allegedly defied.

166.    At no time prior to or after the letter of May 19, 2017 did the OCJ or APD provide Loizon with specific facts supporting the allegation that his actions vis a vis a probationer constituted an attempt to interfere with an ongoing investigation.

167.    Although he signed it, Haywood did not author the May 19, 2017 letter notifying Loizon of the termination of his employment.

168.    The May 19, 2017 letter of termination was prepared at the direction of Evans, who lacked any knowledge of facts to support the allegations of misconduct contained in the letter.

169.    Haywood signed the May 19, 2017 termination letter that Evans had provided him only because Evans had directed him to do so.

170.    Haywood had no personal knowledge and did not provide Evans or the OCJ with any facts to support the allegations of misconduct contained in the May 19, 2017 letter of termination.

171.    Haywood, as Chief of Probation, was Loizon's direct supervisor and the most knowledgeable person in the APD about the quality of Loizon's work and his compliance with APD policies and procedures.

172.    Haywood had not been presented with evidence that Loizon had engaged in the misconduct alleged in the May 19, 2017 letter or any other evidence to support a conclusion that Loizon had engaged in any misconduct that would warrant his immediate termination of employment.

173.    At no time did Haywood inform Evans of any misconduct by Loizon that would merit the termination of Loizon's employment.

174.    At the time he signed the May 19, 2017 letter of termination, Haywood knew of no evidence that had been presented from any source to support the allegations of misconduct alleged against Loizon in the press, including the *Tribune* articles.

175.    Evans imposed discipline against Loizon in a manner and at a level he had never imposed on an African American employee of the APD, despite conduct of an egregious nature by some of the African American employees of the APD.

176.    Evans knew or should have known at the time he directed the May 19, 2017 letter to be prepared that the allegations of misconduct it contained were without merit and pretextual.

177.    At the time of Loizon's termination of employment with the APD, Loizon had never before received any warning or reprimand, much less the imposition of discipline, related or pertaining to the performance of his duties.

178.    At the time of Loizon's termination of employment with the APD, Loizon had never before received any warning or reprimand, much less the imposition of discipline, related or pertaining to or any purported failure to comply with any APD policies or procedures or any defiance of a directive from or order of his superiors.

179.    At the time of Loizon's termination of employment, his personnel file included numerous letters and/or memos thanking Loizon for his hard work and acknowledging his dedication to his job and the APD, as well as his assistance to other policing agencies such as the CPD, FBI and U.S. Marshal's Office.

180.    As a Deputy Chief, Loizon has supervisory authority over other supervisors in the units assigned to him.

181.    Loizon had no authority to hire or fire any APD employees, including any employees under his supervision.

182.    Just as with all other supervisory personnel, Loizon did not have authority to impose disciplinary action, but could only recommend disciplinary action.

183.    Permission to impose disciplinary actions other than coaching had to be sought and obtained from the Chief of Probation, who in turn would commonly seek the approval of Evans and the OCJ for the imposition of any significant disciplinary action.

184.    The APD's Corrective Action Policy for Sworn Supervisors provides that prior to termination, an employee is entitled to: (a) a meeting to review the reasons for which corrective action is contemplated, in which the employee is given an opportunity to respond to each infraction and may be accompanied by another department employee to respond to the charges; (b) a verbal reprimand; (c) a written reprimand; (d) suspension for 30 days or less; and (e) a conference with the employee, supervising manager and any other persons deemed necessary to determine the corrective action, if any, to be imposed.

185.    The APD failed to follow its own Corrective Action Policy for Sworn Supervisors by terminating Loizon after skipping all of the disciplinary actions that must be taken prior to termination as set forth in the policy.

186.    Although the APD policies require an exit interview for all departing employees, it did not conduct an exit interview with Loizon.

187.    On November 7, 2017 Loizon filed a charge with the EEOC alleging that he had been the subject of racial discrimination and retaliation.

188.    On January 18, 2018, Plaintiff received a Right to Sue letter from the EEOC and on January 23, 2018, Plaintiff received a Right to Sue letter from the U.S. Department of Justice.

(Copies of the Right to Sue Letters are attached hereto and made a part hereof as <u>Group Exhibit</u> <u>A</u>).

189.    During the years 1996-2015 Loizon consistently received annual merit pay increases.

190.    During the years 1996-2015, Loizon received a rating of "exceeds expectations" or "high meets expectations" on all but one performance evaluation.

191.    Starting in or about 2003, and continuing through June, 2015, Loizon was solely responsible for answering an APD cell phone that received phone calls from APD staff, probationers, law enforcement agencies and others, including calls from law enforcement agencies located outside the State of Illinois and around the nation who may have had reason to contact the APD about a probationer. Loizon was responsible for answering this phone 24 hours a day, seven days a week, including when Loizon was on leave, vacation, holidays or off work while sick.

192.    During his career at the APD, Loizon monitored over 100,000 convicts sentenced to probation.

193.    The APD has a complaint procedure for probationers who believe that employees of the APD have acted unlawfully or inappropriately, including instructions on how to make a complaint against an APD employee.

194.    Loizon is not aware of a single complaint having been made to the APD or OCJ about him by a probationer either before or after the publication of the *Tribune* article on May 21, 2014.

**<u>Disparate Treatment of Loizon in Comparison to African American APD Officers</u>**

195.    Burton, an African American P.O., repeatedly failed to follow APD protocol while checking in on probationers.  Specifically, among other actions, Burton regularly conducted

"drive-by" curfew checks on his probationers, including Emmanuel Velez and Orangelo Payne, instead of entering the probationer's residence, as required by APD policy. Burton would call a probationer on the phone and ask him to come to the window. If Burton saw the probationer wave out the window, Burton would mark them as home and in compliance with his/her probation terms. Burton was never disciplined for these blatant violations of APD policies.

196.    On or about February 26, 2013, a pre-disciplinary meeting was held with regard to Burton's poor performance, including problems with handing in work on time, failing to order drug tests for probationers, incomplete curfew checks, missing data entry on record sheets, no supervision of probationers for weeks at a time and failure to prepare documentation for court. Burton received a one day suspension for these deficiencies.

197.    In April 2014 Burton and P.O. Lorenzo Spinato were conducting a curfew check on a probationer when they smelled burnt cannabis and observed in plain view a bag of marijuana. The probationer was handcuffed for the safety of the Officers, but he managed to escape and flee the scene. Although Burton gave chase to the fleeing probationer, he was unable to catch him and the probationer remained at large for some period of time. Burton was not disciplined for this incident.

198.    On September 15, 2014 Loizon sent an e-mail to Sobieski and copied Haywood, Deputy Chief Cynthia Komar and Noreen Larson, Director of Human Resources for the APD. The e-mail was a result of an incident involving Burton and probationer Emmanuel Valez on August 25, 2014, in which Burton unlawfully arrested the probationer, who has a record of mental illness, in violation of APD policy.

51

199.     Deputy Komar was one of the first responders who immediately had the hand cuffs that Burton had placed on the probationer removed from the probationer.  These actions were reported from the probationer to Supervisor Darryl Gray, who reached out to Loizon.

200.     Valez, Gray and Loizon discussed the incident over a conference call.  It was determined that the probationer's complaint was credible and Valez was directed to have his case transferred from Burton to P.O. Dan Doody.  Further, Komar directed Burton to file an incident report regarding the incident with Valez.  Burton refused to comply with Komar's directive.

201.     Loizon contacted Burton on September 11, 2014, regarding the status of this incident report. Burton told Loizon he "forgot" to turn it in, but brought it to Loizon's office after Loizon called him.  Loizon recommended that Burton be placed on desk duty, as well as removing his gun card and badge until a thorough and complete investigation into these serious allegations were completed.  Loizon's recommendation was rejected.

202.     Without the knowledge or approval of Loizon or his direct Supervisors, Burton frequently "worked" probationers as confidential informants; including probationers Katrina Bonner and Robert Jones -- conduct that Loizon confronted Burton about and told was unacceptable and that Loizon also reported to his superiors. Burton was the P.O. for three of the probationers referenced in the May 21, 2014 *Tribune* article, namely, Orangelo Payne, Robert Jones and Michael Lipford's nephew, Deandre Norfleet.

203.     Wayne Harris ("Harris"), an African-American P.O., was frequently insubordinate by refusing to cooperate with or listen to the directives given to him by his supervisors.  Harris was never disciplined for his misconduct, and failed to keep up credentials to carry a firearm.  He allowed his FOID card to expire, and let three months pass before taking the necessary steps to reinstate his card.  During the three months the card had lapsed Harris sat in the office and was

52

unavailable to go out on the street.  There were no consequences for Harris' negligence in regard to the lapse of his FOID card.  He was not disciplined, suspended or docked in pay while sitting in an office for three months before obtaining a renewal of his FOID card.

204.    Dixon, an African-American P.O., and Candice Haskins ("Haskins") an African-American Supervisor, conducted a search of a non-probationer's home, Kenny Ray, which later became the subject of a *Tribune* article critical of Loizon and the APD written by Lighty.  Although the Lighty article accused Loizon of directing or conducting "illegal searches of the residences of probationers or non-probationers," an allegation that was not true, Dixon and Haskins were never disciplined for the incident involving Kenny Ray.

205.    In fact, Haskins was promoted to Director of Public Relations in 2014.

206.    Cheryl Anderson ("Anderson"), an African-American P.O., filed a false grievance against Loizon after Loizon's audit of Anderson's caseload revealed that 119 out of 121 cases were in total non-compliance with APD policy.  For example, although Anderson falsely reported that she conducted office checks on clients and reported their status as compliant, the audit showed that many of these individuals were either deceased or incarcerated.  Despite the fact that Anderson had been falsifying her reports and filed a false grievance against Loizon, no disciplinary action was initiated or taken for Anderson's actions that clearly violated the APD mission statement and policies.

207.    Kimberly Flanagan ("Flanagan") is an African-American P.O. who has filed at least five race and gender-based lawsuits against the APD and others.

208.    In one of Flanagan's lawsuits, she alleged that Loizon and Deputy Chief Sobieski plotted to have her killed, when Loizon and Sobieski merely had asked for her presence while

escorting a female informant to another location so as to make sure that a female P.O. was present at all times during the transport.

209.    Flanagan's defamatory allegation against Loizon and Sobieski was originally made in an Incident Report she filed with the APD. It was investigated and found to be totally meritless, yet no disciplinary action was initiated or taken against Flanagan for her defamatory and outrageous false claims against Loizon and Sobieski that merited a termination of her employment.

210.    On another occasion, Loizon approached Flanagan in the APD parking lot after he observed her on the phone, while her partner was sleeping in an APD vehicle. Flanagan should have been performing her field work at the time Loizon saw her in the parking lot. When Loizon asked Flanagan what she was doing, Flanagan responded with abusive and insubordinate language. During the incident, Flanagan called 911 and told the CPD that she was being threatened by a "man with a gun," without notifying the CPD that she was referring to her superior, Loizon, who had a lawful right to possess a gun. She filed an Incident Report accusing Loizon of abusive conduct regarding the incident and was later directed by Wisniewski to refrain from contacting the police regarding APD matters in the future. Flanagan was not disciplined for the incident.

211.    Michael Dickerson ("Dickerson"), an African-American intelligence officer in the APD, was investigated for the shooting of an innocent 14 year-old child that occurred on or about March 7, 2008. The child, Geronimo Alatriste, was exiting his home when Dickerson opened fire, shooting Alatriste in front of his home while posing no reasonable threat. Dickerson had driven around the block four times in this Pilsen neighborhood before stopping in front of Alatriste's home and opening fire. As a result of that shooting Cook County was sued, yet no disciplinary action was initiated or taken against Dickerson as a result of his actions.

212.    Dickerson was later charged with and convicted of solicitation for murder for offering a hitman $1,000.00 to murder his wife.

213.    Connie Williams ("Williams"), an African American Deputy Chief, retired from the APD in March 2018, after being notified by the APD that she was under investigation for falsifying official APD records.  Williams is the grandmother of APD employee Jolania Delafosse, who was shown in a photograph sleeping on the job, sometimes wrapped in a blanket, in a WGN Investigation on May 18, 2015.

214.    April Mohn, an African-American Supervisor engaged in inappropriate relations with a probationer, Durk Banks, a/k/a Lil' Durk, a rap recording artist.  Mohn's daughter aspired to secure a recording contract with Lil' Durk's assistance. Mohn was the supervisor of Claudia Vincent Martin, who approached another P.O. who was the court liaison for Banks' case.  Martin attempted to influence him with respect to his presentation to the court of a violation of probation by Banks. Both Mohn and Martin received short periods of suspension for their misconduct, not a termination of their employment.

215.    African American Officer, Carla Rodgers ("Rodgers"), falsely reported on an APD record sheet that she had run an arrest check on a probationer when, in fact, the probationer had been arrested two days earlier for battery when he masturbated on a fellow patient in a treatment facility.  Rodgers also failed to perform her duties with respect to the handling of this probationer from the outset of his probation in a number of other respects, including failing to document his prior arrest for indecent exposure and his known gang affiliation.  Rodgers was not suspended and did not lose any pay for her complete dereliction of duty in monitoring this probationer.  Despite having only received a reprimand, Rodgers filed a discrimination suit containing false claims against the APD, OCJ, Loizon and others related to the reprimand that was imposed.

216.    On June 26, 2014, African American Officers, Rodgers and Linda Roundtree were in the process of conducting a curfew check when an unknown male offender allegedly ran down the street and started shooting at people, including them.  Rodgers and Roundtree responded by returning gunfire.  However, the only bullet casings located during the examination of the crime scene by the CPD were from Rodgers' and Roundtree's firearms.  Neither Rodgers nor Roundtree were disciplined for their wrongful discharge of their weapons.

### COUNT I – VIOLATION OF TITLE VII - DISCRIMINATION

217.    Plaintiff restates and incorporated by reference paragraphs 1 through 216 above as and for paragraph 217 of this Count I.

218.    The actions of Defendant as described herein are unlawful employment practices in that they have the effect of discriminating against, depriving and tending to deprive equal employment to, and otherwise adversely affecting Plaintiff because of his race (Caucasian), in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*

219.    Plaintiff was treated differently than similarly situated employees who are not Caucasian.

220.    Plaintiff was subjected by the OCJ and Evans to disciplinary and adverse employment actions, including termination, because of his race.

221.    Plaintiff was satisfactorily performing his duties to the legitimate expectations of his employer prior to his termination.

222.    The OCJ and Evans intentionally and knowingly discriminated against Plaintiff in the terms and conditions of his employment, including unwarranted and disproportionate discipline and false allegations of misconduct, ultimately leading to his wrongful discharge.

223. The OCJ's and Evans' racially discriminatory employment practices concerning Plaintiff violated Title VII.

224. The OCJ's and Evans' discriminatory employment practices have denied Plaintiff his job, equal employment opportunities and other positive benefits of employment because of his race.

225. As a direct and proximate result of the actions of Defendants in intentionally engaging in and condoning racial discrimination against Plaintiff, Plaintiff has suffered great mental anguish, humiliation, embarrassment, degradation, physical and emotional pain and suffering, inconvenience, lost wages and benefits, future pecuniary losses, and other consequential damages.

WHEREFORE, PHILIPPE LOIZON, prays for the entry of judgment in his favor and against TIMOTHY EVANS and THE OFFICE OF THE CHIEF JUDGE OF COOK COUNTY, ILLINOIS, on his Title VII race discrimination claim and:

a) Declare that the acts and practices complained of are violations of Title VII;

b) Direct the OCJ and Evans to reinstate Plaintiff to the position of Deputy Chief of the APD;

c) Direct the OCJ to make Plaintiff whole for all earnings and benefits he would have received but for its discriminatory treatment;

d) Award Plaintiff back pay, prejudgment interest and damages for all employment benefits he lost;

e) Award Plaintiff front pay;

f) Award Plaintiff compensatory and punitive damages;

g) Award Plaintiff reasonable attorney's fees, expenses and costs; and

h)  Award whatever further relief this Court may deem just and proper.

## COUNT II -VIOLATION OF TITLE VII - RETALIATION

226.    Plaintiff realleges and incorporates by reference paragraphs 1 through 225 above as and for paragraph 226 of this Count II.

227.    Loizon participated in several activities that are protected under federal law and opposed Defendant's unlawful employment practices, including but not limited to: (a) filing a charge with the EEOC on June 19, 2014, alleging unfair treatment, being subjected to different terms and conditions of employment, including but not limited to, being investigated and being assigned to desk duty; (b) filing a charge based on race discrimination and retaliation with the EEOC in February 2016 alleging that he was subjected to different terms and conditions of employment than non-white employees, including but not limited to work hours, compensatory time off and denial of paid time off benefits; (c) filing a grievance regarding Defendant's unlawful failure to pay Loizon his accrued compensatory time; (d) filing a complaint with the Illinois Judicial Inquiry Board in 2013 against Judge William Hooks alleging that Judge Hooks' ordering of the Deputy Chief of the APD Gang Unit to conduct an internal investigation with regard to the discovery of evidence in a probationer's case was an abuse of his judicial power; and (e) complaining to the OCJ on numerous occasions as set forth above concerning unlawful employment practices, including, but not limited to, complaints to the head of Human Resources for the OCJ, Bruce Wisniewski, in November 2013 concerning then Acting Chief Reyes' refusal to meet with Loizon to discuss Loizon's concerns about unlawful employment practices of the APD, Reyes' direction to shred documents reflecting the poor work performance of staff assigned to then Acting Assistant Chief Nicole Raymond; and Raymond's demeaning, threatening and harassing treatment of APD employees, including Court Liaison Officer Mary Kennedy.

58

228.    As a result of Loizon's participation in such protected activities and opposition to unlawful employment practices, Defendant subjected Loizon to adverse employment actions, including unwarranted and disproportionate disciplinary action; heightened scrutiny; disparate treatment in the terms and conditions of his employment, demotion to desk duty and unlawful termination.

229.    Loizon was subjected to the adverse employment actions described above because of his participation in protected activities and his opposition to the APD's unlawful employment practices.

230.    By engaging in and condoning retaliatory conduct, Defendants discriminated against Plaintiff in violation of Title VII.

231.    As a direct result of Defendants' conduct, Plaintiff has been deprived of lost wages and employment benefits, future pecuniary losses and other consequential damages.

232.    In addition, the retaliatory actions of Defendants against Loizon have caused him severe mental pain and suffering, humiliation, embarrassment and degradation entitling him to compensatory damages.

WHEREFORE, PHILIPPE LOIZON, prays for the entry of judgment in his favor and against TIMOTHY EVANS and THE OFFICE OF THE CHIEF JUDGE OF COOK COUNTY, ILLINOIS, on his Title VII retaliation claim and:

a)  Declare that the acts and practices complained of are violations of Title VII;

b)  Direct the OCJ and Evans to reinstate Plaintiff to the position of Deputy Chief of the APD;

c)  Direct the OCJ to make Plaintiff whole for all earnings and benefits he would have received but for its discriminatory treatment;

59

d) Award Plaintiff back pay, prejudgment interest and damages for all employment benefits he lost;

e) Award the Plaintiff front pay;

f) Award Plaintiff compensatory and punitive damages;

g) Award Plaintiff reasonable attorney's fees, expenses and costs; and

h) Award whatever further relief this Court may deem just and proper.

## COUNT III - VIOLATION OF FAIR LABOR STANDARDS ACT

233. Plaintiff realleges and incorporates by reference paragraphs 1 through 232 above as and for paragraph 233 of this Count III.

234. This count stems from Defendant's violation of the Fair Labor Standards Act, 29 U.S.C. §201, et. seq., ("FLSA") for its failure to pay compensatory time wages to Plaintiff.

235. The OCJ is an "employer" under the FLSA.

236. Loizon is not exempt from the compensatory time provisions of the FLSA because he was not employed in any bona fide executive, administrative or professional capacity, as defined by 29 U.S.C. Section 201.

237. In addition, Loizon is not exempt from protection under the FLSA because he did not have the authority to hire or fire employees of the OCJ.

238. On information and belief, as of May 22, 2017, Loizon had at least 2,877 accrued compensatory hours remaining due and unpaid.

239. Loizon has repeatedly demanded that the OCJ pay him for his accrued, unpaid comp hours.

240.    The OCJ has not responded to Loizon's demands for payment of his accrued, unused comp time and has not paid him for the comp hours that its director of personnel confirmed to Loizon following his termination of employment on May 22, 2017.

241.    Former APD employees, Archie Shaw, Rich Martin and Bob Dicanio and current employee, Kevin Coughlin, were paid for their accrued and unused comp time upon request.

242.    The FLSA states that "[u]pon termination of employment, an employee shall be paid for unused compensatory time earned after April 14, 1986, at a rate of compensation not less than - (1) the average regular rate received by such employee during the last 3 years of the employee's employment, or (2) the final regular rate received by such employee, whichever is higher."

243.    Defendant's failure to pay Loizon one and one-half of his regular rate for hours worked in excess of forty (40) in given work weeks violated section 7 of the FLSA, 29 U.S.C. § 207.

244.    As a result of Defendant's actions, Loizon has been damaged.

245.    Defendant had the ability to pay Loizon, but willfully refused to do so.

WHEREFORE, PHILIPPE LOIZON, prays for the entry of judgment in his favor and against THE OFFICE OF THE CHIEF JUDGE OF COOK COUNTY, ILLINOIS, on Count III for damages in an amount in excess of $150,000.00, for an accounting to determine the amount of compensatory pay due Plaintiff, for interest on final compensation due Plaintiff as provided under the FLSA, payment of all reasonable attorney's fees and costs, and such additional relief as the Court may deem just and proper.

## COUNT IV – VIOLATION OF ILLINOIS WAGE PAYMENT AND COLLECTION ACT

246.     Plaintiff realleges and incorporates by reference paragraphs 1 through 245 above as and for paragraph 246 of this Count IV.

247.     This is an action against Defendant for violations of the Illinois Wage Payment and Collection Act ("IWPCA"), 820 ILCS 115/1 et seq.

248.     Defendant OCJ is an employer under the IWPCA pursuant to 820 ILCS 115/2.

249.     The OCJ failed to pay Loizon all of his final compensation at the time of his termination as required by the IWPCA, including, but not limited to compensatory time owed to Loizon pursuant to Defendant's applicable policies.

250.     Plaintiff submitted a formal written demand on Defendant for payment of his unpaid final compensation but Defendant has not responded to the demand or made payment of all or any portion of the final compensation due.

251.     As a result of Defendant's actions, Loizon has been damaged.

252.     Defendant had the ability to pay Loizon, but willfully refused to do so.

WHEREFORE, PHILIPPE LOIZON, prays for the entry of judgment in his favor and against THE OFFICE OF THE CHIEF JUDGE OF COOK COUNTY, ILLINOIS, on Count IV for compensatory damages in an amount in excess of $150,000.00, for an accounting to determine the amount of compensatory pay due Plaintiff, for interest on final compensation due Plaintiff as provided under the Act, payment of all reasonable attorney's fees and costs, and such additional relief as the Court may deem just and proper.

### COUNT V - VIOLATION OF ILLINOIS MINIMUM WAGE LAW

253.     Plaintiff realleges and incorporates by reference paragraphs 1 through 252 above as and for paragraph 253 of this Count V.

62

254.    This is an action under the Illinois Minimum Wage Law ("IMWL"), 820 ILCS 105/1 et seq., for unpaid compensatory time.

255.    Defendant OCJ is an employer under the IMWL pursuant to 820 ILCS 105/3(c).

256.    Defendant's failure to pay Loizon compensatory time at the rate of one-and-one-half times his regular rate for hours worked in excess of forty (40) in given work weeks violated section 4a of the IMWL, 820 ILCS 105/4a.

257.    As a result of Defendant's actions, Loizon has been damaged.

258.    Defendant's violations of section 4a of the IMWL were willful.

WHEREFORE**,** PHILIPPE LOIZON, prays for the entry of judgment in his favor and against THE OFFICE OF THE CHIEF JUDGE OF COOK COUNTY, ILLINOIS, on Count V for compensatory damages in an amount in excess of $150,000.00, for an accounting to determine the amount of compensatory pay due Plaintiff, for interest on final compensation due Plaintiff as provided under the Act, payment of all reasonable attorney's fees and costs, and such additional relief as the Court may deem just and proper.

### DEMAND FOR TRIAL BY JURY

Plaintiff demands trial by jury on all issues so triable.

Dated: April 17, 2018                                   Respectfully submitted,

                                                        PHILIPPE LOIZON

                                        By:     /s/ Gregory A. Friedman
                                                One of His Attorneys

Gregory A. Friedman
Michelle L. Carey
Freidman Maguire & Carey, P.C.
150 S. Wacker Drive, Suite 2600
Chicago, Illinois 60606
gfriedman@fmpclaw.com
mcarey@fmpclaw.com

63