## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| PHILIPPE Y. LOIZON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 18 C 2759 |
| | ) | |
| | ) | Judge John Z. Lee |
| HONORABLE TIMOTHY C. EVANS, | ) | |
| CHIEF JUDGE OF THE CIRCUIT | ) | |
| COURT OF COOK COUNTY, ILLINOIS, | ) | |
| individually, and THE OFFICE OF THE | ) | |
| CHIEF JUDGE OF THE CIRCUIT | ) | |
| COURT OF COOK COUNTY, ILLINOIS, | ) | |
| | ) | |
| Defendants. | ) | |

### MEMORANDUM OPINION AND ORDER

Philippe Y. Loizon ("Loizon") has brought numerous claims against Timothy C. Evans, the Chief Judge of the Circuit Court of Cook County, Illinois ("Chief Judge Evans"), as well as the Office of the Chief Judge of the Circuit Court of Cook County, Illinois ("OCJ") (collectively "Defendants"), arising out of his termination from the Cook County Adult Probation Department ("APD"), an agency managed and supervised by the OCJ. Defendants have moved to dismiss most of Loizon's claims pursuant to Fed. R. Civ. P. 12(b)(6), to strike some allegations in Loizon's complaint pursuant to Fed. R. Civ. P. 12(f), and to dismiss Chief Judge Evans in his individual capacity. For the reasons below, Defendants' motion to dismiss is granted in part and denied in part, their motion to strike is denied, and their motion to dismiss Chief Judge Evans in his individual capacity is denied.

# I.     <u>Background</u>

## A.     **Factual Background**[1]

Loizon started working for the APD in 1988, beginning what would prove to be a long career as a probation officer ("PO").  Am. Compl. ¶ 8.  Roughly a decade later, Chief Judge Evans was elected to his present post, the duties of which include responsibility for the management and operation of the APD and the OCJ.  *Id.* ¶ 6.

During Loizon's nearly thirty years of service as a PO, he received uniformly positive performance evaluations.  *See id.* ¶¶ 21, 22, 34, 37, 41, 44, 60, 141.  He was promoted to Supervisor in 1996, *id.* ¶ 16, and to Deputy Chief PO in 2003.  *Id.* ¶ 23.  At one point, Loizon supervised almost three times more employees than any other Deputy Chief in the APD, covering roughly 125 POs and about 7,000 probationers.  *Id.* ¶¶ 31–32.

Despite his strong employment record, Loizon's tenure at the APD was tumultuous.  He repeatedly corresponded with Chief Judge Evans and Acting APD Chief Jesus Reyes ("Reyes") regarding the APD's "need for additional manpower, the need for new policies and procedures and clarification of existing policies and procedures, [and] the need for holding officers accountable."  *Id.* ¶ 39.  Not only were these communications allegedly ignored, but Reyes purportedly ordered Loizon to

---

[1]     These facts are alleged in the Amended Complaint, ECF No. 61.  On a motion to dismiss, the court "accept[s] as true all well-pleaded factual allegations [in the complaint] and draw[s] all reasonable inferences in favor of the plaintiff."  *Heredia v. Capital Mgmt. Servs., L.P.*, 942 F.3d 811, 814 (7th Cir. 2019).

cease writing regarding his "concerns about deficiencies in the APD's management and operation." *Id.* ¶ 40.

Some time later, in 2013, Loizon presented a new caseload management strategy for POs at an APD executive staff meeting. *Id.* ¶¶ 63–64. For reasons unknown, Reyes put a stop to Loizon's presentation and ordered Loizon to destroy the materials related to it. *Id.* ¶ 68. Several months later, Loizon complained to the OCJ's Human Resources department that Reyes had subjected him to "discriminatory and harassing conduct." *Id.* ¶ 72. Loizon never received a response to his complaint. *Id.* ¶ 73.

But the real trouble for Loizon began in May 2014, when the *Chicago Tribune* (the "*Tribune*") published an article containing many troubling allegations against him. For example, the article claimed that Loizon had built inappropriate "alliances with the police and FBI" during his work as a PO, that POs serving under him were inadequately trained, that he conducted illegal raids, and that he had an "improper personal relationship with [some] probationers." *Id.* ¶ 83. Loizon maintains that all of the allegations against him in this article were false. *Id.* ¶ 84.

In response to the piece, Chief Judge Evans publicly announced that Loizon had been placed on "desk duty" pending an investigation into his behavior. *Id.* ¶ 117. While on desk duty, Loizon was prohibited from going into the field as part of his normal responsibilities. *Id.* ¶ 119.

Chief Judge Evans received the results of the investigation in August 2014, but has never disclosed any details to the public or to Loizon. *Id.* ¶ 121. Loizon

himself was never "afforded any opportunity to respond" to the *Tribune*'s allegations, *id.* ¶ 118, and his request to Chief Judge Evans that he be provided counsel to assist him in refuting the allegations was denied. *Id.* ¶ 125.

Almost two years later, in March 2016, the *Tribune* published an article critical of Chief Judge Evans' silence regarding the investigation into Loizon. *Id.* ¶ 142. Two days after this article was published, the Chief PO ordered Loizon to appear at a meeting to discuss the allegations against him. *Id.* ¶ 146. At this meeting, Loizon was asked a number of questions, but, according to him, no facts were cited or evidence presented in support of any of the allegations. *Id.* ¶ 148. For his part, Loizon provided the meeting's attendees with the names of a number of witnesses he believed would clear his name, but none of these witnesses were ever interviewed by the OCJ or APD. *Id.* ¶¶ 153–54.

About a year later, in March 2017, the *Tribune* published a third article; this one reported the approximately thousands of hours of compensatory time Loizon had accrued with the APD. "The article was critical of the high number of Loizon's accrued comp hours . . . and referred to Loizon as 'a controversial figure in the [APD].'" *Id.* ¶¶ 157–58. About two weeks after this piece was published, Chief Judge Evans directed that Loizon be terminated. *Id.* ¶ 160. This litigation followed.

## B.    Procedural Background and Summary of Counts

Loizon initially filed a five-count complaint against the OCJ and Chief Judge Evans in his official capacity, alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, the Fair Labor Standards Act ("FLSA"), 29 U.S.C.

§ 201 *et seq.*, and the Illinois Wage Payment and Collection Act ("IWPCA"), 820 Ill. Comp. Stat. 115 *et seq. See* 2/12/19 Order at 1, ECF No. 55. The Court granted Defendants' motion to dismiss Loizon's claims against Chief Judge Evans in his official capacity as duplicative of his claims against the OCJ, but denied Defendants' motion to dismiss Loizon's claim under the IWPCA. *Id.* As to that claim, the Court determined Loizon had alleged that, "contrary to the applicable OCJ policies," he had not received payment for the compensatory time he had accrued with the APD and therefore, had adequately pleaded he "was owed compensatory time under an agreement." *Id.* at 4.

Loizon amended his complaint to add six more counts against the OCJ and Chief Judge Evans, this time in his individual capacity. Pl.'s Resp. Mot. Dismiss and/or Strike ("Pl.'s Resp.") at 1, ECF No. 150. Defendants have now moved to strike Loizon's references to his accrued compensatory time in Count III, to dismiss Counts IV through XI for failure to state a claim, and to dismiss as a defendant Chief Judge Evans in his individual capacity. Defs.' Mem. Supp. Mot. Dismiss ("Defs.' Mem.") at 1, ECF No. 146.

At this junction, a brief summary of Loizon's claims relevant to the motion to dismiss would be helpful. In Count III,[2] Loizon claims that the OCJ violated the FLSA by failing to pay him for the "at least 2,877 . . . compensatory hours" he accrued

---

[2]    Defendants have not moved to dismiss Counts I and II, and they have only moved to strike certain factual allegations from Count III.

with the APD. Am. Compl. at 60, ¶ 238.[3] The OCJ's alleged failure to cash out Loizon's comp hours also largely forms the basis for Counts IV and V, respectively asserting claims under the IWPCA and the Illinois Minimum Wage Law ("IMWL"), 820 Ill. Comp. Stat. 105/1 *et seq.*

Count VI claims a violation of the Consolidated Omnibus Reconciliation Act of 1985 ("COBRA"), 29 U.S.C. § 1161 *et seq.* Loizon alleges that the OCJ failed to notify him of his right to continued insurance coverage under COBRA at the time of his termination. Am. Compl. at 63, ¶ 219. As a result, Loizon's insurance coverage lapsed, and he was forced to procure alternative insurance "nearly three times more costly" than his plan with the APD. *Id.* at 64, ¶ 223.

In Count VII, brought against both the OCJ and Chief Judge Evans in his individual capacity, Loizon alleges that the treatment he experienced at the APD, as well as his termination, constituted intentional infliction of emotional distress ("IIED") under Illinois law. *Id.* at 64–66, ¶¶ 217–27.

Count VIII, against the OCJ only, is based on the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 *et seq.* The FMLA entitles "eligible employees" to take a twelve-week leave if they suffer from a "serious health condition." 29 U.S.C. § 2612(a)(1)(D). Loizon claims that the OCJ retaliated against him for exercising his rights under the FMLA because "he was on approved medical leave" at the time he was terminated. Am. Compl. at 68, ¶ 222.

---

[3] Loizon's counts suffer from a numbering problem. Some paragraph numbers are duplicated in different counts. When this issue occurs, the Court will specify the page number on which the correct paragraph appears.

Counts IX and X, against the OCJ and Chief Judge Evans in his individual capacity, allege that Loizon was deprived of a property interest in his continued employment (Count IX) and a liberty interest in the pursuit of his chosen occupation (Count X) without due process of law, in violation of 42 U.S.C. § 1983. *See generally* Am. Counts IX and X to Am. Compl. ("Am. Counts"), ECF No. 141.[4]

Finally, Count XI, which also names the OCJ and Chief Judge Evans in his individual capacity, alleges that Defendants violated Loizon's First Amendment rights by retaliating against him for speaking out regarding his concerns about APD operations. Am. Compl. at 75, ¶¶ 217–21.

## II.     Legal Standard

To survive a Rule 12(b)(6) motion to dismiss, a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

That said, when considering motions to dismiss, the Court accepts "all well-pleaded factual allegations as true and view[s] them in the light most favorable to the plaintiff." *Lavalais v. Vill. of Melrose Park*, 734 F.3d 629, 632 (7th Cir. 2013). At the same time, "allegations in the form of legal conclusions are insufficient to survive a

---

[4]     The Court gave Loizon leave to amend Counts IX and X on October 7, 2019. Pl.'s Resp. at 2. Amended Counts IX and X will be treated as part of Loizon's complaint for the purposes of this motion. *See Board v. Gill*, No. 05-2102, 2005 WL 8163037, at *1 (C.D. Ill. Nov. 4, 2005) (considering a motion to dismiss amended counts filed separately from the main complaint in the case).

Rule 12(b)(6) motion." *McReynolds v. Merrill Lynch & Co., Inc.*, 694 F.3d 873, 885 (7th Cir. 2012) (citing *Iqbal*, 556 U.S. at 678).

Federal Rule of Civil Procedure 12(f) permits the Court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." The Court will exercise this power "only if the challenged allegations are so unrelated to the present claim as to be void of merit and unworthy of consideration." *Geschke v. Air Force Ass'n*, No. 02 C 50271, 2002 WL 31253746, at *1 (N.D. Ill. Oct. 8, 2002).

### III. Analysis

### A. Defendants' Motion to Dismiss: Loizon's Claims Against the OCJ

#### 1. Whether Counts IV–V, VII, and IX–X Against the OCJ Are Barred by the Eleventh Amendment

At the outset, Defendants assert that the Eleventh Amendment immunizes the OCJ from several of Loizon's claims, while Loizon claims that Defendants waived their Eleventh Amendment defense and that, in any event, the Amendment is inapplicable to Counts IX and X.

The Constitution provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. The Eleventh Amendment prohibits private suits against states and state agencies in federal court unless (1) the state "by unequivocal language waive[s] the protections of the [E]leventh [A]mendment" or (2) "Congress . . . by unequivocal language use[s] its enforcement

powers under the [F]ourteenth [A]mendment to abrogate the states' [E]leventh [A]mendment immunity." *Kroll v. Bd. of Trs. of Univ. of Ill.*, 934 F.2d 904, 907 (7th Cir. 1991).

As a threshold matter, Loizon maintains that Defendants waived Eleventh Amendment immunity by failing to raise it in their first motion to dismiss. Pl.'s Resp. at 17. Nonetheless, courts are entitled to raise Eleventh Amendment immunity on their own initiative. *Ind. Prot. & Advocacy Servs. v. Ind. Family & Soc. Servs. Admin.*, 603 F.3d 365, 370 (7th Cir. 2010). The Court will do so here.

The OCJ is an "arm of the state" of Illinois. *Haag v. Cook Cty. Adult Probation*, No. 17 C 05403, 2018 WL 5249228, at *5 (N.D. Ill. Oct. 22, 2018). Therefore, the Eleventh Amendment protects it from private suits in this Court unless one of the exceptions applies. Loizon, however, provides no indication that Illinois has expressly waived immunity with respect to any of the causes of action alleged in Counts IV and V, VII, or IX and X.[5] Illinois' sovereign immunity statute makes no exceptions for any of these causes of action. 745 Ill. Comp. Stat. 5/1; *see also* 745 Ill. Comp. Stat. 5/1.5 (listing exceptions). And, indeed, Illinois has expressly safeguarded state employees from liability under the IWPCA. 820 Ill. Comp. Stat. 115/1. Moreover, Congress has not abrogated Illinois' immunity regarding any of these causes of action. *See Kroll*, 934 F.2d at 909 (stating § 1983 does not abrogate states' Eleventh Amendment immunity).

---

[5]     As stated above, Count IV arises under the IWPCA, Count V under the IMWL, Count VII under Illinois IIED law, and Counts IX and X under 42 U.S.C. § 1983.

Loizon also argues, however, that Counts IX and X are not subject to the Eleventh Amendment at all because they seek "prospective injunctive relief." Pl.'s Resp. at 19. But Loizon stretches the applicable case law too far. While it is true that the Eleventh Amendment does not bar suits against state *officials* in their official capacity for prospective injunctive relief, this narrow exception "has no application in suits against the states *and their agencies*." *Quick v. Ill. Dep't of Fin. & Prof'l Regulation*, No. 19-cv-7797, 2020 WL 3429772, at *5 (N.D. Ill. June 23, 2020) (quoting *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993)). Accordingly, the Eleventh Amendment prevents the OCJ from being sued even for prospective injunctive relief. Therefore, Counts IX and X, as well as Counts IV, V, and VII, are dismissed as against the OCJ.

### 2. Count VI (COBRA)

With the Eleventh Amendment question answered, the Court turns to the remaining Counts against the OCJ. As to Count VI, Defendants do not challenge the substance of Loizon's claim that the OCJ violated COBRA, but they argue Loizon's requested relief is statutorily barred.

The parties essentially agree that Defendants' COBRA liability is governed by the Public Health Services Act ("PHSA"). [6] This legislation mandates that

---

[6] Loizon asserts, in a section heading, that "[t]he PHSA is [i]napplicable" to Count VI. Pl.'s Resp. at 3. But Loizon does not actually argue this. Rather, as explained below, he insists that the relief Count VI seeks is available under the PHSA. *Id.* Loizon's bare statement that the PHSA does not apply to Count VI is unsupported by any authority and, thus, waived. *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991) ("[P]erfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived.").

governmental health plans "make continuation coverage available for qualified beneficiaries who would lose coverage as a result of a qualifying event." *Mansfield v. Chi. Park Dist. Group Plan*, 946 F. Supp. 586, 591 (N.D. Ill. 1996). Moreover, the PHSA "requires governmental employers to provide each employee with notice of his PHSA rights (1) at the time that he joins a government-sponsored group health plan and (2) at the time his employment is terminated." *Bigelow v. United Healthcare of Miss., Inc.*, 220 F.3d 339, 345 (5th Cir. 2000) (citing 42 U.S.C. § 300bb–6).

The statute allows plaintiffs to seek "appropriate equitable relief" for violations of this provision. 42 U.S.C. § 300bb–7. "Equitable relief typically does not include money damages," *Lyons v. Bd. of Regents of Univ. of Wis. Sys.*, No. 14-CV-460, 2015 WL 59425, at *2 (E.D. Wis. Jan. 5, 2015), but plaintiffs may seek payment in the form of equitable restitution "where money or property identified as belonging in good conscience to the plaintiff c[an] clearly be traced to particular funds or property in the defendant's possession." *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 213 (2002).

In Count VI, Loizon asserts that Defendants failed to notify him of his rights under COBRA when he was terminated, and that this failure compelled him to purchase insurance "nearly three times more costly" than his policy with the APD. Am. Compl. at 63–64, ¶¶ 220–25. As a result, he asks for "compensatory damages in the amount of extra medical expenses and the increase in premiums that he incurred post-termination, . . . punitive damages, [and] payment of all reasonable attorney's fees and costs." *Id.* at 64.

This is not a claim for equitable restitution as described in *Knudson*. Loizon "does not seek the return of any particular funds that the [D]efendants received from him" and indeed does not allege "that he ever paid *anything* to the [D]efendants;" rather, he "seeks compensation" for expenses he incurred from third parties. *See Lyons*, 2015 WL 59425, at *3 (emphasis added) (holding that such a claim is legal, not equitable). As such, Loizon's requested relief is barred by the PHSA.

Undeterred, Loizon maintains that Count VI complies with the PHSA, because "an award of money as restitution for pecuniary losses caused by a defendant, where such relief is necessary to make a plaintiff whole," is a form of equitable relief. Pl.'s Resp. at 3 (quoting *Mansfield*, 946 F. Supp. at 592). But the Court does not find *Mansfield* persuasive, because it was decided before "the Supreme Court clarified the distinction between restitution at law and restitution in equity" in *Knudson*. *See Lyons*, 2015 WL 59425, at *3 (declining to follow *Mansfield*'s holding respecting equitable relief in light of *Knudson*).

Count VI also requests "such additional relief as the Court may deem just and proper," which may include equitable relief. Am. Compl. at 64. But in his response to Defendants' motion to dismiss, Loizon argues only that he is entitled to a monetary award to make him whole. Because the Court has determined that this form of relief is not "equitable" and Loizon has identified no other basis for relief, Count VI is dismissed. *See Lyons*, 2015 WL 59425, at *3 (dismissing a COBRA claim seeking "any and all relief" and "such other relief as may be just and appropriate" because the

plaintiff "ma[de] no attempt to argue" that he was entitled to any relief other than a monetary award).

### 3. Count VIII (FMLA Retaliation)

Turning to Count VIII, in which Loizon claims that the OCJ retaliated against him for taking FMLA leave, Defendants assert that Loizon has not even pleaded he was entitled to FMLA leave to begin with.

The FMLA prohibits employers from retaliating against an employee who takes, or attempts to take, FMLA leave. *Pagel v. TIN Inc.*, 695 F.3d 622, 626 (7th Cir. 2012) (citing 29 U.S.C. § 2615(a)(2)). A plaintiff bringing a claim of FMLA retaliation must "be entitled to FMLA benefits." *Id.* at 631.

Employees are entitled to FMLA leave if they suffer from a "serious health condition" that makes them "unable to perform" their job. 29 U.S.C. § 2612(a)(1)(D). A serious health condition is one that involves "inpatient care in a hospital, hospice, or residential medical care facility" or "continuing treatment by a health care provider." 29 U.S.C. § 2611(11)(A)–(B).

Loizon does not even state, much less support with specific factual allegations, that he has ever had a health condition that satisfies these requirements. All Loizon's complaint says is that he "was approved for a personal leave of absence due to medical reasons from October 28, 2016 through October 28, 2017." Am. Compl. at 67, ¶ 220. Loizon offers no details about the condition(s) that gave rise to this leave, and his vague assertion that the leave was for "medical reasons" does not support the inference that he was entitled to FMLA benefits. *See Jackson v. Dakkota Integrated*

*Sys., LLC*, No. 1:14-cv-06384, 2015 WL 1138565, at *2 (N.D. Ill. Mar. 10, 2015) (holding an employee had not pleaded that she had a serious health condition when she merely stated that she took off work to see a physician regarding treatment for a condition). Even weaker than the *Jackson* plaintiff's unsuccessful attempt to plead an FMLA claim, Loizon does not even claim that he sought or received medical advice or treatment *at all* during his leave. Nor has Loizon pleaded that any health condition he may have had rendered him unable to perform his duties as a PO. *See Bucks v. Mr. Bults, Inc.*, 218 F. Supp. 3d 776, 780 (S.D. Ill. 2016) (holding a truck driver had not adequately alleged that injuries caused by a fall that required surgery rendered him unable to perform his job, because he had offered only conclusory allegations to that effect). If the plaintiff in *Bucks*, whose injuries required surgery, did not sufficiently plead that he was incapacitated from his job, then Loizon, who has not even identified a specific condition that precipitated his leave, certainly has not. Accordingly, Count VIII is dismissed.[7]

### 4. Count XI (First Amendment)

With respect to Count XI, Loizon claims that Defendants retaliated against him for engaging in constitutionally protected speech regarding matters of public

---

[7] Loizon also draws the Court's attention to ¶ 156 of his Amended Complaint, in which he alleges that he "took what turned out to be an extended leave to care for his mother and for himself and family resulting from injuries sustained when his family van was rear ended outside of Indianapolis on the way to a softball tournament in Columbus, Ohio." This allegation suffers from the same deficiencies discussed above. Loizon does not allege that he or any of his family members sought or received medical treatment as a result of this accident, or that any injuries he sustained rendered him unable to perform the duties of a PO.

concern. Defendants respond that Loizon's speech is not protected by the Constitution because it was performed pursuant to his professional duties.

"[T]he First Amendment protects a public employee's right, in certain circumstances, to speak *as a citizen* addressing matters of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006) (emphasis added). But the First Amendment affords no protection to speech "employees make pursuant to their professional duties." *Id.* at 426. "The proper inquiry" as to whether an employee has spoken as a citizen or pursuant to his professional duties "is a practical one." *Id.* at 424. Employees may speak as citizens even if their speech "concerns the subject matter of" their employment and "occurs inside the[ir] office." *Chrzanowski v. Bianchi*, 725 F.3d 734, 738 (7th Cir. 2013). But speech promulgated in furtherance of an employee's "daily professional activities" is not constitutionally protected. *Id.* at 739 (quoting *Garcetti*, 547 U.S. at 422).

In support of his First Amendment claim, Loizon points to the following allegations. He wrote to Reyes "concerning a severe supervisor shortage in the field service units." Am. Compl. ¶ 38. He "provided written requests to his superiors" regarding "the need for additional manpower, the need for new policies and procedures and clarification of existing policies and procedures, [and] the need for holding officers accountable." *Id.* ¶ 39. He "expressed concerns about deficiencies and dysfunctionalities within the APD" to Chief Judge Evans. *Id.* ¶ 61. And he proposed a new case management strategy to high-ranking APD officials at a meeting in 2013. *Id.* ¶¶ 63–71.

The Court has no difficulty concluding that, in all of these instances, Loizon spoke as an APD employee rather than as a citizen. As a Deputy Chief PO, Loizon's responsibilities included "[r]eview[ing] and evaluat[ing] staff performance," "[b]e[ing] actively involved with policymaking," "recommend[ing] the issuance of employee discipline as needed," "[w]orking closely with all the directors in the department to address department issues," and "preparing reports." *Id.* ¶ 24. All of the speech he alleges he undertook was plainly in furtherance of his daily professional obligations as he describes them, and, thus, the speech at issue is not constitutionally protected.

Of course, Loizon is correct that "there are few matters 'of greater public concern in a large metropolitan area than police protection and public safety.'" Pl.'s Resp. at 15 (quoting *Gustafson v. Jones*, 290 F.3d 895, 907 (7th Cir. 2002)). But the mere fact that Loizon's job implicated matters of public concern does not grant constitutional significance to speech that is clearly within the scope of that job. Otherwise, a great majority of public employees' speech related to their professional duties would be protected by the First Amendment.

Loizon's argument is simply foreclosed by *Garcetti* and Seventh Circuit precedent. In *Sigsworth v. City of Aurora, Illinois*, the plaintiff, an employee of a city police department, reported to his supervisors his "suspicions" that members of a task force had tipped off "key targets in a drug raid." 487 F.3d 506, 507 (7th Cir. 2007). The Seventh Circuit found that the plaintiff's report was not constitutionally protected speech, as "he was merely doing what was expected of him as a member of the task force." *Id.* at 511. *Sigsworth* is on point here. In voicing his concerns about

16

the operations of the APD and proposing policy changes, Loizon was merely doing what he himself says was expected of him as a Deputy Chief PO. Put differently, Loizon engaged in the speech at issue in this case "because that is what he," as a Deputy Chief, "was employed to do." *See Garcetti*, 547 U.S. at 421. Accordingly, Loizon has not pleaded a cause of action under the First Amendment, and Count XI is dismissed as to both the OCJ and Chief Judge Evans.

## B. Claims Against Chief Judge Evans in His Individual Capacity

### 1. Whether the Eleventh Amendment Bars Claims Against Chief Judge Evans in His Individual Capacity

Here, Defendants argue that the Eleventh Amendment immunizes Chief Judge Evans, in his individual capacity, from the claims against him, while Loizon claims the Eleventh Amendment does not apply to individual capacity claims.

Generally, lawsuits against state officials in their individual capacities are not barred by the Eleventh Amendment, because any judgment from such a suit would be paid from the official's personal assets rather than the state's treasury. *Luder v. Endicott*, 253 F.3d 1020, 1022–23 (7th Cir. 2001). "But even when a suit is against a public officer in his or her individual capacity, the court is obliged to consider whether it may really and substantially be against the state." *Id.* at 1023.

A suit is against a state, rather than an individual official, "if the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration, or if the effect of the judgment would be to restrain the Government from acting, or to compel it to act." *Id.* (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101 n.11 (1984)). As such, public employees cannot

17

obtain relief like back pay or reinstatement from individual defendants, because these remedies would require state action to implement. *Benjamin v. Ill. Dep't of Fin. & Prof'l Regulation*, 837 F. Supp. 2d 840, 852 (N.D. Ill. 2011).

Defendants contend that Loizon's complaint "contains no plausible claim for relief against [Chief] Judge Evans in his individual capacity" because it fails to allege that he "undertook any actionable conduct outside the scope of his employment." Defs.' Mem. at 5. This argument misapprehends the Eleventh Amendment analysis. Defendants' position would accord state officials blanket immunity for acts performed pursuant to their official duties, but the Supreme Court has expressly held such immunity does not exist. *See Hafer v. Melo*, 502 U.S. 21, 28 (1991). As indicated above, the capacity in which a defendant is sued depends not on the "official" or "individual" character of his actions but on the effect that a judgment against that defendant would have on the operations of a sovereign state. *See Luder*, 253 F.3d at 1022–23.

Loizon is explicitly suing Chief Judge Evans "individually" and therefore seeks judgment against his assets. Am. Compl. at 1 (case caption). Defendants have given the Court no reason to believe that a judgment against Chief Judge Evans would necessarily expend itself on Illinois' treasury, interfere with the public administration, or restrain Illinois from acting or compel it to act. Accordingly, the Eleventh Amendment has no bearing on Loizon's individual-capacity claims against Chief Judge Evans, and Defendants' motion to dismiss Chief Judge Evans, individually, from this action is denied.

But this conclusion comes with significant caveats. Some of the Counts in which Chief Judge Evans is named request relief that would require state action to implement, such as Loizon's reinstatement. This relief cannot properly be granted by an individual defendant. Accordingly, the Court dismisses Count X against Chief Judge Evans in his individual capacity to the extent Loizon seeks reinstatement. Am. Counts at 13.[8]

### 2. Count VII (IIED)

As to Count VII, Defendants insist that Chief Judge Evans did not allegedly engage in any extreme or outrageous conduct. Loizon counters that his own emotional vulnerability, as well as Chief Judge Evans' alleged abuse of official power, aggravate the severity of the conduct at issue.[9]

---

[8] The Court acknowledges that this result is in tension with the Court's February 12, 2019 Order, in which it dismissed claims against Chief Judge Evans in his official capacity as duplicative of claims against the OCJ. 2/12/19 Order at 3. Loizon had argued that the official capacity claims against Chief Judge Evans should remain because he would be "responsible for carrying out any requested prospective injunctive relief." *Id.* at 2. The Court nevertheless dismissed the official capacity claims because Loizon had "not presented any argument as to why the OCJ would not also be responsible for obeying any injunction issued in this case." *Id.* at 3. As discussed, however, prospective injunctive relief may only be sought against state officials in their official capacity. The parties had not previously addressed the Eleventh Amendment or its implications when briefing the prior motion to dismiss. Because the issue has now been brought to light, the Court holds *sua sponte* that Loizon may assert Count X against Chief Judge Evans in his official capacity to the extent that prospective injunctive relief is requested. The Court grants Loizon leave to amend his complaint in this respect.

[9] In response to this Count, Defendants also assert that Chief Judge Evans is protected by Illinois' sovereign immunity statute. 745 Ill. Comp. Stat. 5/1. The Court will bypass this defense and proceed to the merits of Loizon's IIED claim, because it plainly fails as a matter of law. *See, e.g.*, *Jose-Nicolas v. Berry*, No. 3:15-cv-964-NJR-DGW, 2018 WL 1466769, at *9 (S.D. Ill. Mar. 2, 2018) (declining to address an Illinois state sovereign immunity defense to an IIED claim because the claim was meritless).

To prevail on an IIED claim under Illinois law, a plaintiff must show (1) that the defendant engaged in a course of extreme and outrageous conduct; (2) that the defendant intended, or was aware of a high probability, that his conduct would cause the plaintiff severe emotional distress; and (3) that the plaintiff in fact suffered severe emotional distress. *McGrath v. Fahey*, 126 Ill. 2d 78, 86 (1988). The element of extreme and outrageous conduct requires that a defendant took actions "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency." *Pub. Fin. Corp. v. Davis*, 66 Ill. 2d 85, 90 (1976) (quoting Restatement (Second) of Torts sec. 46, comment D (1965)). "[I]n the absence of conduct calculated to coerce an employee to do something illegal, [Illinois] courts have generally declined to find an employer's . . . conduct sufficiently extreme and outrageous as to give rise to an action for [IIED]." *Arroyo v. Volvo Grp. N. Am., LLC*, 805 F.3d 278, 288 (7th Cir. 2015) (quoting *Welsh v. Commonwealth Edison Co.*, 713 N.E.2d 679, 684 (Ill. App. Ct. 1999)).

Loizon has failed to allege that Chief Judge Evans engaged in any extreme and outrageous conduct. While Chief Judge Evans did publicly subject Loizon to potentially embarrassing discipline, and eventual termination, it is clear as a matter of Illinois law that such actions, without more, do not give rise to an IIED claim. *See Graham v. Commonwealth Edison Co.*, 742 N.E.2d 858, 866 (Ill. App. Ct. 2000) (noting that Illinois courts "often hesitate to find a claim for [IIED] in employment situations" based on concern that "if everyday job stresses resulting from discipline, personality conflicts, job transfers, or even terminations could give rise to a cause of

action for [IIED], nearly every employee would have a cause of action."); *see also Harriston v. Chi. Tribune Co.*, 992 F.2d 697, 703 (7th Cir. 1993) (holding that a plaintiff had not alleged the required level of extreme and outrageous conduct where she alleged her employer reprimanded her for no reason, rebuked her for asking about policy changes, and falsely accused her of failing to perform her duties).

In an effort to preserve his IIED claim, Loizon asserts that Chief Judge Evans was, or should have been, aware that he was "particularly susceptible to emotional distress." Pl.'s Resp. at 7. But while Illinois courts may consider susceptibility to emotional distress as a factor in evaluating an IIED claim, it is not dispositive. *Edwards*, 2015 WL 6445417, at *4 (holding that defendants' actions were not extreme and outrageous even though the plaintiff alleged they knew she suffered from post-traumatic stress disorder); *Khan v. Am. Airlines*, 266 Ill. App. 3d 726, 733 (1994) (dismissing an IIED claim despite plaintiff's insistence that defendants were aware of his "added sensitivity"). Even taking Loizon's alleged susceptibility to emotional distress into account, Chief Judge Evans' conduct did not go beyond all possible bounds of decency.

Loizon also contends that Chief Judge Evans' "position of power" over him aggravated the outrageousness of his conduct. Pl.'s Resp. at 7. The Court is not persuaded by this argument. Employers generally hold significant power over their employees, and, yet, Illinois courts have refused to find employers' conduct extreme and outrageous absent an allegation they coerced an employee to break the law. *Miller v. Equitable Life Assur. Soc. of U.S.*, 181 Ill. App. 3d 954, 958 (1989) (finding

the plaintiff had not alleged extreme and outrageous conduct because her employer did not "coerce" her into "illegal activity"); *Harris v. First Fed. Sav. & Loan Ass'n of Chi.*, 129 Ill. App. 3d 978, 982 (1984) (same). Loizon has made no such allegations, so he has failed to state a claim for IIED.

As a last resort, Loizon points out that Chief Judge Evans placed him on desk duty and asserts a court in this district has recognized that desk duty "'is an extremely embarrassing form of discipline' within the APD." Pl.'s Resp. at 6 (quoting *Flanagan v. Office of Chief Judge of Circuit Court of Cook Cty., Ill.*, No. 06 C 1462, 2007 WL 2875726, at *10 (N.D. Ill. Sept. 28, 2007)). Loizon's reliance on *Flanagan* is misplaced. The *Flanagan* court was not considering an IIED claim, but rather various employment discrimination and retaliation claims. *Id.* at *1. Furthermore, in the portion of the opinion Loizon quotes, the court was merely reciting testimony given by a witness in the case at hand, not drawing independent conclusions about the "embarrassing" nature of desk duty. *Id.* at *10. Because Loizon has failed to allege extreme and outrageous conduct on Chief Judge Evans' part, Count VII is dismissed.

### 3. Count IX (Deprivation of Property Interest Without Due Process)

Turning to Loizon's § 1983 claims, Defendants contend that Loizon had no property interest in his continued employment with the APD, while Loizon argues that an employment document granted him such an interest.

To plead a cause of action under § 1983, a plaintiff must allege that a defendant acted "under color of state law" and "deprived [the plaintiff] of rights,

22

privileges or immunities guaranteed by the Constitution or laws of the United States." *Bayview-Lofberg's, Inc. v. City of Milwaukee*, 905 F.2d 142, 144 (7th Cir. 1990). Defendants do not dispute that they acted under color of state law in terminating Loizon.

To establish a due process claim, however, a plaintiff also must show "(1) that the claimed interest is a property or liberty interest under the [F]ourteenth [A]mendment; (2) that 'the alleged loss . . . amounted to a deprivation'; and (3) that the deprivation was without due process of law." *Id.* (quoting *Polenz v. Parrott*, 883 F.2d 551, 555 (7th Cir. 1989)). Property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). In Illinois, "'terms of employment must provide that termination will be only for cause or otherwise evince mutually explicit understandings of continued employment' in order for there to be a property interest in employment." *Meade v. Moraine Valley Cmty. Coll.*, 770 F.3d 680, 686 (7th Cir. 2014) (quoting *Cromwell v. City of Momence*, 713 F.3d 361, 364 (7th Cir. 2013)).

In their arguments related to Count IX, both parties zero in on the APD's "Administrative & Sworn Supervisor Corrective Action Procedures" ("CAP"). Am. Counts, Ex. B, Administrative & Sworn Supervisor Corrective Action Procedures ("CAP") at 1, ECF No. 141. The CAP is meant "[t]o provide a process to investigate an infraction of policy/procedure, job responsibility or other behavior deemed

unacceptable," and it applies "[t]o all [APD] department managers and administrative staff." *Id.*

Loizon pleads, and Defendants do not dispute, that the CAP applied to him because he was an APD department manager at the time he was terminated. Am. Counts ¶ 223. Loizon asserts that the CAP created a property interest in his employment, citing *Duldulao v. Saint Mary of Nazareth Hospital Center*. In that case, the Illinois Supreme Court held that an employment document "creates enforceable contractual rights" when (1) the document "contain[s] a promise clear enough that an employee would reasonably believe an offer has been made," (2) the document is "disseminated to the employee in such a manner that the employee is aware of its contents and reasonably believes it to be an offer," and (3) the employee "accept[s] the offer by commencing or continuing to work after learning" of the document. 115 Ill. 2d 482, 490 (1987).

Loizon argues that the CAP's repeated use of mandatory language, such as "discharge *shall* include all the steps found in the above section," creates a clear promise of, and therefore a property interest in, continued employment. Pl.'s Resp. at 11 (quoting Am. Counts ¶ 261) (emphasis added). In response, Defendants note that the CAP states corrective action "may be given for any policy infraction," and insist that the use of the word "may" shows that the CAP is permissive rather than mandatory. Defs.' Reply at 6, ECF No. 154 (quoting CAP at 1, Am. Counts).

But Loizon points to *Robinson v. Ada S. McKinley Community Services, Inc.* In that case, the Seventh Circuit determined that an employment document

24

contained a sufficiently clear contractual promise because its disciplinary procedures section repeatedly used mandatory language, even though the section also stated that "[v]iolations of agency standards by an employee *may* warrant disciplinary action." 19 F.3d 359, 362–63 (7th Cir. 1994) (emphasis added).

Both parties' arguments in this regard largely miss the mark. Neither *Duldulao* nor *Robinson* dealt with § 1983 claims or the creation of a property interest in employment. The question in this case is not whether an employment document makes certain disciplinary procedures contractually mandatory (the issue addressed in *Duldulao* and *Robinson*) but whether it grants Loizon a constitutionally protected property interest in his continued employment at the APD. These questions are not the same.

As the Seventh Circuit has made clear, "not every employment contract creates a property right." *Campbell v. City of Champaign*, 940 F.2d 1111, 1112 (7th Cir. 1991). Thus, even an employment document that satisfies the criteria set forth in *Duldulao* does not necessarily create a property interest in continued employment protected by § 1983. *Id.* (rebuffing plaintiff's attempt to "tack" *Duldulao* on to her § 1983 claim). "[A] contract that creates merely a right to a procedure does not create a property right within the meaning of the due process clause." *Lim v. Cent. DuPage Hosp.*, 871 F.2d 644, 647–48 (7th Cir. 1989); *see id.* (holding that a hospital's breach of "procedures for determining whether a member of the staff will be reappointed" may have violated the plaintiff's contractual rights but did not constitute a deprivation of a constitutionally protected property interest); *see also Cheli v.*

*Taylorville CUSD #3*, No. 19-cv-03085, 2020 WL 2802815, at *5 (C.D. Ill. May 29, 2020) (holding that an employment document entitling employees "to a conference prior to a suspension or discharge" did not create a constitutional entitlement to continued employment). In short, "[w]hen the claimed deprivation of property is the loss of a job, the entitlement must be to a job, rather than just to a set of disciplinary procedures." *Campbell*, 940 F.2d at 1113.

With these general principles in mind, the Court turns to the CAP. As noted by Defendants, nothing in this document entitles Loizon to continued employment at the APD. The CAP does not provide fixed terms of employment for department managers or administrative staff; nor does it state that such employees shall be terminated only for cause. *See Davis v. Vill. of Hazel Crest*, No. 17-cv-3724, 2018 WL 835224, at *5 (N.D. Ill. Feb. 13, 2018) (dismissing a due process claim where the plaintiff failed to allege that he had a guarantee of employment). Even if Loizon's arguments were to prevail, he would merely have established a contractual entitlement to certain pre-termination procedures. But that, in and of itself, does not give Loizon a property interest in his employment that may be vindicated through § 1983. Accordingly, Count IX is dismissed.

### 4.   Count X (Impairment of Liberty Interest Without Due Process)

Even though Loizon has not pleaded that he had a property interest in his job, his claim for deprivation of his liberty interest in pursuing his occupation may proceed, as Defendants have provided no pertinent arguments for its dismissal.

26

Even a plaintiff who does not have a property interest in his job may claim that a defendant deprived him of a constitutionally protected liberty interest. *Czupryn v. Burke*, No. 2:07-cv-350-WTL-WGH, 2009 WL 972841, at *2 n.2 (S.D. Ind. Apr. 9, 2009). "[W]hen a state actor casts doubt on an individual's 'good name, reputation, honor or integrity' in such a manner that it becomes 'virtually impossible for the [individual] to find new employment in his chosen field,' the government has infringed upon that individual's liberty interest to pursue the occupation of his choice." *Doyle v. Camelot Care Ctrs., Inc.*, 305 F.3d 603, 617 (7th Cir. 2002) (quoting *Townsend v. Vallas*, 256 F.3d 661, 670 (7th Cir. 2001)). Such infringement occurs without due process when the plaintiff is not afforded "an opportunity to clear his name." *Roth*, 408 U.S. at 573 n.12.

Though liberty and property interests are legally distinct, Defendants' filings treat Counts IX and X as one and the same. Because Defendants have offered no argument unique to Count X that is supported by pertinent authority, they have not carried their burden of showing that Count X fails to state a claim, and their motion to dismiss that Count therefore fails. *See Berkowitz*, 927 F.2d at 1384 ("[P]erfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived."). Accordingly, Count X survives dismissal as against Chief Judge Evans.

## C. Defendants' Motion to Strike

Finally, Defendants have moved to strike Loizon's references to his accrued compensatory time in support of Count III, arguing that he cannot recover damages

for comp hours accrued in excess of the FLSA's statutory maximum. Although Plaintiff asserts that Defendants have waived the argument by not raising it in their previously filed motion to dismiss, the Court concludes that Defendants' position lacks merit, and, thus, there is no harm in addressing it.

The FLSA permits states and their political subdivisions, such as the APD and OCJ, to offer their employees, "in lieu of overtime compensation, compensatory time off at a rate not less than one and one-half hours for each hour of employment for which overtime compensation is required by this section." 29 U.S.C. § 207(o)(1); *Christensen v. Harris Cty.*, 529 U.S. 576, 578 (2000). Employees engaged in public safety work may only accrue 480 hours of comp time. 29 U.S.C. § 207(o)(3)(A). Defendants do not dispute that, as a PO, Loizon was engaged in public safety work. Public safety employees must receive standard "overtime compensation" for comp time accrued in excess of the 480-hour maximum. *Id.*

Loizon has alleged that he has accrued "thousands of hours" in comp time, clearly exceeding the FLSA's cap. Am. Compl. ¶ 128. Defendants thus refer to Loizon's attempt to recover compensation for this comp time as a "clear legal impossibility." Defs.' Reply at 12. But the FLSA plainly states that employees "shall . . . be paid overtime compensation" for "additional overtime hours of work" above the 480-hour maximum. 29 U.S.C. § 207(o)(3)(A). Loizon has explicitly alleged that the OCJ violated this statutory requirement. Am. Compl. ¶¶ 128–30. What is more, Loizon indicates that other APD employees' "accrued, unpaid comp time was

28

paid," *id.* at 5, and that the OCJ's director of personnel "confirmed" his number of accrued comp hours following his termination. *Id.* at 61, ¶ 240.

The mere fact that Loizon could not legally accrue more than 480 hours of compensatory time does not relieve the OCJ of its obligation to pay him for his overtime work. *See Beck v. City of Cleveland, Ohio*, 390 F.3d 912, 920 (6th Cir. 2004) ("Congress, however, did not intend to relieve . . . governmental entities of all financial costs of overtime, as reflected in Section 207(o)(3)(A) that limits compensatory time to 480 hours and requires any excess to be paid in cash."). Indeed, if the OCJ allowed Loizon to accrue comp time in excess of 480 hours without cashing him out, that itself would violate the FLSA. *Baker v. Stone Cty., Mo.*, 41 F. Supp. 2d 965, 997 (W.D. Mo. 1999). As such, Loizon's references to his compensatory time are material to his case, and the Court will not strike them from his amended complaint.

## IV.    Conclusion

For the reasons set forth above, Defendants' motion to dismiss is granted in part and denied in part.  In summary, the motion is granted as to Counts IV, V, VI, VII, VIII, IX, and XI.  The motion is also granted as to Count X against the OCJ and to the extent it seeks reinstatement, but it is otherwise denied.  But Loizon is granted leave to amend Count X to add a claim against Chief Judge Evans in his official capacity for the sole purpose of securing prospective injunctive relief.  Defendants' motion to dismiss Chief Judge Evans in his individual capacity is denied.  Defendants' motion to strike Loizon's references to his compensatory time in support of Count III also is denied.


**IT IS SO ORDERED.**          **ENTERED   9/3/20**

_____
**John Z. Lee**
**United States District Judge**

30