## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| PHILIPPE Y. LOIZON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 18 C 2759 |
| | ) | |
| HONORABLE TIMOTHY C. EVANS, | ) | Judge John Z. Lee |
| CHIEF JUDGE OF THE CIRCUIT | ) | |
| COURT OF COOK COUNTY, ILLINOIS, | ) | |
| individually, and THE OFFICE OF | ) | |
| THE CHIEF JUDGE OF THE CIRCUIT | ) | |
| COURT OF COOK COUNTY, ILLINOIS, | ) | |
| | ) | |
| Defendants. | ) | |

### MEMORANDUM OPINION AND ORDER

After Phillippe Loizon was fired from his position as Deputy Chief of the Cook County Adult Probation Department ("APD"), he sued Chief Judge of the Circuit Court of Cook County Timothy C. Evans, as well as the Office of the Chief Judge of the Circuit Court of Cook County, Illinois ("OCJ"). Loizon claims that the OCJ discriminated and retaliated against him in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and that the OCJ owes him wages for compensatory time under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.* Loizon also brings a claim under 42 U.S.C. § 1983 alleging that Chief Judge Evans made public statements that deprived Loizon of his liberty interest in pursuing his occupation without due process.

Defendants have moved for summary judgment, and Loizon has cross moved for partial summary judgment as to his FLSA claim. For the reasons provided below, Defendants' motion is granted, and Loizon's cross-motion is denied.

## I.      Background Facts[1]

### A.      Loizon's Career at the APD

Loizon began working as a probation officer for the APD in 1988. Defs.' Statement of Facts ("DSOF") ¶ 5. He was eventually promoted to supervisor in 1996, and then to Deputy Chief in 2003. *Id.*; Pl.'s Ex. 84, Loizon Dep. at 44:23–45:3, ECF No. 232-30. During the years he served as Deputy Chief, Loizon first reported to Thomas Quinn, then Lavone Haywood, then Matthew Sobieski, all of whom have served as Assistant Chief Probation Officers. Loizon Dep. at 51: 1–14.

But like all APD employees, Loizon ultimately answered to Chief Judge Evans. DSOF ¶ 4. Evans has been the Chief Judge of the Circuit Court of Cook County, Illinois, since 2001. *Id.* As Chief Judge, he is responsible for appointing the Chief Probation Officer, as well as all other probation officers for the Circuit. *Id.*; *see* 730 Ill. Comp. Stat. 110/15(2)(b).

As Deputy Chief, Loizon oversaw the operation of the caseload and weapons division, a job that included managing 120 supervisors and their subordinates.

---

[1]      The following facts are undisputed, unless otherwise noted. While Defendants argue that certain portions of Plaintiff's submissions violate Local Rule 56.1, such arguments are unnecessary because the Court ordinarily reviews submissions for compliance when ruling on summary judgment motions. Suffice it to say that, where a proponent of a fact statement has not cited supportive evidence in the record, the fact statement has been ignored. Also, where a party's denial of a statement of fact is non-responsive, partially non-responsive, or unsupported by a citation to the record, the proponent's statement of fact has been deemed admitted, in whole or in part as appropriate.

Loizon Dep. at 53:22–54:8; Pl.'s Ex. 115, Deputy Chief Essential Duties ¶ 2 ("DC Duties"), ECF No. 233-7; DSOF ¶ 10. On an annual basis, Loizon evaluated supervisors and approved their evaluations of subordinates. DSOF ¶ 9. Those evaluations determined whether Loizon's subordinates received merit pay increases—if Loizon gave the employee an overall rating of "exceeds expectations," they would automatically receive a merit pay step increase. *See id.*; Defs.' Ex. 9, Larson Dep. at 76:20–77:21, ECF No. 215-9.

Loizon had no authority to hire or fire any APD employee. *See* Pl.'s Resp. DSOF ¶ 11. But he was authorized to make staffing recommendations and placements; review and evaluate staff performance; provide staff with training and guidance; and identify, recommend, and deliver correction action for staff for deficient or delinquent performance and/or policy and procedure infractions. DC Duties ¶¶ 4, 13. Loizon states that he has recommended in the past that investigations be undertaken and/or that corrective action be imposed in certain instances, and when doing so, he complied with applicable collective bargaining agreements, as well as the APD's infraction investigation policy. Pl.'s Resp. DSOF ¶ 8. While Loizon's superiors accepted some of his recommendations, there were times when his recommendations did not appear to result in any corrective action. *Id.* Loizon points to two such examples, one in June 2014 and another in April 2016. In both times, he informed his supervisors that a probation officer, Lorenzo Burton, had engaged in misconduct by cultivating informants, but Loizon is unaware of any corrective action that was taken as a result. *Id.*

3

**B.** **The *Chicago Tribune* Inquiry and First Article**

Loizon's performance as Deputy Chief came under scrutiny in early May 2014, when Todd Lighty and Cynthia Dizikes of the *Chicago Tribune* requested an interview with Chief Judge Evans concerning the APD's weapons units, including the gang intervention and intensive probation units. DSOF ¶ 49; *see* Defs.' Ex. 30, Email from T. Lighty to T. Evans (May 9, 2014), ECF No. 215-30. The request noted that those units were overseen by Haywood, whom Evans had promoted to Chief Probation Officer in March 2014. Pl.'s Resp. DSOF ¶ 49, ECF No. 227. Chief Judge Evans instructed his staff to have Haywood appear for the interview. DSOF ¶ 49.

The reporters interviewed Haywood and asked him about allegations that probationers and non-probationers had made against Loizon relating to his conduct during searches and his relationships with certain probationers who became informants for law enforcement. *Id.* ¶ 50; Pl.'s Ex. 62, Haywood's Post-Interview Resps., ECF No. 232-12. Due to these allegations, Haywood placed Loizon on desk duty as of May 15, 2014, pending an internal investigation. DSOF ¶ 69. Haywood notified Loizon that he was to work at his desk rather than going out into the community. *Id.*

An article appeared in the *Chicago Tribune* on May 21, 2014. *Id.* ¶ 51; *see* Defs.' Ex. 31, Cynthia Dizikes and Todd Lighty, *Warrantless Searches Draw Criticism*, CHI. TRIB. (May 21, 2014) ("5/21/14 Article"), ECF No. 215-31. According to its authors, for years, Cook County probation officers had "quietly teamed up with law enforcement to go into probationers' homes without warrants, looking for guns,

4

drugs and information and leading to questionable and illegal searches." 5/21/14 Article at 1. The article goes on to state: "[U]nlike police, [probation officers] have the power under the law to visit homes and conduct surprise searches without court-ordered warrants if they have 'reasonable suspicion,' according to agreements probationers sign." DSOF ¶ 53. The *Tribune* found that such an arrangement "has proved beneficial to Chicago police and the FBI, which . . . have assisted [probation officers] during searches, gaining access to homes where they might otherwise need a warrant." *Id.*

The article mentioned specifically that these "concerns stemmed from the activities of the gun-carrying probation units supervised by Deputy Chief Philippe Loizon, a veteran probation officer who has built alliances with police and the FBI, at times over his bosses' objections." 5/21/14 Article at 2. Among other incidents, the article noted a warrantless search conducted by Loizon and police officers of non-probationer Kenny Ray, during which the officers discovered a handgun and marijuana, resulting in criminal charges. *Id.* at 3–4. Cook County Circuit Court Judge Domenica Stephenson later dismissed these charges, concluding that the officers had exceeded their authority. *Id.* at 4. The *Tribune* also reported that, according to Ray, he was missing $1,500.00 and a GPS device after the search. *Id.*

The *Tribune* article also questioned Loizon's personal ties to certain probationers, like Robert Jones, who would go on to become confidential informants for law enforcement. *Id.* at 7–8. Probation officers told the *Tribune* that some officers pressured probationers to become informants by promising special treatment and by

threatening to disrupt their lives if they refused to cooperate. *Id.* at 8. While Jones was on probation, Loizon took him to the dentist, and Jones eventually became an informant. *Id.* According to Jones, he felt that the APD should have focused instead on helping him find a job rather than pressuring him to risk his own safety or threatening him with jail time. *Id.*

## C. The OCJ Press Release

The same day that the article came out, the OCJ issued a press release. It announced that Chief Judge Evans had retained the law firm Laner Muchin Ltd. to investigate whether the leaders of the APD's specialized weapons units[2] encouraged and participated in improper searches and engaged in other questionable practices ("Laner Muchin investigation"). DSOF ¶¶ 65–66. According to the press release, Chief Judge Evans was "outraged by these allegations which, if true, could be considered a blatant disregard of constitutional rights[.]" *Id.* ¶ 66. The OCJ assured the public that, "[i]f the investigation determines that best practices require modification of departmental procedures and policies, those recommendations will be evaluated and implemented." *See id.* Lastly, the press release noted that Loizon had been reassigned to desk duty. *Id.* ¶ 68.

---

[2] APD's specialized weapons units oversee probationers under the gang division and the intensive probation supervision division. *See* Pl.'s Ex. 6, Haywood Dep. at 16:17–18:14, ECF No. 230-7. Unlike standard probationers, these probationers are subject to curfew checks by APD officers. *Id.*

### D.      The Laner Muchin Investigation

Meanwhile, the Laner Muchin investigation continued. *Id.* ¶ 71. When all was said and done, thirty-five individuals were interviewed about the various allegations contained in the *Tribune* article. *Id.* ¶ 102.

Laner Muchin interviewed Loizon on two occasions, and he also provided information that he felt rebutted the allegations. *Id.*  ¶ 71; Pl.'s Resp. DSOF ¶ 84.[3] As part of this effort, Loizon hired John Byrne, a private investigator, to find and interview Robert Jones, the probationer-turned-informant mentioned in the *Tribune* article. PSOAF ¶ 65. Byrne interviewed Jones and, based on the interview, drafted a six-page affidavit that Jones signed. *Id.* ¶¶ 64–65.

Additionally, Daniel Locallo, Loizon's friend and a retired Cook County Judge, contacted Laner Muchin's Joseph Gagliardo, whom Locallo had known for decades, and suggested that Laner Muchin interview Jones. Pl.'s Ex. 48, Locallo Aff. ¶¶ 18–19, ECF No. 230-46. Gagliardo told Locallo to arrange the interview, and, with Loizon's approval, Jones came to Chicago from St. Louis to be interviewed during the summer of 2014. *Id.* ¶¶ 19–21.

Prior to Jones's interview, Locallo drove Jones to Loizon's office, where the three of them met for fifteen to thirty minutes and, according to Locallo, discussed the importance of telling the truth. *Id.* ¶ 23. After the interview, Locallo drove Jones to his sister's residence and gave him $100 for gas money and meals to return to St. Louis. Pl.'s Resp. DSOF ¶ 82.

---

[3]      Loizon contends that, although he provided a list of witnesses with knowledge of facts that would refute the allegations, he is unaware that any were interviewed. PSOAF ¶ 71.

Laner Muchin submitted an initial summary of the investigation to Chief Judge Evans on August 15, 2014.  PSOAF ¶ 129.  On March 6, 2015, the law firm provided Evans with another letter analyzing what, if any, potential liability the OCJ faced arising out of the APD's misconduct.  *Id.*  On September 4, 2015, Laner Muchin also sent a memorandum regarding Jones's interview.  *Id.*  Chief Judge Evans received a final summary of the investigation's findings on September 11, 2015.  *Id.*

## E.   The Second *Tribune* Article

The *Tribune* published a second article on May 10, 2015.  DSOF ¶ 51; *see* Defs.' Ex. 40, Cynthia Dizikes and Todd Lighty, *Cook County Probation Official Interfered with Probe, Witness Says*, CHI. TRIB. (May 10, 2015) ("5/10/15 Article"), ECF No. 215-40.  Speaking of Loizon, Jones told the *Tribune* reporters, "The man got in contact with me because he wanted me to do something," and "[h]e called me and made promises."  *Id.*  Jones further revealed that "he was given $500 to travel to Chicago, where he said he was advised on how to answer potential questions from the lawyers investigating the probation department."  *Id.*  According to the article, Jones reached out to the *Tribune* after Loizon had failed to deliver on his promise to have a friend's company employ Jones at $18 per hour.  5/10/15 Article at 4.

Jones admitted to the *Tribune* that he had lied about Loizon during his interview with Laner Muchin and that he had signed a false affidavit to protect Loizon.  *Id.* at 2.  Specifically, Jones admitted that his prior statement that he had been pressured to become an informant by another probation officer, not Loizon, was untruthful.  *Id.* at 4.

8

The *Tribune* also reported that Locallo had confirmed to reporters that he had given Jones $100 for transportation money, but that Locallo denied that he or Loizon had interfered with the investigation. *Id.* Locallo suggested that the real reason that Jones retracted his earlier statements was that Loizon had refused Jones's request to put money into his bank account. *Id.*

The article ended by quoting Chief Judge Evans, who stated that, if true, Jones's accusations would constitute "a violation of the probationer officer oath of office and could be grounds for discipline, dismissal or referral to the office of the Cook County state's attorney for possible prosecution[.]" *Id.*

## F. Meeting with Loizon, Haywood, Sobieski, and OCJ Representatives

In a letter dated March 30, 2016, Haywood directed Loizon to meet with him, Assistant Chief Sobieski, and representatives of the OCJ on April 1, 2016. DSOF ¶ 95. The letter stated:

> The purpose of the meeting is to discuss allegations that you may have engaged in the following types of conduct during your employment with the APD:
>
> - directed or conducted illegal searches of the residences of probationers or non-probationers
>
> - failed to comply with APD directives circumscribing the APD's cooperation with law enforcement agencies
>
> - cultivated improper relationships with probationers, including pressuring them to act as confidential informants for law enforcement agencies

DSOF ¶ 96.[4]

At the meeting, Loizon was questioned about these three topics.  *Id*. ¶ 97.  In response, he provided his account of the events, as well as additional facts that he believed discredited the allegations.  *See generally* Defs.' Ex. 32, 4/1/16 Meeting Tr. ("Meeting Tr."), ECF No. 215-32.

When questioned about the incident involving Kenny Ray and conducting illegal searches, Loizon recalled that Ray shared a single-family home with Michael McGowan.  Ray lived on the second floor, while McGowan lived on the first floor of the house.  McGowan was on probation at the time.  Meeting Tr. at 23:2–21, 31:5–6; *see also* DSOF ¶¶ 50, 54.

Loizon and other APD personnel had come to the house looking for McGowan to conduct a curfew check and a search of his residence.  Meeting Tr. at 23:2–21, 31:5–6.  McGowan met them and took them to his bedroom on the first floor as requested. *Id*. at 23:2–21; *cf.* Pl.'s Ex. 64, Transcript of Hearing ("Hr'g Tr.") at 26:14–27:20, *People v. Ray*, No. 11 CR 684001 (Cir. Ct. Cook Cnty. Feb. 24, 2014), ECF No. 232-14. Loizon then detected a strong odor of cannabis.   Meeting Tr. at 23:2–21.  At this point, Loizon and a probation officer went upstairs and discovered Ray smoking a

---

[4]     The letter also stated that "[e]ffective immediately and pending a decision based on a report and recommendations following the meeting, you are hereby reassigned to administrative duties."  Pl.'s Ex.76, Letter from L. Haywood, Chief Probation Officer, to P. Loizon, Deputy Chief (Mar. 30, 2016), ECF No. 232-22.  "While performing your new duties, you are not to perform field work of any kind or to engage in any work on behalf of the Department that involves direct, personal contact with probationers or members of the pubic." *Id*.

blunt; the other probation officer handcuffed him. *Id.* Loizon called Chicago police officers for back up, and they arrived minutes later. *Id.*

In response to accusations that he had failed to comply with APD's directives to limit cooperation with law enforcement agencies, Loizon stated, "We [APD] run a small police department. Actually we run a big police department." *Id.* ¶ 99. Loizon now contends that he was speaking figuratively given that certain APD officers received police training, carried weapons, and enforced court orders. Pl.'s Resp. DSOF ¶ 99.[5] Loizon also noted that, if he authorized a search, the members of the FBI and CPD would act as the APD's agents. DSOF ¶ 99.

As for pressuring probationers to become informants, Loizon admitted that he took Robert Jones to a dentist. Meeting Tr. at 95:16–13. But he did not recall Jones ever providing information concerning criminal activity, other than as an informant for other probation officers, Lorenzo Burton and Landon Wade. *Id.* at 7:1–8:1. Loizon stated that he had hired a private investigator who had obtained a signed affidavit from Jones to rebut the allegations in the first *Tribune* article, and that anything not contained in the affidavit was "perjury." *Id.* at 11:13–12:24.

During the meeting, Loizon also described his circumstances as "very unfair" and "crazy." *Id.* at 100:12. He expressed his frustration that the *Tribune*'s allegations were being taken as "Gospel" and "it's not fair. I don't feel it's fair." *Id.* at 58–17–20. He suggested that Sobieski and Haywood had just as much control over the weapons

---

[5]     Loizon also argues in his papers that, at one point during the meeting he said, "We're probation officers. We're not police officers." But the cited portion of the record does not support this. *See* Pl.'s Resp. DSOF ¶ 99 (citing Defs.' Ex. 32, Meeting Tr. at 7:3–4).

unit as he did. *Id.* at 83:5–6. He added, "And I know it's not Judge Evans. I know Judge Evans doesn't have a mean bone in his body, and it's not his intent to torture me or whatever." *Id.* at 102:22–24.

## G. The Third *Tribune* Article

On March 8, 2017, the *Tribune* reported that Chief Judge Evans had launched a broad review of the APD's compensation practices after a *Tribune* investigation found that Loizon had accrued more than $200,000 in compensatory time ("comp time"). DSOF ¶ 92; Todd Lighty, *After Tribune Reveals Probation Official's $200K in Comp Time, Cook County Courts Vow Action*, CHI. TRIB. (Mar. 8, 2017) ("3/8/17 Article"), ECF No. 215-46. Although the reporter attempted to contact Loizon prior to publication, Loizon declined to speak with him. DSOF ¶ 94. According to the Tribune, under the APD's "longstanding policy, exempt employees like Loizon and other senior managers may receive one hour of comp time for each hour of overtime worked. The policy does not limit the number of hours an employee may collect . . . ." *Id.* ¶ 93.

## H. Loizon's Employment Is Terminated

On May 19, 2017, Haywood informed Loizon in a letter that his employment with the Circuit Court of Cook County was terminated. DSOF ¶ 103. Although the letter was signed by Haywood, it is undisputed that Chief Judge Evans made the decision to fire Loizon. DSOF ¶ 104. The letter listed five reasons for the termination. *Id.* ¶ 103.

12

First, the letter claimed that Loizon's "vision of probation diverges from the mission" of APD. It also noted that Loizon had showed "questionable judgment in interactions with both probationers and non-probationers" and that he had shown "defiance of departmental policy and orders with regard to the appropriate relationship between law enforcement agencies and the Adult Probation Department." *Id.* Additionally, the letter took issue with Loizon's actions with respect to "a former probationer could reasonably be perceived as attempted interference with an ongoing investigation" that created "an appearance of impropriety that taints the work and reputation" of the APD. *Id.* Lastly, the letter noted a lack of confidence in Loizon's "ability to be a positive influence and contribute to furthering the operations of the Adult Probation Department in line with its mission." Defs.' Ex. 3, Letter from L. Haywood to P. Loizon at 1 (May 19, 2017), ECF No. 215-3.

The termination letter also informed Loizon that "the litigation involving allegations by probationers and private individuals of illegal and unconstitutional actions by the weapons units led by you in which you were named as a defendant has been settled and is no longer pending against you." *Id.* at 2.

Chief Judge Evans stated that, when terminating Loizon, he considered: (1) a judge's decision not to permit evidence that was collected by Loizon and his subordinates in an unconstitutional manner; (2) Loizon's belief and repeated statements that the APD was a small police department and that, on occasion, Chicago police officers and the FBI would act as APD's agents; and (3) allegations

13

that Loizon had paid a former probationer who was a witness in the ongoing Laner Muchin investigation. *Id.* ¶ 105.

## I. The Fourth and Fifth *Tribune* Articles

On the day that Loizon was fired, the *Tribune* published two more articles. *See* Pl.'s Ex. 110, Todd Lighty, *Senior Leader in Probation Department Dismissed After Accusations About Rogue Unit,* CHI. TRIB. (May 19, 2017) ("*Dismissed After Accusations* Article"), ECF No. 233-2; Pl.'s Ex. 111, Todd Lighty, *Probation Department Leader Fired Amid Scandal*, CHI. TRIB. (May 19, 2017) ("*Fired Amid Scandal* Article"), ECF No. 233-3. Both articles reported that Loizon had been fired "for conduct, which diverges from the chief judge's vision." *Id.* at 1. The first article included a statement from Chief Judge Evans's office that "Chief Judge Evans no longer has confidence in Mr. Loizon's ability to be a positive influence and contribute to the operations of the department," and that Loizon acted in "defiance of departmental policy and orders" regarding the relationship between law enforcement agencies and the probation department. *Dismissed After Accusations* Article at 2. The articles go on to state:

> Loizon's firing comes as the probation department settled federal lawsuits in which two Chicago men alleged their civil rights were violated during warrantless searches involving teams of probation officers, Chicago police and the FBI. Those cases settled for a total of $110,000. Loizon was a named defendant in one of the suits. Officers he oversaw were named in both.

*Id.* at 3; *see also Fired Amid Scandal* Article at 1.

**J.    Loizon's EEOC Charges and This Lawsuit**

Loizon filed his first EEOC charge based on race discrimination on June 19, 2014.  DSOF ¶ 28.  He stated that he had worked for the APD since 1988 and had been subjected to different terms and conditions of employment than other employees.  He claims that he was investigated and assigned to desk duty because he is white and in retaliation for his complaints about unfair treatment during his employment.  *Id.*

Loizon filed a second EEOC charge on February 22, 2016.  DSOF ¶ 29.  As before, he stated that he began working for the APD in 1988 and that he was subject to different terms and conditions of employment than non-white employees.  *Id.*  The terms and conditions included different work hours, different comp time off, and the denial of paid time-off benefits.  *Id.*  He alleged that he complained to no avail and that he subsequently suffered from loss of pay, denial of promotion, and loss of overtime work.  *Id.*

The EEOC issued a right-to-sue letter regarding Loizon's second EEOC Charge on July 20, 2016.  *Id.* ¶ 30.  But, for whatever reason, Loizon chose not to file suit. DSOF ¶ 31.

Loizon then filed a third EEOC charge on November 7, 2017.  *Id.* ¶ 22.  In it, he stated that he had previously filed an EEOC charge, that he complained without success about suffering from different terms and conditions of employment, including being assigned additional duties, and that he had been discharged in retaliation.  *Id.*

According to Loizon, he also experienced these adverse actions because he is white. *Id.*

The EEOC issued another notice of right to sue on November 30, 2017. *Id.* ¶ 23. Loizon claims that he never received it. Pl.'s Resp. DSOF ¶ 23. The notice was resent to Loizon's counsel on January 23, 2018, and stated, "If you choose to commence a civil action, such suit must be filed in the appropriate Court within 90 days of your receipt of this Notice." *Id.*

Loizon filed this lawsuit on April 17, 2018. DSOF ¶ 24. The Court dismissed some of Loizon's claims on the pleadings. *See generally Loizon v. Evans*, No. 18 C 2759, 2020 WL 5253852 (N.D. Ill. Sept. 3, 2020). The following claims remain. First, Loizon alleges that the OCJ discriminated against him and retaliated against him in violation of Title VII. Second, Loizon claims that the OCJ failed to pay his comp time upon his termination in violation of the FLSA. Third, he asserts a claim under § 1983 accusing Chief Judge Evans of depriving him of his liberty interest to pursue his occupation without due process, by making defamatory statements about him to the *Tribune.*

## II. <u>Legal Standard</u>

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v.*

16

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). After a "properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 250 (internal quotations omitted).

The Court "consider[s] all of the evidence in the record in the light most favorable to the non-moving party, and . . . draw[s] all reasonable inferences from that evidence in favor of the party opposing summary judgment." *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018) (cleaned up). The Court "must refrain from making credibility determinations or weighing evidence." *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 467 (7th Cir. 2020) (citing *Anderson*, 477 U.S. at 255).

In ruling on summary judgment, the Court gives the non-moving party "the benefit of reasonable inferences from the evidence, but not speculative inferences in [its] favor." *White v. City of Chi.*, 829 F.3d 837, 841 (7th Cir. 2016) (internal citations omitted). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *Id.* (citation omitted).

When cross-motions for summary judgment are filed, a court construes all facts and draws all reasonable inferences in favor of the party against whom the motion was filed. *Indianapolis Airport Auth. v. Travelers Prop. Cas. Co. of Am.*, 849 F.3d 355, 361 (7th Cir. 2017). A court treats the motions separately. *Marcatante v. City of Chi.*, 657 F.3d 433, 439 (7th Cir. 2011); *see also Kreg Therapeutics, Inc. v. VitalGo, Inc.*, 919 F.3d 405, 416 (7th Cir. 2019) ("Each cross movant for summary judgment bears a respective burden to show no issue of material fact with respect to the claim.").

17

### III.   Analysis

**A.   Title VII Claims**

**1.   Statute of Limitations**

Loizon grounds his discrimination and retaliation claims on the OCJ's placement of him on desk duty and his eventual termination.  As a threshold issue, the OCJ argues that Title VII's statute of limitations bars Loizon from pursuing a Title VII claims premised on his desk duty assignment.  The OCJ is correct.

The OCJ placed Loizon on desk duty on May 15, 2014.  DSOF  ¶ 69.  Loizon filed his first EEOC charge as to this action on June 19, 2014.  *Id.* ¶ 28.  He filed his second EEOC charge citing this same action on February 22, 2016.  *Id.* ¶ 29.  During the EEOC's investigation of his second charge, an EEOC investigator asked Haywood to explain why Loizon had been assigned to desk duty and to submit all supporting documents and evidence.  *See* Defs.' Ex. 34, Letter from S. Hayes, EEOC Investigator, to L. Haywood, Chief Probation Officer (July 15, 2016), ECF No. 215-34.

The EEOC then issued a right-to-sue notice as to Loizon's second charge on July 20, 2016.  DSOF ¶ 30.  But Loizon chose not to file suit.  DSOF ¶ 31.  Because a plaintiff asserting a Title VII claim must be filed within ninety days of receiving a right-to-sue notice, 42 U.S.C. § 2000e–5(f)(1), Loizon's discrimination and retaliation claims based on being placed on desk duty are time-barred.

In response, Loizon argues that the allegations contained in his third EEOC charge also encompass his desk-duty assignment.  In his view, to the extent that his

18

Title VII clams are based on his third EEOC charge, they are timely because he filed this lawsuit within eighty-four days of receiving the re-issued right-to-sue notice. DSOF ¶¶ 22–23. Loizon's attempt to support this argument by pointing out that his placement on desk duty was a discrete act is beside the point. *See* Pl.'s Combined Mem. Opp'n Defs.' Mot. Summ. J. and Supp. Cross-Mot. Summ. J. ("Pl.'s Mem.") at 12, ECF No. 235. The OCJ placed Loizon on desk duty on May 15, 2014. And, by the time he filed his first EEOC charge on June 19, 2014, he was well aware that being placed on desk duty subjected him to different terms and conditions of employment. The fact that he remained on desk duty in 2017 does not change this fact. *See Bass v. Joliet Pub. Sch. Dist. No. 86*, 746 F.3d 835, 839–40 (7th Cir. 2014) ("If a discrete wrongful act causes continuing harm . . . then the 300-day period [in which to file an administrative charge] runs from the date of that event; it does not restart with each new day the harm is experienced." (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002))); *cf. Morgan*, 536 U.S. at 113 (stating that discrete acts are ones that are "easy to identify").

Furthermore, as a general matter, in a deferral state such as Illinois, a plaintiff who asserts a Title VII claim has 300 days from the alleged discriminatory or retaliatory act to file a charge of discrimination with the EEOC. *See* 42 U.S.C. § 2000e-5(e)(1); *Chatman v. Bd. of Educ. of City of Chi.*, 5 F.4th 738, 744 (7th Cir. 2021). Loizon filed his final EEOC charge on November 7, 2017. *Id.* ¶ 22. As a result, Loizon

may not base a Title VII discrimination or retaliation claim on any conduct by the OCJ that occurred prior to January 11, 2017.[6]

## 2. Retaliation Claim

Loizon claims that the OCJ violated Title VII by retaliating against him for complaining about his adverse treatment. To survive summary judgment as to a retaliation claim, Loizon "must produce enough evidence for a reasonable jury to conclude that (1) [he] engaged in a statutorily protected activity; (2) the [OCJ] took a materially adverse action against [him]; and (3) there existed a but-for causal connection between the two." *See Burton v. Bd. of Regents of Univ. of Wis. Sys.*, 851 F.3d 690, 695 (7th Cir. 2017).

Loizon has satisfied the first prong. He filed EEOC charges in June 2014 and February 2016 that alleged race discrimination. DSOF ¶¶ 28–29. He complained to Human Resources Director Noreen Larson in November 2015 that non-white APD employees were permitted to build and use their comp time as they desired, but he was not shown that courtesy. Pl.'s Resp. DSOF ¶ 91;[7] PSOAF ¶ 145. Loizon emphasized to Larson in May 2016 that the APD authorized comp time for non-white, non-male employees who were at or above his position, but did not authorize his comp time. PSOAF ¶ 134. And, after an April 2016 meeting where he was asked to rebut the allegations against him, Loizon sent an email to Larson and Sobieski in May 2016,

---

[6] That said, Loizon still may rely on relevant actions that took place prior to that date as background evidence to support a timely claim. *See Morgan*, 536 U.S. at 113.

[7] Although Loizon states that this occurred at a meeting in October 2016, the cited portions of the record do not support this contention.

and asked: "If I were a minority, would this have been allowed?" Pl.'s Resp. DSOF ¶ 71.[8]

Loizon satisfies the second prong as well. It is undisputed that he was discharged on May 19, 2017, and that Chief Judge Evans made the termination decision. DSOF ¶¶ 103–04.

The third prong—establishing but-for causation—requires some more discussion. The Seventh Circuit has held that, when considering this question, the Court should consider "the evidence as a whole and ask whether a reasonable jury could draw an inference of retaliation." *See King v. Ford Motor Co.*, 872 F.3d 833, 842 (7th Cir. 2017). Loizon advances two arguments to show causation. First, Loizon points to two other non-white employees who, he claims, filed an EEOC charge or other grievance, but were not terminated. Second, he argues that the timing of his termination supports an inference of causation.

As to the similarly situated comparators, Loizon identifies Kimberly Flanagan and Archie Shaw, presumably to try to show that it was his filing of the EEOC charges that caused his discharge. But, in order to do so, he must identify a similarly situated employee who was fired even though that person had *not* filed an EEOC charge. *See Sylvester v. SOS Children's Vills. Ill., Inc.*, 453 F.3d 900, 902 (7th Cir. 2006) (holding that one way to establish retaliation is to "show that after filing the

---

[8] To the extent that Loizon points to other complaints that he made to the OCJ about his treatment, he has not established that they qualify as statutorily protected activity under Title VII. *See Emerson v. Dart*, 900 F.3d 469, 472 (7th Cir. 2018) ("[To] constitute statutorily protected activity under Title VII, the complaint must indicate [that] the discrimination occurred because of sex, race, national origin, or some other protected class.") (cleaned up).

charge [or otherwise opposing the employer's allegedly discriminatory practice] only he, and not any similarly situated employee who did not file a charge, was subjected to an adverse employment action even though he was performing his job in a satisfactory manner.") (quoting *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002)). Here, Flanagan filed an EEOC charge against the OCJ and was not fired; thus, her situation does not create a reasonable inference that Loizon's EEOC charges are what caused his termination. (Indeed, it leads to the opposite inference.) As for Shaw, he filed a grievance about comp time *after* he had retired from APD (so he could not be fired), so Shaw's situation does not aid Loizon either.

Loizon also argues that a reasonable jury could find but-for causation from the timing of his discharge. He leans heavily on the timing between the publication of a *Chicago Tribune* article on March 8, 2017, and his discharge seventy-two days later. That article reported that Chief Judge Evans had vowed to conduct a broad review of the APD's compensation practices after a *Tribune* investigation found that Loizon had accrued more than $200,000 in comp time. DSOF ¶ 92; 3/8/17 Article. But the article does not discuss Loizon's EEOC charges or his other complaints. Therefore, no reasonable jury could find that the timing between the publication of the March 8, 2017, article and Loizon's termination support an inference that his firing was caused by his EEOC charges and other complaints of discrimination.

Nor can the protracted time period between his protected activities in June 2014, November 2015, February 2016, and May 2016 and his ultimate discharge in

May 2017 create a reasonable inference of retaliation. To infer a causal connection between Loizon's filing of the charges and his termination would be sheer speculation. *See Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918 (7th Cir. 2000) (holding that a three-month interval between the protected activity and the adverse employment action was too long to support an inference of retaliation).

What is more, the record is devoid of any evidence that Chief Judge Evans was aware that Loizon had engaged in any protected activity prior to terminating him. *See Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1121–22 (7th Cir. 2009) (holding that the plaintiff, a police officer, "failed to show that there is a causal connection between the suspension and his statutorily protected activity" because he did not show that the Chief of Police who suspended him was aware that he filed a grievance). Nor is there any evidence from which a jury could reasonably infer that Chief Judge Evans was aware of Loizon's protected activity. *Igasaki v. Ill. Dep't of Fin. and Pro. Regul.*, 988 F.3d 948, 962 (7th Cir. 2021) ("[A] speculative inference does not an employment discrimination case make.").

For these reasons, the OCJ's motion for summary judgment as to Loizon's Title VII retaliation claim is granted.

## 2.    Discrimination Claim

Title VII makes it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of . . . race." 42 U.S.C. § 2000e-2(a)(1). To survive summary judgment, the plaintiff must present evidence that "would permit a reasonable

factfinder to conclude that the plaintiff's race . . . caused the discharge." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). "[A]ll evidence belongs in a single pile and must be evaluated as a whole." *Id.* at 766.

Where a non-minority plaintiff brings a reverse discrimination claim, the Seventh Circuit has "modified the traditional *McDonnell-Douglas* burden-shifting framework . . . to require evidence of 'background circumstances' supporting a race-discrimination claim brought by a white plaintiff." *Bless v. Cook Cnty. Sheriff's Off.*, 9 F.4th 565, 574 (7th Cir. 2021). Thus, to establish a *prima facie* discrimination case, Loizon must demonstrate that (1) "background circumstances exist to show an inference that the employer has reason or inclination to discriminate invidiously against whites or evidence that there is something 'fishy' about the facts at hand"; (2) "he was meeting his employer's legitimate performance expectations"; (3) "he suffered an adverse employment action"; and (4) "he was treated less favorably than similarly situated individuals who are not members of his protected class." *Id.* (internal quotation marks omitted).

Loizon has made no attempt to satisfy the first three prongs. Accordingly, beyond the undisputed fact that he suffered an adverse employment action, he has waived his ability to establish a prima facie case under the modified *McDonnell-Douglas* framework. That leaves only Loizon's challenges to the OCJ's stated reasons for his termination, which argue that they were untrue and merely pretext for racial discrimination.

As noted, the May 19, 2017, termination letter provided five reasons for Loizon's termination. DSOF ¶ 103. (1) Loizon's view of what probation officers should do differed from the APD's mission, which limited the duties of probation officers to supervising probationers and allowed officers to contacting law enforcement personnel only to report violations of criminal law or to request protection when necessary. (2) Loizon showed questionable judgment in his interactions with probationers and non-probationers. (3) He violated departmental policy and orders in how he interacted with law enforcement agencies. (4) Loizon's interactions with Jones could reasonably be perceived as an attempt to interfere with the Laner Muchin investigation and created an appearance of impropriety that tainted the work and reputation of the APD. (5) Chief Judge Evans had lost confidence in Loizon's "ability to be a positive influence and contribute to furthering the operations of the Adult Probation Department in line with its mission." Termination Letter at 1.

Where, as here, an employer offers several reasons for an adverse employment action, "the employee has the burden of demonstrating that each proffered nondiscriminatory reason is pretextual." *Wilson v. AM Gen. Corp.*, 167 F.3d 1114, 1120 (7th Cir. 1999). To establish pretext, "an employee may show that the employer's reason had no basis in fact, that the explanation was not the real reason for its action or that the reason stated was insufficient to warrant the adverse job action." *Atanus v. Perry*, 520 F.3d 662, 674 (7th Cir. 2008) (cleaned up). The pivotal question here is "whether [plaintiff] has created a genuine issue concerning the

sincerity of the proffered reasons" given for the adverse employment action. *Sarsha v. Sears, Roebuck & Co.*, 3 F.3d 1035, 1039 (7th Cir. 1993). Thus, Loizon has to offer enough facts to create a factual dispute of pretext as to each of the five reasons set forth in the May 19 letter.

As to reasons (1) and (3), construing all of the disputed facts in Loizon's favor and granting him the benefit of all reasonable inferences, the Court concludes that Loizon has met this burden. To rebut these reasons, he notes that Evans knew and encouraged joint operations between and among the APD, the Chicago Police Department, the Cook County Sheriff's Department, and the FBI. PSOAF ¶¶ 49, 51, 54. While thin, this is sufficient to defeat summary judgment as to these points.

Loizon, however, fares less well as to reasons (2), (4) and (5). Rather than addressing these reasons head-on, he attempts to demonstrate that these reasons were pretextual by comparing his situation to those of non-white APD employees who, he argues, were similarly situated but not terminated. *See* Pl.'s Mem. at 26–27. "[W]hether employees are similarly situated is a flexible, common-sense, and factual inquiry." *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 225 (7th Cir. 2017) (internal quotation marks omitted). "Relevant factors include whether the employees (i) held the same job description, (ii) were subject to the same standards, (iii) were subordinate to the same supervisor, and (iv) had comparable experience, education, and other qualifications—provided the employer considered these latter factors in making the personnel decision." *Id.* at 226 (cleaned up).

Loizon starts by referencing a Black Deputy Chief, who was temporarily suspended for falsifying personnel records. PSOAF ¶ 27. But Loizon admits that that particular Deputy Chief was about to be terminated for her actions, but resigned to avoid being fired. *Id.* ¶ 29. Given that the APD had decided to fire her, just as it did Loizon, this example does not aid Loizon's case.

Loizon also cites various Black supervisors and probation officers who, he states, violated certain APD policies, but were not terminated. *See id.* ¶¶ 30–34, 36–40, 187–90. He identifies a Black supervisor and a Black probation officer, who were accused of engaging in an inappropriate relationship with a probationer. *Id.* ¶ 30. Loizon cites another Black supervisor, who had been accused of failing to report corrupt or unethical conduct by another employee. *Id.* ¶ 31. The APD issued correction actions to these probation officers, but did not fire them. *Id.*

Fatal to Loizon's argument, however, is that these probation officers were subject to a collective bargaining agreement, whereas Loizon, as Deputy Chief, was not. *See* Pl.'s Resp. DSOF ¶ 8; Loizon Dep. at 57:8–10.[9] This difference in employment status precludes a finding that these probation officers were similarly situated to Loizon. *See Martin v. Budget Rent-A-Car Sys. Inc.*, 432 F. App'x 407, 410 (5th Cir. 2011) (union membership is a factor in determining whether employees are similarly situated to one another); *see also, e.g., Milloy v. WBBM-TV, Chi.*, 613 F. Supp. 2d 1035, 1037 (N.D. Ill. 2009); *Marshall v. Winpak Heat Seal Corp.*, No. 08-CV-

---

[9] While the APD had certain corrective action procedures that applied to supervisors, probation officers, and Deputy Chiefs, *see* PSOAF ¶ 23, it does not change the fact that, as a Deputy Chief, Loizon was an at-will employee not subject to a collective bargaining agreement.

27

1170, 2010 WL 1433374, at *5 (C.D. Ill. Apr. 8, 2010); *Joiner v. Merrillville Cmty. Sch. Corp.*, 05–cv–407, 2008 WL 151327, at *20 (N.D. Ind. Jan.11, 2008); *Johnson v. Pepsi Cola Gen. Bottlers, Inc.,* No. 04 C 325, 2005 WL 1629895, at *7 (E.D. Wis. July 6, 2005); *Sutherland v. Norfolk S. Ry.*, No. 01 C 2337, 2002 WL 1827630, at *4 (N.D. Ill. Aug. 9, 2002). Accordingly, Loizon's argument that these Black supervisors and probation officers create a reasonable inference that reasons (2), (4) and (5) were pretexts for discrimination is unpersuasive.

In fact, the record provides ample evidence to support each of these reasons for termination. First, when firing Loizon, Chief Judge Evans considered the fact that a circuit judge had barred the prosecution from using the evidence the state had collected against Kenny Ray for illegal marijuana use, because Loizon and his companions had exceeded their probationary authority. DSOF ¶ 105. This provides support for Chief Judge Evans's opinion that Loizon showed questionable judgment in his interactions with probationers and non-probationers. *Id.* ¶ 103. Evans also considered the allegation that Loizon's friend gave $100 to Jones, who (Loizon knew) was a witness in the Laner Muchin investigation. *Id.* ¶ 82. This lends credence to Evans' belief that Loizon had created an appearance of impropriety that tainted the work and reputation of the APD. *Id.* ¶ 103. Moreover, Evans's lack of confidence in Loizon's "ability to be a positive influence" is supported by the fact that both of these situations brought considerable disrepute upon the APD. In the face of this countervailing evidence, Loizon points to no facts in the record to create a genuine dispute that these reasons were pretexts for discrimination. Moreover, even if Chief

Judge Evans had a mistaken view of the facts or made a mistake in deciding to fire Loizon, this is not enough to prove pretext without some indication in the record that his decision was motivated by a retaliatory or racial animus. *See Formella v. Brennan*, 817 F.3d 503, 513 (7th Cir. 2016) ("'Pretext requires more than showing that the decision was mistaken, ill considered or foolish, and so long as the employer honestly believes those reasons, pretext has not been shown.'") (quoting *Ballance v. City of Springfield*, 424 F.3d 614, 617 (7th Cir. 2005)); *Luster v. Ill. Dep't of Corr.*, 652 F.3d 726, 733 (7th Cir. 2011) (same).

Lastly, Loizon argues that the timing of the termination of his employment raises a triable issue as to pretext. He posits that, because all of the incidents that formed the bases for his discharge occurred over two years prior to his actual firing, those reasons cannot be the real reasons. He speculates that the "more logical explanation" for his firing is that he was discriminated against based on his race. Pl.'s Mem. at 27. But, as discussed above, Loizon has offered no evidence from which a rational jury could find that his termination was due to race discrimination.

For all of these reasons, Defendants' motion for summary judgment as to the race discrimination claim is granted.

## B.    FLSA Claim

### 1.    Bona Fide Executive Employee Exemption

Loizon's FLSA claim centers on the OCJ's failure to pay him for the compensatory time he accrued from 2003 to 2014. Defendants argue that Loizon is

exempt from the FLSA because he was employed in a "bona-fide executive capacity." 29 U.S.C. § 213(a)(1) (alterations omitted).[10]

The FLSA's overtime provisions do not apply to a worker employed in a "bona fide executive capacity." *Id.* (alterations omitted). Under the Department of Labor ("DOL") regulations in effect at the time Loizon was terminated, the executive exemption covers an employee:

(1) [Who is] [c]ompensated on a salary basis at a rate not less than $455 per week;

(2) Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;

(3) Who customarily and regularly directs the work of two or more other employees; and

(4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

---

[10] Loizon points out that the applicability of an FLSA exemption is an affirmative defense, *see Schmidt v. Eagle Waste & Recycling, Inc.*, 599 F.3d 626, 632 (7th Cir. 2010), and argues that Defendants waived the applicability of the exemption because they raised it for the first time in their summary judgment motion, rather than in the pleadings. But "a delay in raising an affirmative defense only results in waiver if the other party is prejudiced as a result." *Id.* Here, Loizon anticipated the exemption argument by stating in his amended complaint that he "is not exempt from the compensatory time provisions of the FLSA because he was not employed in any bona fide executive, administrative or professional capacity," and Defendants denied this allegation in their answer. *See* Defs.' Answer Pl.'s Compl. ("Answer") ¶ 236, ECF 84. Accordingly, Loizon can hardly be said to have been prejudiced by Defendants' failure to plead the defense. *See Schmidt*, 599 F.3d at 632 (no waiver of exemption defense where "[defendant] did not raise the . . . exemptions explicitly in its answer," but "den[ied] that [plaintiff] was a nonexempt employee" in the answer, so plaintiff was not prejudiced).

29 C.F.R. § 541.100(a) (2017). The burden is on the employer to prove that an employee is exempt. *Schaefer-LaRose v. Eli Lilly & Co.*, 679 F.3d 560, 571 (7th Cir. 2012). Here, Loizon does not contest that the first three factors apply to him. *See* Pl.'s Mem. at 27.[11] But he does argue that he is not exempt because he had no authority to hire or fire employees and that his recommendations as to hiring, firing, advancement, or promotion were not given "particular weight."

DOL guidance with respect to this point provides that the factors to be considered include "whether it is part of the employee's job duties to make such suggestions and recommendations; the frequency with which such suggestions and recommendations are made or requested; and the frequency with which the employee's suggestions and recommendations are relied upon." 29 C.F.R. § 541.105. Importantly, the employee's recommendations "may still be deemed to have 'particular weight' even if a higher level manager's recommendation has more importance and even if the employee does not have the authority to make the ultimate decision as to the employee's change in status." *Id.* What is more, "many different employee duties and levels of involvement can work to satisfy" the standard. *Madden v. Lumber One Home Ctr., Inc.*, 745 F.3d 899, 904 (8th Cir. 2014); *see, e.g., Conroy v. City of Chi.*, 644 F. Supp. 2d 1061, 1071 (N.D. Ill. 2009) (recommendations factor

---

[11] Nor could he. Loizon's annual compensation was over $115,000, far in excess of the $455 per week requirement for the first factor. DSOF ¶ 115. As to the second and third factors, Loizon's primary job duties involved supervision and management of probation supervisors. *See id.* ¶¶ 6–7; Answer ¶ 24; Loizon Dep. at 45:5–13 (detailing Loizon's supervisory responsibilities as Deputy Chief); *id.* at 52:21–54:13 (stating that Loizon regularly supervised more than fifty employees, and "at times" more than 100, *id.* at 53:11–12)). Accordingly, there is no dispute of material fact that Loizon's position satisfies the first three factors of the bona fide executive capacity exemption.

satisfied where plaintiffs gave "one-word evaluations" for pay increases that "[could] be disregarded" by superiors).

Defendants point out that Loizon's duties as Deputy Chief included conducting performance reviews for his subordinates that directly affected their ability to receive merit pay. Loizon does not contest that he provided the evaluations, but he argues that, because the evaluations did not involve hiring, firing, advancement, or promotion, they do not place him within the regulation's ambit.

Loizon's argument, however, ignores the catchall term, "any other change of status." *See* 29 C.F.R. § 541.100(a)(4). Even assuming that merit pay increases do not count as "advancement" or "promotion" within the meaning of the subsection, the Court still must give effect to the "any other change in legal status" language. Were "hiring, firing, advancement, [or] promotion" exhaustive of the categories of decisions in which executive employees participate, the catchall would be superfluous.

The canon of *ejusdem generis* guides this interpretive task. That rule counsels that "[w]here general words follow specific words in a statutory enumeration, the general words are [usually] construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Yates v. United States*, 574 U.S. 528. 545 (2015) (quoting *Wash. State Dep't of Soc. and Health Servs. v. Guardianship Estate of Keffeler*, 537 U.S. 371, 384 (2003)). Hiring, firing, advancement, and promotion are all decisions that require individualized assessments of an employee's (or prospective employee's) merit, and result in "vertical" (*i.e.*, either positive or negative) changes in an employee's status. As the

name suggests, merit pay increases are vertical changes in employee status that are based on evaluations of employee performance. Thus, the Court concludes, consistent with other courts to have addressed the issue, that performance evaluations leading to merit pay increases are "suggestions and recommendations" leading to "change[s] in legal status" under § 540.100(a)(4). *See, e.g.*, *Conroy*, 644 F. Supp. 2d at 671; *Gellhaus v. Wal-Mart Stores, Inc.*, 769 F. Supp. 2d 1071, 1082 (E.D. Tex. 2011) (plaintiff satisfied fourth element of executive exemption test because "several of her subordinates received pay raises based in part on [plaintiff's] review of their performance").

Defendants have also shown that Loizon's merit pay evaluations were given "particular weight." Indeed, the undisputed facts show that a direct supervisor's evaluation of "exceeds expectations" results in an automatic merit pay increase. *See* DSOF ¶ 9 (citing Larson Dep. at 76:20–77:21 ("Merit pay is a rating of the employee on several different subject areas in which they perform their duties, and they're rated. And *anyone that is an exceeds level* receives a certain amount of money." *Id.* at 76:23–77:3 (emphasis added))); Pl.'s Resp. DSOF ¶ 9 (admitting that "it is APD policy that employees who receive an overall rating of 'exceeds expectations' on their annual evaluation receive[] merit pay").

The Court concludes that, because the undisputed facts indicate that Loizon conducted performance evaluations that led to merit pay increases for his subordinates, the fourth factor of the executive exemption test applies here.

Accordingly, Defendants have met their burden to show that Loizon is covered by the bona-fide executive capacity exemption.

### 2. Liability Based on Internal Policies

In an effort to rescue his FLSA claim, Loizon claims that the OCJ's internal policies permitting exempt employees to earn compensatory time "create liability" under the FLSA. Pl.'s Mem. at 27. Loizon is incorrect.

DOL regulations make clear that an employer's decision to offer compensatory time to an exempt employee does not cause the employer to lose the exemption "if the employment arrangement also includes a guarantee of at least the minimum weekly-required amount paid on a salary basis." 29 C.F.R. § 541.604(a) ("Such additional compensation may be paid on any basis (e.g., flat sum, bonus payment, straight-time hourly amount, time and one-half or any other basis), and may include paid time off."). Here, it is undisputed that Loizon continued to earn an annual salary well above the minimum statutory amount while he was accruing comp time.

What is more, Loizon cites no legal authority in support of his novel theory. None of the cases he cites support the proposition that entitlements created by an employer's internal policies nullify an otherwise-applicable FLSA exemption. For example, *Freeman v. City of Mobile* involved police officers who sued for compensatory time under the FLSA. 146 F.3d 1292, 1294 (11th Cir. 1998). The Eleventh Circuit found that they were exempt from the FLSA, but held that the FLSA exemption did not preempt plaintiffs' enforcement of contract rights created by state and local law. *See id.* at 1298. Here, Loizon's only remaining claim for compensatory time arises

34

under the FLSA, not contract rights created by state or local law as in *Freeman*. *See Loizon*, 2020 WL 5253852, at *13 (dismissing Loizon's state law claims). And in *Beck v. City of Cleveland*, the Sixth Circuit concluded that the district court incorrectly applied a FLSA exemption to preclude police officers' claims for compensatory time. 392 F.3d 912, 926 (6th Cir. 2004). It said nothing about whether a public employer's promises of compensatory time can defeat a FLSA exemption, as Loizon asserts.

Because Defendants have shown that Loizon is covered by the executive exemption, Defendants' motion for summary judgment is granted as to the FLSA claim. Loizon's cross-motion for summary judgment is denied.

## C. Due Process

Finally, Loizon contends that Chief Judge Evans deprived him of his liberty interest in pursuing his occupation by making defamatory statements about him without due process of law. A due process claim requires the plaintiff to show that the government deprived them of a protected interest with "constitutionally deficient procedural protections" surrounding the deprivation. *Tucker v. City of Chi.*, 907 F.3d 487, 491 (7th Cir. 2018). "Mere injury to reputation, even if it seriously impairs one's future employment prospects, is not a constitutionally protected liberty or property interest under the due process clause." *Roake v. Forest Preserve Dist. of Cook Cnty.*, 849 F.3d 342, 347 (7th Cir. 2017). Rather, in order to give rise to a constitutional violation, such injuries "must also alter a previously recognized legal status or right." *Alston v. City of Madison*, 853 F.3d 901, 909 (7th Cir. 2017); *see Hinkle v. White*, 793 F.3d 764, 768 (7th Cir. 2015).

### 1.    Scope of Liberty Interest

The parties appear to assume that Loizon can show infringement of a protected liberty interest by proving that Evans defamed him and that "'he suffered a tangible loss of other employment opportunities' as a result of the defamation." Defs.' Mem. at 19 (quoting *Covell v. Menkis*, 595 F.3d 673, 675 (7th Cir. 2010)); Pl.'s Mem. at 35 (citing *Covell*, 595 F.3d at 677–78). This is not the law. Instead, "even when it causes serious impairment of one's future employment," defamation by the government does not infringe on a liberty interest unless it is accompanied by a change in legal status. *Hinkle*, 793 F.3d at 767 (quoting *Hojnacki v. Klein-Acosta*, 285 F.3d 544, 548 (7th Cir. 2002)); *see id.* at 768; *Doe v. Purdue Univ.*, 928 F.3d 652, 662 (7th Cir. 2019) (Barrett, J.) (same).

*Hinkle* explicitly rejected the idea that loss of employment prospects alone can transform a defamation claim against the government into a due process claim. 793 F.3d at 767–68. In that case, the plaintiff was a sheriff who sued state police investigators for spreading rumors to several local officials and the town newspaper that the plaintiff was an arsonist and child molester. *Id.* at 765–66. The plaintiff argued that, in spreading the rumors, the investigators infringed on his liberty interest in following his chosen occupation because they "rendered him unable to find a job in law enforcement management." *Id.* at 766. The Seventh Circuit disagreed because "even if [the] defamation seriously impaired his future employment prospects, the state did not alter his legal status." *Id.* at 768. The court explained that, although "on several occasions . . . [it had] quoted the boilerplate 'virtually

impossible for the [individual] to find new employment in his chosen field'" language in the context of the liberty interest in following one's chosen occupation, it "has never held that the State infringes on a plaintiff's liberty interest when the defamation *alone* renders it 'virtually impossible for the individual to find new employment in his chosen field.'" *Id.* at 769 (quoting *Townsend v. Vallas*, 256 F.3d 661, 670 (7th Cir. 2001)). The court further noted that, in every case where it had held that plaintiffs' liberty interests were infringed by statements that made it harder for them to find future employment, the statements were made in connection with a decision not to rehire or to terminate the plaintiff. *See id.* at 768–69 (first citing *Doyle v. Camelot Care Ctrs., Inc.*, 305 F.3d 603, 617 (7th Cir. 2002), and then citing *Townsend*, 256 F.3d at 670).[12]

All of this is to say that Loizon cannot rest his due process claim on freestanding defamatory statements just because those statements later happened to impair his employment prospects. Instead, Loizon can only base his due process claim on defamation connected with Evans's alteration of his legal status. And Loizon's reassignment to desk duty in May 2014 does not constitute a "change in legal status" for purposes of due process. He contends that he could no longer receive a

---

[12]  Indeed, *Covell*, which the parties cite for the rule that defamation is actionable under the Due Process Clause if it causes a tangible loss in employment prospects, also acknowledges that defamation only implicates a liberty interest "where *in terminating the employee* the government . . . 'impose[s] on him a stigma or other disability that foreclose[s] his freedom to take advantage of other employment opportunities.'" 595 F.3d at 677 (emphasis added) (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 573 (1972)); *see also id.* at 675 ("Covell contends that the Defendants deprived him of his liberty interest in employment, by disseminating false information related to his termination without providing a name clearing hearing.").

high score on his performance evaluations, which meant he was ineligible for merit pay, and lost the ability to accrue compensatory time and "weapons pay." PSOAF ¶ 118. But even taking Loizon's claims as true, these consequences are not sufficient to constitute a change in his legal status for purposes of his due process claim because "the temporary loss of this possibility for additional income" is not, standing alone, "the sort of deprivation that triggers the protection of federal due process." *Townsend*, 256 F.3d at 676; *see id.* ("Disputes over overtime, over work assignments, over lunch and coffee breaks do not implicate the great objects of the Fourteenth Amendment." (quoting *Brown v. Brienen*, 722 F.2d 360, 365 (7th Cir. 1983))); *Siegert v. Gilley*, 500 U.S. 226, 233 (1991) (defamation does not infringe a liberty interest unless it is "made in the context of the employer discharging or failing to rehire a plaintiff"). Accordingly, only the statements made incident to Evans's termination of Loizon in May 2017 can form the basis of his due process claim.

To show that Evans's statements in connection with his termination infringed his liberty interest, Loizon must first show that the statements: (1) stigmatized him "by marking him as one who lost his job because of dishonesty or other job-related moral turpitude;" (2) were publicly disclosed by the named defendant; and (3) caused a tangible loss of future employment opportunities. *Covell*, 595 F.3d at 677–78 (quoting *Lawson v. Sheriff of Tippecanoe Cnty.*, 725 F.2d 1136, 1139 (7th Cir. 1984)). Loizon must then show that Evans afforded him "constitutionally deficient procedural protections" in connection with the defamation. *Tucker*, 907 F.3d at 491.

### 2.    Infringement Analysis

Although he can show facts to support prongs (1) and (2), Loizon cannot create a genuine issue of material fact as to prong (3) of the infringement analysis.[13]  As for the first prong, Evans's only publicly disclosed statements about Loizon made contemporaneously with his firing were the statements in the May 19, 2017, *Tribune* articles that Loizon's conduct "diverges from the chief judge's vision," that "Chief Judge Evans no longer has confidence in Mr. Loizon's ability to be an influence and contribute to the operations of the department," *Dismissed After Accusations* Article at 2, and that Loizon acted in "defiance of departmental policy and orders."  *Fired Amid Scandal* Article at 1.  Read in the light most favorable to Loizon and in the context of the articles in which they appear (which refer to Loizon's behavior as a "scandal" and reference the allegations that he supervised systematic violations of constitutional rights), these statements accuse him of "job-related moral turpitude." *Covell*, 595 F.3d at 677.  And Evans "publicly announced the firing, and provided statements to the press that were subsequently published in the local newspaper," which satisfies the disclosure requirement of the second prong.  *Lashbrook v. Oerkfitz*, 63 F.3d 1339, 1349 (7th Cir. 1995).

But Loizon has not put forth admissible evidence showing that he suffered a tangible loss of employment opportunities because of the statements.  Loizon testified that, following his firing from the APD, he was terminated from his position with

---

[13]    Defendants also argue that the two-year statute of limitations applicable under § 1983 bars Loizon's claim to the extent it is based on conduct that occurred prior to April 17, 2016. Because the Court concludes that Loizon's due process claim is limited to the circumstances surrounding his termination in May 2017, it need not address that argument.

another employer, Blue Star, because he was no longer a "sworn peace officer." Loizon Dep. 36:10–37:2; *see id.* at 32:8–24. But his loss of his status as a peace officer was a result of his termination, not the alleged defamation. Accordingly, it cannot support his due process claim. *See Townsend*, 256 F.3d at 670 (the plaintiff must have "suffered a tangible loss of other employment opportunities *as a result of public disclosure*." (emphasis added)).[14]

Loizon also states that he applied for security jobs with Levy Restaurants (who terminated him before he was fired from the APD), and a local school, but was rejected both times because of his bad reputation. Again, Loizon fails to connect these hiring decisions to the defamatory statements published in the *Tribune*. As a threshold matter, Loizon has not properly raised these events because he has not included them in his response to Defendants' statement of facts or his own statement of additional facts. These allegations are therefore not properly before the Court. *See* LR 56.1(b)(3)(C); *Allen-Noll v. Madison Area Tech. Coll.*, 969 F.3d 343, 349 (7th Cir. 2020) (district courts may require "exact compliance" with the summary judgment rules); *Cichon v. Exelon Generation Co., L.L.C.*, 401 F.3d 803, 809–10 (7th Cir. 2005)

---

[14]    In his response to Defendants' statement of facts, Loizon argues that the real reason that Blue Star terminated him was that he left the APD without "good standing." Pl.'s Resp. DSOF ¶ 111. Even granting Loizon the inference that "good standing" refers to his public reputation, Loizon's assertion amounts to little more than conjecture because he does not provide a foundation for his knowledge of the basis for his termination, nor does he offer any testimony or affidavits from Blue Star personnel. *See* Loizon Dep. at 32:13–24 (stating his belief that Blue Star would have retained him "[i]f [he] [was] to retire with [his] credentials in place, that's okay, in good standing if you will. Unfortunately, I wasn't afforded that opportunity.").

(affirming district court's decision not to consider facts that were not contained in plaintiff's Local Rule 56.1 summary judgment filings).

But, even if the Court were to ignore this procedural defect, Loizon still has not offered admissible evidence to support his claims that Levy and the local school failed to hire him because of Evans's statements. In his deposition, Loizon surmises that Levy failed to rehire him following his dismissal from the APD because Levy told him (in so many words) that his reputation "isn't very good; maybe when you get through this, you could come back and work here, but probably not the best thing publicity-wise for us right now." Loizon Dep. at 32:9–12. As Defendants point out, this statement is outside the scope of Loizon's personal knowledge and is inadmissible hearsay. The same is true of Loizon's claims about the school's reason for not hiring him. *See id.* at 273:18–20 (stating that, when he went "to the local high school to get a job, [he] was told don't bother").[15] Accordingly, these statements cannot support Loizon's due process claim. *See Eaton v. J.H. Findorff & Son, Inc.*, 1 F.4th 508, 512 n.3 (7th Cir. 2021) (refusing to consider, on hearsay grounds, plaintiff's deposition statements that a coworker "told [plaintiff] that there was an opening" when the coworker was not deposed and plaintiff did not produce an affidavit from the coworker).

Given all of these reasons, Defendants' motion for summary judgment as to Loizon's due process claim is granted.

---

[15] Further hurting Loizon's case, Loizon does not provide the names or titles of the people at Levy or the school who told him that his reputation precluded him from employment.

41

### IV.    <u>Conclusion</u>

For the reasons provided above, Defendants' motion is granted, and Loizon's cross-motion is denied.  This case is hereby terminated.

**IT IS SO ORDERED.**                         **ENTERED:  3/28/22**

_____
**John Z. Lee
United States District Judge**